UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIE SANDERS | : | CIVIL ACTION NO. |
| | : | 3:02 cv 498(AWT) |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| FIRELINE, INC. | : | |
| | : | |
| Defendant. | : | JUNE 15, 2006 |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to *Fed.R.Civ.P.* 56, the defendant, Fireline, Inc. ("Defendant" or "Fireline"), through its undersigned counsel, hereby submits this Memorandum of Law in Support of its Motion for Summary Judgment.

**I.   INTRODUCTION**

There being no genuine issue of material fact as to the Defendant's liability in this matter, summary judgment should enter. Connecticut case law is clear that in order for a plaintiff to establish liability under the Connecticut Product Liability Act, Conn. Gen. Stat. § 52-572m et seq., (the "CPLA"), ***the plaintiff must establish causation*** through expert testimony.

In the case at bar, Plaintiff, Willie Sanders ("Plaintiff" or "Sanders"), has utterly failed to proffer any expert testimony pertaining to causation or liability with respect to the alleged deficiencies in the pour cup at issue, the basis for Plaintiff's cause of action against the

Defendant. Tellingly, Plaintiff's only disclosed "liability expert," Michael Shanok ("Shanok"), explicitly testified at his deposition that he ***cannot offer testimony as to a specific cause of the alleged failure of the pour cup***. See Deposition Transcript Part II of Michael Shanok ("Dep. Tr. of Shanok II"), dated April 12, 2004, at 110-111, attached hereto as Exhibit A. Rather, Shanok's opinion as to the alleged failure of the pour cup is a laundry list of five separate and independent hypotheses, not one of which he has attempted to validate through scientific methodology. See Dep. Tr. of Shanok II at 125.

Furthermore, Shanok's opinion as to causation relies heavily on his judgment of Sanders' veracity. Indeed, Shanok's judgment of Sanders' veracity is the only methodology apparent in Shanok's "Report of Opinion" ("Shanok's Report"), attached hereto as Exhibit B. The Second Circuit has ruled that such methodology – expert testimony that relies on the expert's belief in the veracity of the party retaining him – falls *de facto* short of the requirements of the Federal Rules of Evidence for admitting expert testimony, and should thus be excluded. Alternatively, if Shanok's opinion regarding causation does not merely rely on his judgment of Sanders' veracity, then it is only his own *ipse dixit* that connects his data to his conclusions. The Second Circuit has ruled that this "methodology," too, fails the test in the Federal Rules of Evidence for admitting expert testimony.

Consequently, as Plaintiff's only liability expert cannot establish causation, a required element of Plaintiff's case under the CPLA, there is no genuine issue of material fact as to liability, and thus, summary judgment should enter in the Defendant's favor.[1]

## II.  FACTUAL AND PROCEDURAL BACKGROUND

This is a product liability action arising from an incident which allegedly occurred at Ansonia Copper & Brass ("AC&B") on February 23, 1999. AC&B is a foundry, located in Ansonia, Connecticut. AC&B manufactures wire and rods. As part of this process, metal billets, from which the wire and rods are cut, are manufactured by casters at various casting stations.[2]

At the time of the incident, Sanders was a caster, operating Station No. 4. He was in the middle of the casting process, known as a "pour," when he experienced a flash explosion of steam, allegedly caused by the contact of molten metal and water. The pour process involves the pouring of molten metal (melted in a furnace by the caster at the beginning of the pour process) into certain molds, which form the shape of the billets. The molten metal is poured through certain fused silica pour cups, manufactured by Fireline, which then distribute the molten metal through four holes in the bottom of the cups, so that the metal flows up against the walls of the molds, to create the billets. Each pour involves two cups, two molds, and results in two billets.

---

[1] Defendant has also filed a Motion to Preclude Plaintiff from using Shanok as an expert in this matter, based upon his lack of qualifications and opinions and inadequate methodology.
[2] By way of illustration, a billet is a long, solid, metal cylinder, which when completed, looks like a small, metal telephone pole.

As the molds are formed, they are gradually lowered into cooling tanks, which contain water, and which act to cool the molten metal, thereby resulting in the hardening of the metal into the appropriate shape.

Essentially, Plaintiff alleges that during the pour at issue, the bottom portion of one of the cups broke off, thereby causing an improper distribution of the molten metal, which ultimately caused one of the billets to split, causing the molten metal to come into direct contact with the water in the cooling tank. As all casters know, when molten metal and water come into contact, a flash explosion occurs. See Deposition of Sanders at 77, attached hereto as Exhibit C.

Plaintiff commenced this suit in Connecticut Superior Court by way of a Complaint, dated February 19, 2002. On March 21, 2002, the Defendant removed this action to the United States District Court for the District of Connecticut, pursuant to 28 U.S.C. § 1441(a). Plaintiff's *single* cause of action against Fireline sounds in a purported violation of the Connecticut Products Liability Act, Conn. Gen. Stat. § 52-572m et seq. ("CPLA") in that the cup sold by Defendant was allegedly defective and/or unreasonably dangerous to the Plaintiff and that such alleged defect caused Plaintiff's injuries. See Complaint, ¶¶ 4-7. In other words, Plaintiff claims that as a direct and proximate result of the breaking of the cup, he was injured. See Complaint, ¶¶ 4-7.[3]

---

[3] Plaintiff further alleges negligent failure to test/inspect, failure to warn, breach of the warranty of merchantability, and unreasonable risk of injury. There has been no expert testimony offered as to these allegations, except that Plaintiff's Disclosure of Expert Witnesses claims that Shanok will offer expert testimony regarding failure to warn.

On or about April 15, 2002, Defendant filed its Answer and Affirmative Defenses ("Answer & Affirmative Defenses") to Plaintiff's Complaint. In its Answer and Affirmative Defenses, Fireline denied any and all alleged liability.[4]

## III.  THE TESTIMONY OF MICHAEL SHANOK

Michael Shanok, Plaintiff's *only* disclosed liability expert in this matter, has testified under oath, at his deposition, that he is unable to testify as to the cause of the alleged failure of the pour cup. See Dep. Tr. of Shanok II, at 110-111. Specifically, he has testified as follows:

> Q: So, as you sit here today, you can't offer a specific cause of the failure of the pour cup that Mr. Sanders was using on February 23 of 1999; is that correct?
>
> **A: I can't – I cannot offer a specific cause of its failure.**

Instead, Shanok has presented Defendant and the Court with a laundry list of five *possible* causes of this incident. See Shanok Report at ¶9A-E. Despite having provided such a broad array of hypotheses, Shanok has admitted that the cause of the alleged failure of the pour cup *may not even be included in his list*. He testified as follows:

> Q: So, what you're telling us now is those opinions are not finalized?
>
> **A: Well, there are a number of – I say here that I'm of the opinion the failure occurred as a result of one or more of the following defects, the manufacture or design, and without further information which will be produced at the**

---

[4] Defendant also asserted the following five affirmative defenses: (1) Plaintiff's Complaint fails to state a claim upon which relief may be granted; (2) any damages purportedly suffered by Plaintiff were caused by the negligence or other culpable conduct of third parties over which Fireline had no control, and with whom it had no relationship; (3) any damages Plaintiff claims to have suffered were caused by the improper use and operation of the product or by the misuse of the product; (4) any damages Plaintiff claims to have suffered were caused by the alteration, modification, and change of the product by Plaintiff or a third party, and finally that (5) any damages Plaintiff claims to have suffered were caused, in whole or in part, by his own negligence.

> **time that Fireline's expert produces his or her report, I don't have a final opinion as to which one or more of those possible defect causes is going to be my final opinion.**
>
> Q:   If any?
>
> **A:   If any.**

Dep. Tr. of Shanok II, at 100.

As the above-quoted testimony indicates, Shanok's opinion is explicitly not final. Later during the same deposition, he reiterated that point:

> Q:   And you're sitting here now under oath telling me that these opinions aren't finalized; is that correct?
>
> **A:   With respect to the perspective causes of the failure, at this time it would be wrong for me to say they're final opinions.**

## IV.   THE SHANOK REPORT

The Shanok Report contains the details of Shanok's conclusions, as well as the data on which he based the conclusions and, presumably, the methodology by which he connected the data to the conclusions. Shanok's Report claims that Shanok's opinion is based upon the following:

a.   Review of entries regarding AC&B on OSHA's website;

b.   Review of a deposition of, and interviews with, Sanders;

c.   Review of OSHA's case file on its inspection of the incident alleged in Sanders' Complaint (the "OSHA Report");

- 6 -

    d.      Examination of new and used pour cups (not including the one destroyed in the incident alleged in Sanders' Complaint);

    e.      Shanok's visit to AC&B, where he observed and photographed a furnace in operation;

    f.      Shanok's conversations with AC&B Superintendent Joseph Walsh[5]; and

    g.      Shanok's "education, training, background and experience in engineering and safety, including previous employment with and [work as a] consultant to ferrous and non-ferrous industrial employers with foundry facilities."

See Shanok's Report, preliminary statement.

Shanok's Report contains pages from the OSHA Report, See Shanok's Report at "Enclosure #1," which detail OSHA's investigation of the incident, including examination of the facility, interviews with witnesses, testing of the billets involved in the incident alleged in Sanders' Complaint, and OSHA's conclusions. OSHA's testing of the billets was extensive, as reflected in their report. The two billets were cut open in several predetermined locations, compared with one another, measured, acid-etched and polished. OSHA examined the billets' grain, the centering and tightness of the pour, and the composition of the alloy, as well as the stress fractures in the damaged billet.

---

[5] Interestingly, Joseph Walsh testified at his deposition that he was in charge of AC&B's investigation of the Sanders incident, and that he concluded that the incident was caused by operator (Sanders) error. See Walsh Deposition, attached hereto as Exhibit D, at pp.50-52.

OSHA concluded, upon the completion of its investigation, that the incident alleged in Sanders' Complaint was caused by operator error:

> Based on the investigation, it appears that the caster began the shrinking process ([redacted] Statement) for the billets, however, he neglected to turn off the down-cast unit ([redacted] Statement). The billet continues to be lowered into the tank at a rate of approximately 4 inches per minute. The billet had been lowered enough so that when molten metal was introduced into the cooling center, the side walls reheated and did not have the normal support of the mold depth which is 15 inches. The walls of the south billet bulged outward ... finding a weak point in which the molten metal was able to penetrate the billet wall, reaching the outside part of the billet. The molten metal hit the spray ring which caused the contact with the water and thereby caused the violent reaction between the two.

See Shanok's Report at "Enclosure #1," "Conclusion."

Shanok's Report contains several statements that are highly critical of the OSHA Report's conclusions. See Shanok's Report at ¶¶ 5 ("The writer believes that this was an incorrect assumption.") and 7 ("The writer is of the opinion that ... the conclusions which OSHA drew as to how the incident occurred are faulted.").

Shanok's Report instead develops an alternative explanation for the incident, one that involves a) the failure of the pour cup, b) an absence of operator error, and c) a direct causal link between the failure of the pour cup and the flash explosion. See Shanok's Report at ¶¶ 8 and 8 a-g. In developing this alternative explanation, Shanok relies on measurements taken directly from the OSHA report of which he is so highly critical, and on approximate measurements taken for him secondhand by Joseph Walsh, the Mill Superintendent:

> The OSHA accident investigation contained measurements which demonstrated that the breach in the sidewall of the south billet, which allowed molten metal to flow directly into the water bath tank, was eight inches from the top of the billet and that contact of molten metal flow occurred 28 to 29 inches below the top of the north billet. At the writer's request, Mr. Walsh determined that, during the casting process, the bottom of the pour cup is approximately eleven inches above the bottom of the mold, the bottom of the mold is approximately eighteen inches above the surface of the water in the water bath tank and the molds are seven inches apart from one another.

See Shanok's Report at ¶ 8.

If Shanok's sourcing of his data is dubious, his methodology is a mystery. Shanok's Report does not describe any tests he devised to validate his opinion regarding causation. It does not cite any authorities, and contains no calculations other than the addition of two approximate measurements of length. Instead, Shanok's Report contains the bare statement that the measurements he relied on are "consistent with a scenario" that matches his conclusions. See Shanok's Report at ¶ 8. He offers absolutely no scientific or technical reasons for placing his own account, based partially on secondhand, inexact measurements, over that of OSHA's investigators, which is based on extensive testing.

The only reasoning in Shanok's Report that would justify accepting his explanation over that of the OSHA investigators is that he finds the Plaintiff to be credible. Shanok's Report at ¶ 6. His description of the facts contains a string of statements reflecting his reliance on the testimony of Sanders over the conclusions of the OSHA investigators: "OSHA did not believe Mr. Sanders' claim ... [Sanders] adamantly disagrees with OSHA's determination ... He further

disagrees with OSHA's contention ... He further insisted ... He was incredulous ... Mr. Sanders believes ... Mr. Sanders' observation ... ." See Shanok's Report at ¶¶ 5-7. At one point, when faced with a contradiction between Sanders' recollection and OSHA's conclusion, Shanok says of the latter, "The writer believes that this was an incorrect assumption." See Shanok's Report at ¶ 5. In short, the chief factor in Shanok's difficult-to-discern methodology for privileging a conclusion that is "consistent with" his secondhand, inexact measurements – over that of OSHA investigators who have conducted rigorous testing – appears to be his acceptance of the credibility of the party retaining him. In the absence of that explanation, the only remaining reason for Shanok to privilege his conclusion over that of the OSHA investigators is his own *ipse dixit*.

## V.  LAW & ARGUMENT

As demonstrated below, summary judgment in the instant case should enter as there is no genuine issue of material fact as to Defendant's liability, and hence, judgment as a matter of law is appropriate. Connecticut law is clear that in order for a plaintiff to establish liability pursuant to Conn. Gen. Stat. § 52-572m et seq., the plaintiff must establish, through expert testimony, a causal link between the defendant's conduct and the injuries and damages alleged. In the case at bar, the Plaintiff's *only* liability expert has specifically testified that he cannot state what the alleged defect in the pour cup was. He has even admitted that the alleged defect may not have been included in the list of possibilities proposed in the Shanok Report. His opinions regarding causation either rely on his acceptance of Sanders' veracity, or on his own *ipse dixit* – two

"methodologies" explicitly prohibited by the Second Circuit. Plaintiff has presented *no* other testimony or evidence establishing causation or any causal link in this case.[6] Accordingly, summary judgment should enter.

### A.    Standard of Review

Summary judgment is proper only where there is no genuine issue of material fact to be tried on a matter, and the moving party is entitled to summary judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Donahue v. Windsor Locks Board of Fire Comm'rs,* 834 F.2d 54, 57 (2d Cir. 1987). In determining whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 91 L.Ed. 2d 202, 106 S. Ct. 2505 (1986). "The genuine issue aspect of summary judgment procedure requires the parties to bring forward before trial evidentiary facts, or substantial evidence outside of the pleadings, from which material facts alleged in the pleadings can be warrantably inferred." *United Oil Co. v. Urban Redevelopment Comm'n,* 158 Conn. 364, 378-79, 260 A.2d 596 (1969). Indeed, a party may not "rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Zabelle v. Coratolo*, 816 F. Supp. 115, 119 (D. Conn. 1993); see also *Hildabrand v.*

---

[6] As is stated in Defendant's Motion to Preclude, Shanok should be precluded from performing any further testing in this case, as Plaintiff's deadline for disclosing a final expert opinion, pursuant to *Fed.R.Civ.P.* 26(a)(2)(B) was, at the very latest, May 3, 2006 – this deadline passed much earlier under the various scheduling orders that have been in place throughout the 4+ year pendency of this case. Defendant has invested a great deal of time and expense to learn and fully understand Shanok's opinion, and to allow further analysis by Shanok would mean that Defendant would have to incur additional expenses, including re-deposing Shanok, which would be highly prejudicial to Defendant.

*Diffeo P'ship, Inc.,* 89 F. Supp. 202, 205 (D. Conn. 2000) ("[I]f a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate").

    **B.    Summary Judgment in the Instant Case Should Enter as There is no Issue of Material Fact as to the Defendant's Liability.**

        **1.    Connecticut Law Requires The Presentation of Expert Testimony on the Issue of Causation Pursuant to the Product Liability Act.**

It is axiomatic that under Connecticut's product liability statute, "the plaintiff must plead and prove that the product was defective and that the defect was the proximate cause of the plaintiff's injuries." Haesche v. Kissner, 229 Conn. 213, 218 (1994), quoting Wierzbicki v. W.W. Grainger, Inc., 20 Conn. App. 332, 334 (1989).

In Gold v. Dalkon Shield Claimants Trust, 1998 U.S. Dist. LEXIS 22413 at *5 (D. Conn. 1998)(Burns, J.)(attached hereto as Exh. E), the plaintiff brought suit against the defendant pursuant to the Connecticut Product Liability Act based on injuries she allegedly received in using the Dalkon Shield, an allegedly defective product manufactured and sold by the defendant. See id., at *6. The defendant subsequently moved for summary judgment based on the plaintiff's failure to establish, through expert testimony, a causal link between any claimed defect in the Dalkon Shield and her alleged injuries. Id. at *7. The District Court for the District of Connecticut stated that the dispositive issue on a motion for summary judgment pursuant to the CPLA was whether "a reasonable jury could find that the plaintiff has met her burden of proof as to causation without the benefit of expert testimony." Id. at *8. The court held that expert

testimony *is required* to establish causation under the CPLA, and accordingly, granted summary judgment in the defendant's favor. It provided:

> To meet her burden of proof as to cause in fact, the plaintiff must establish a causal link between a defect in the Dalkon Shield and her claimed injuries. Specifically, **she must demonstrate that it is more probable than not that a defective tail string in the Dalkon Shield caused her to contract [her illness]** which then led to her infertility. The plaintiff cannot make this showing from articles and clinical studies which conclude that a defective tail string in the Dalkon Shield tends to cause PID which often leads to infertility. **She must prove by a preponderance of the evidence that this series of events that she alleges actually occurred in her case. The Court finds that expert medical testimony is the sole means by which she can carry this burden of proof.**

Id. at **9-10 (emphases added).

The court went even further by stating:

> Even assuming that the plaintiff can show that the Dalkon Shield was defective and that she suffered the injuries she claims, **without a proffer of expert medical testimony as to causation to link the defect to the injury, a reasonable jury could not find that the plaintiff has proved that the defect caused her specific injuries. She, therefore, fails to demonstrate the existence of a triable issue of fact to go to a jury. Given the absence of evidence to prove the plaintiff's case, the defendant trust is entitled to summary judgment.**

(citations omitted). Id. at *10; see also Hunter v. Mazda of Milford, No. CV 980350686S, 1999 Conn. Super. LEXIS 695, at *9 (Conn. Super. Ct. Mar. 2, 1999) (Skolnick, J.) (stating that "evidence of a malfunction itself is not enough to sustain a claim under the Products Liability Act without showing that the defect existed at the time of sale.") (attached hereto as Exh. F); Aspiazu v. Orgera, 535 A.2d 338, 342 (Conn. 1987) (finding that under certain circumstances, expert testimony is required); Fane v. Zimmer, 927 F.2d 124, 131 (2d Cir. 1991) (affirming trial court's directed verdict for defendant in a product liability case because, absent medical

testimony on the issue of causation, the plaintiffs could not prove the elements of strict liability or negligence); see, e.g., Fitzgerald v. Manning, 679 F.2d 341, 351 (4th Cir. 1982) (finding that "only if the opinion evidence on causation, as offered by the plaintiff, rises to the level of a reasonable degree of medical certainty that it was more likely that the defendant's negligence was the cause than any other cause, is there sufficient evidence on causation to permit jury submission on causation.").

The District Court, in Gold, further found that "***expert testimony is required when the factual content of the underlying issues is not found within the laypersons' common knowledge and experience.***" (emphasis added). Gold, 1998 U.S. Dist. LEXIS 22413, at *8.

    **2.**    **Absent a Proffer of Expert Liability Testimony Causally Linking the Alleged Defect in the Fireline Pour Cup to the Plaintiff's Claimed Injuries, a Reasonable Finder of Fact Could not Determine that the Plaintiff has Established, by a Preponderance of the Evidence, that the claimed Defect Caused his Injuries; Accordingly, Defendant is Entitled to Judgment as a Matter of Law.**

As outlined more fully in the Motion to Preclude Proffered Expert Testimony of Michael Shanok Pursuant to Federal Rule of Evidence 702 and Daubert (Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993)), filed contemporaneously with this Motion, Shanok's Report exhibits a methodology that falls short of any standard that this Court can allow.

Federal Rule of Evidence 702 governs the admissibility of expert testimony. The Supreme Court, in its Daubert decision, established a two-pronged standard requiring the district

courts, pursuant to Fed. R. Evid. 104(a),[7] to act in a "gate-keeping" role in determining whether the proffered expert testimony is both *reliable and relevant*. Relevant discussion of the Daubert rule can be found in the Second Circuit's decision of Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005): "[T]he Supreme Court has ... stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [the] methodology and the expert's conclusions." Nimely, 414 F.3d at 396. " '[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.' " Id, quoting, General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). In Nimely, the Second Circuit vacated the Eastern District of New York's admission of the testimony of a medical expert. While the Court allowed that the expert's opinion may have been predicated to a degree on genuine expertise and experience, the expert's opinion also depended on the expert's conclusions about the credibility of the parties retaining him. "That such a 'methodology' could not even begin to satisfy any of Daubert's criteria for assessing the scientific reliability of an opinion, see Daubert, 509 U.S. at 593-94, 113 S.Ct. 2876, only scratches the surface of its shortcomings." Id. at 399.

As illustrated above, Shanok's Report is replete with conclusory statements about Sanders' veracity. Indeed, his whole argument is built, step by step, on allegations that Shanok preferred Sanders' account to that of the OSHA investigators, or the bare statements that Sanders

---

[7] Pursuant to Fed. R. Evid. 104(a), "preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court. . . . " *Fed. R. Evid.* 104(a).

disagreed with OSHA's findings. If this Court does not find that Shanok's methodology relied on his judgment of Sanders' veracity, then there is no other methodology exhibited in Shanok's report to justify weighing his conclusions over those of OSHA, except for Shanok's own *ipse dixit*. Such a methodology is also explicitly rejected by Nimely.

As such, under the holding in Nimely, Shanok's testimony as to causation is *de facto* inadmissible. Plaintiff has disclosed no other liability expert and is too late to produce another one.[8] Absent expert testimony establishing a causal link between the claimed defect and the Plaintiffs' injuries, a reasonable finder of fact could not conclude that Defendant is liable pursuant to the CPLA. Accordingly, there is no genuine issue of material fact as to the Defendant's liability in this case, and thus, judgment should enter as a matter of law.

## VI. CONCLUSION

WHEREFORE, based on the foregoing reasons, this Court should enter an order granting summary judgment in favor of Defendant, Fireline, Inc.

---

[8] *See* Defendant's Motion to Preclude Proffered Expert Testimony of Michael Shanok, filed contemporaneously herewith.

THE DEFENDANT
FIRELINE, INC.

By_____
Mark B. Seiger, Esq.
Fed. Bar No. ct 05580
Charles F. Gfeller, Esq.
Fed. Bar No. ct 18119
EDWARDS ANGELL PALMER
& DODGE LLP
90 State House Square
Hartford, Connecticut 06103
(860) 525-5065
Telecopy (860) 527-4198

## CERTIFICATION

      This is to certify that on the 15th day of June, 2006, a copy of the foregoing has been mailed via First Class U.S. Mail, postage pre-paid, to:

Robert J. Sweeney, Esq.
Early, Ludwick & Sweeney
One Century Tower
265 Church Street, 11th Floor
PO Box 1866
New Haven, CT 06508

Timothy D. Ward, Esq.
McGann, Bartlett & Brown
281 Hartford Turnpike # 401
Vernon, CT 06066



Charles F. Gfeller

HFD_164544_4/JGEOGHEGAN