**Report of Opinion #03071**
July 28, 2003,  Page 16

### Enclosures

a. Excerpt from OSHA Inspection Report

b. Photographs taken by OSHA during its investigation

c. Deposition transcript of Willie Sanders

d. Photos of exemplar pour cups

e. C.V. of Michael E. Shanok, PE

f. List of testimony by Michael E. Shanok, PE at trials, depositions and hearings from July 28, 1999, to July 28, 2003

g. List of materials published by Michael E. Shanok, PE between July of 1993 and the present

g. Fee schedule for Michael E. Shanok, PE

forensic engineering

limited to: Skimming, Charging and Pouring, workers must also wear half face respirators, aluminized full length coats and face shields. Aluminized coats are optional during the warmer weather, although management is presently exploring options such as cooling vests in order to make these coats mandatory.

The operation involved ... ...  ... direct chill (also called semi-continuous) process which is the melting of the Copper ... this mixture is created and the amount necessary to m... located at the rear of the furnace. The alloy is t... e it is melted at a temperature of 1200 degrees Celsius. Once the entire contents is melted, impurities are "Skimmed" off the top, and a sample is taken and sent to the lab (onsite) for analysis (called Sampling). When the lab determines the mixtures is correct, they release it and the caster begins pouring the molten metal at a prescribed downcast rate of 4 inches per minute. Completed billets measure 130 inches long by 13.5 inches in diameter.

Enclosure #1
Excerpt from OSHA Report

The caster achieves this pour by tilting the furnace forward so the molten metal pours into a "Running Box". This box is "T" shaped with holes on either end of the horizontal portion. These holes are directly above their respective billet molding unit. The metal is poured into the running box where it flows through the holes and onto "Cups" (ceramic unit with holes at the bottom of the unit which directs the metal towards the sides of the mold). The cups are controlled by "Screw Downs" located on either side of the mold tank. The screw downs control the amount of metal allowed into the cups. The base of the mold is located on the "Plenum" on which the base of the billet sits during the pour. The plenum is controlled with a hydraulic lift, which moves the mold up to the top of the mold tank, then as metal is poured, the plenum moves downward to the desired length of 130 inches.

The mold unit is cooled with a "Water Ring" located on the outside of the mold (it does not come in contact with the molten metal). As a result of the cooling, the metal is cooled from the outside in. This causes the billet to create it's own walls. The base unit is dropped (downcast) as the continues to be poured in. The cups causes the metal to be directed to the sides so the wall continues to solidify before the center of the billet. This entire process normally takes between 25-35 minutes, depending on the alloy being poured and it's prescribed downcast rate.

At the end of the pour, the billet has about a 12 inch section at the top of the billet where the outer wall has reached the desired length, but the center has not. The process to fill this void is known as the "Shrinking" process. The caster first waits for about ten (10) minutes, and then pour small amounts of metal into the billet until the center is filled. This process is used to minimize waste, even though waste can easily be remelted.

According to management, furnace #4 (involved in the accident) had been checked out and placed back in service sometime on the second shift the day following the accident. The molds had also been taken out of service, and were placed on a pallet, to be held in the wood shop pending the outcome of the investigation. The billets were marked and placed in the Metal Storage Department pending testing to be performed in the next few days.

ACCIDENT INVESTIGATION

The investigation of the accident was begun, when the facility was re-entered. At that time, the #4 furnace was observed in operation. According to management, the furnace (involved in the accident) had been checked out and placed back in service sometime on the second shift the following day. The molds and 7c personal protective equipment had been removed from service as well and were placed on a pallet, to be held in the wood shop pending the outcome of the investigation. (NOTE: Although the Wood shop is remotely located with respect to the Casting Department, no chain of custody or other security measures was maintained for either the molds or the ppe). Also, the two billets were marked and placed in Metal Storage pending testing to be done in the next few days.

The first priority in this inspection was the investigation of the accident. Several days were required to conduct initial interviews and take statements (March 3rd-16th). Interviews were conducted in the following order;

        7c     , Casting Department Superintendent

        7c     Caster Furnace #21/Injured Worker (At his Home)

        7c     , Electronic Technician

        7c     , Union President/Electrician

        7c     Caster Furnace #4
                    Casting Department Foreman
                      Casting Department, General Foreman

Tuesday, March 9th-  General Mechanic
                     e R.N., Company Nurse
                     , Caster Furnace #6
                     Metal Storage Department Foreman
                     aster Furnace #23
                     Caster Furnace #22
                     General Mechanic

Thursday, March 11th- 7c , Electrician Leadman
                     - General Mechanic
                     r- Rod Mill Operator/Safety Committee Member

## FINDINGS

### Preceding Events

- On the day of the accident, . 7c furnace (#21) was out of service since the previous shift. When he arrived to work, he was informed of this and immediately assigned to the utility job and was told that 7c had to go to the company doctor that morning and he would be taking over #4 while 7c was gone. 7c was the regular operator of Furnace #4.

- 7c states he began the pour at 5 and 7c took over at 5 am so he could go to the company doctor. Both men indicate there were no problems at this time.

### Time

- Security reports show the initial call from the Casting Department (500 Line) came in at 5 , as was the initial 911 call for the ambulance. The report also notes there was a one to two minute time lapse between the explosion and the call to security.

- Allegations were made regarding excessive time, from initiating the "911" call to the time it took for the company nurse to arrive (forty-five minutes because she was lost in another part of the mill). Security records indicate the initial call for help was made within one or two minutes of the explosion, the "911" call was made immediately following that call and that security transported the company nurse within four minutes of the first call, from the Medical department where she and the company doctor were holding clinic and had seen just moments before. The first of two ambulances arrived within ten minutes and the second ambulance (Paramedic Intercept) seven minutes later.

- The length of the billets (100.5 and 99 inches) at a rate of 4 inches per minute per interviews with both casters. Immediately following the explosion, 7c who was first on scene, indicates he found the down-cast speed indicator at 4.16 inches per minute.

- The noted speed of down-cast and billet's length indicates the pour had been going on for at least 24 minutes. This along with the first call made at 5 (and subsequent note regarding lapse time) indicates the start of the pour was initiated within two or three minutes of the reported 8:50 am start time. 7c indicates that the furnace (contents) look small to him, leading him to believe that he did not have enough to make full billets. Subsequent to the accident, the contents were poured into a pot. Per 7c the pot contents were observed and that judgement was probably okay in that it would have been very close.

- An allegation was made that the "Shrink process" had begun when the incident occurred, however, the statement of 7c who was first on scene immediately following the explosion, indicates that he stopped the down cast and tilted the furnace back to it's upright position. The investigation of all the systems, found no problems consistent with this allegation.

### Pour

- 7c started the pour prior to being relieved by 7c Interviews indicate there were no problems during the pour and 7- did not have to take any corrective measures while he was pouring. The level of the metal was about an inch from the top of the mold. This is how he normally pours the metal.

### Billets-

- The two billets were observed, photographed and measured. The South billet (involved in the incident) measured 100 inches long, with the interior portion measured to be between 13 1/2 inches deep. An 6 1/2 inch long by 3/4 inch wide opening was observed and measured to be 8 inches from the top of the billet.

- The North billet was measured [●] 99 inches long, with it's interior portion m[●]ured to also be 13 1/2 inches deep. An area on the outside of this billet measured to be 28-29 inches from the top of the billet was observed to have come in contact with molten metal after the outer wall had been formed and cooled.

- The difference in lengths is attributed to the loss of metal through the breached area of the south billet. According to management, both the opening in the south billet and the area of metal on the outside portion of the north billet were determined to face each other at the time of the accident.

Billet Testing

- The billets were taken to the lab for testing to determine whether or not there was a problem in the pour. Both billets were cut so comparisons could be made between billets. Each billet was cut in several predetermined locations (see field notes for diagram) not involving the area that had the hole in it's side. Each piece was acid etched and polished to bring out the grain. It was determined through this testing that the pour was in fact without problems in that the center of the billet was observed to be generally centered (slight drifting in the good or north billet) and non-drifting, the pattern was uniformed and tight, and no impurities were observed. Additional testing will be performed on the damaged portion of the billets to further ensure the nothing was missed.

This testing was reported by management to be unremarkable and provided little additional information. The cuts made in the upper portion of the billet revealed an oblong ring, with several stress fractures on the outside portion of the billet indicating that the molten metal had pushed towards the breached area. Management believes this occurred from one of two conditions. First, there was a "Hot Spot" caused by any number of reasons. Second, there was a malfunction of the cup. In either condition, there is a set protocol for the caster to use. Management also feels that if either condition existed to the point of breaching the wall, then it would be due to the caster not properly watching the pour.

- A post pour alloy analysis was conducted by the company lab. The analysis determined that although the billet started out as a "1450" alloy, it ended up as a "1452" alloy because of excessive Phosphorous. According to management, this is not unusual for an alloy to be reclassified. In this particular instance, both alloys are cast using identical procedures (heat, downcast speed, etc).

Molds

- The molds were inspected after the accident and found to have cooled splattered molten metal on the top section of the mold, consistent with molten metal that is shot straight up in the air and falling directly onto the mold. The only damage noted was to the water ring on the mold unit. No problems with the mold rings were observed, reported or discussed by either caster before or during the pour.

Running Box

- The running box was observed by ⁊ᴄ and ⁊ᴄ ⸜ immediately following the incident. The running box was in an up-side-down position nearly on top of the molds. Mr. ⁊ᴄ indicates that an inspection of the box found no damage and despite allegations of an overflow, there were no visible indications of an overflow on the box's exterior.

Cup

- The cup (South Billet) involved in the accident was unsalvageable according to management and was not available for this investigation. Interviews with both casters indicate the cup was new for that pour, and are not generally a problem with that particular alloy (Other alloys such as 1850 can cause the cup to become brittle).

Mold Tank

- The plenum was removed from the tank and the walls were visually observed both interior and exterior for damage. None was found.

Control Panel

- Following the initial accident investigation of the incident (by management) the "Electronics" were inspected. A small piece of metal was found across two contacts, causing a light to remain lit. This was the only problem found with the electronics. Despite allegations that one arm fell off, and the other was unresponsive, interviews indicate both control arms on the panel were in tact and correctly secured in place and were functioning properly.

Personal Protective Equipment  

- The injured's personal protective equipment (hardhat, face shield, safety glasses, respirator, green fire retardant jacket, aluminized coat, spats, and work boots), except for the green fire retardant pants was collected, placed in a plastic bag and was kept with the molds in the wood shop for later evaluation. The pants are thought to have accompanied the injured to the hospital and have not been seen since. All the remaining equipment was observed and found to be completely covered in lamp black but undamaged as a result of the explosion.

Rescue operation/Ambulance personnel

- Interviews indicate that immediately following the explosion the area surrounding Furnace #4 was completely covered in a cloud of lamp black such that workers could not see directly in front of them even with a flashlight. This cloud did not dissipate for at least several minutes after the explosion. Subsequently when the ambulance crew arrived, they raised significant concerns about the dust and the potential contents and their personal safety. At one point the crew apparently asked to have the injured worker brought out of the area to them.

- An allegation was made by the injured that he was thrown into a dump box located in the general vicinity of the furnace. This box is used to dump the contents out of the running box, and is only used for certain alloys. 1450 is not one that requires the box, although the alloy (182) being pour on Number 6 Furnace did require the box be in the area. The ambulance call report indicates the injured was not thrown.

DETERMINATIONS

- On the morning of the day of the explosion, the injured took over a pour at furnace #4 of a 1450 copper alloy. At that time communication between both men indicated there were no problems with the pour.

- The injured indicated the remainder of the pour was also without problem, except for his feeling that the furnace contents were light, meaning he did not believe he had enough metal to complete a full billet.

- The injured ceased the pour short (at about 100 inches) in favor of beginning the shrinking process. After waiting approximately ten (10) minutes for the center of the billet to cool, he began pouring metal into the running box.

- Shortly after this pour, the explosion occurred.

- ᴧᴗ , General Supervisor of Metal Storage and Casting, was first on scene following the explosion. He found the plenum in the down-cast mode at a rate of 4.16 inches per minute, and the furnace tilted forward. He turned to down-cast off and tilted the furnace back to it's up-right position.

CONCLUSION

- Based on the investigation, it appears that the caster began the shrinking process, ᴧᴗ Statement) for the billets, however, he neglected to turn off the down-cast unit, ᴧᴗ Statement). The billet continued to be lowered into the tank at a rate of approximately 4 inches per minute. The billet had been lowered enough so that when molten metal was introduced into the cooling center, the side walls reheated and did not have the normal support of the mold depth which is 15 inches. The walls of the south billet bulged outward (Photo's Roll 9), finding a weak point in which the molten metal was able to penetrate the billet wall, reaching the outside part of the billet. The molten metal hit the spray ring which caused the contact with the water and thereby caused the violent reaction between the two.

- The company has no written procedures for any of the casting processes, relying on caster experience instead.

- The company did not adequately conduct a Job Hazard analysis of this work and subsequently has no safe guards in place for the possibility of problems due to malfunction of the machinery and/or operator error and/or misjudgment. The company is not adequately prepared for emergencies such as molten metal contacting water.

- The company has inadequate housekeeping requirements for the casting shop. During the event of an explosion, a dust cloud was created and it was determined to have hampered the attempt to find the injured worker and created a source of significant concern for the ambulance crews safety and health.

Enclosure #2
OSHA Photographs





**forensic engineering**
*Accident, fire and failure investigation*

Michael E. Shanok, PE
Gilbert E. Nicholls, PE

100 Hinman Street ■ Cheshire, Connecticut 06410-2546
203-699-9137 ■ Fax: 203-2727512   www.foreng.com

Curriculum Vitae
*Michael E. Shanok, PE*

## Education and background

**Electrical, Mechanical and Structural Engineer**; Principal of a consulting engineering firm in its 27th year of operation, offering accident investigation / analysis / reconstruction, safety auditing and training and emergency trouble-shooting services. More than thirty years of staff and managerial engineering experience including electric utilities, plastics, rubber, ferrous and non-ferrous metal manufacturing industries. Performed assignments in more than half the states of the Union and four foreign countries.

- **B.S. - U.S. Naval Academy, 1960**; Mechanical/Electrical Engineering & Naval Science
- More than 2,500 hours of continuing education in engineering, advanced mathematics, safety, computer science, fire cause & origin analysis, motor vehicle accident reconstruction.
- **Registered Professional Engineer**, Connecticut and Massachusetts
- Trained and accredited by OSHA as an **Authorized Outreach instructor** for general industry and construction safety
- Accredited by CT Dept. Of Education and the American Institute of Architects as a **provider of Continuing Education Units** (CEU's) for safety training.
- American Society of Safety Engineers 1989 Region XI (New England/Eastern New York state) **"Safety Professional of the Year"**

## Previous Positions

1972 - 1973:   Senior Engineer, Services & Utilities, **General Products div. B.F. Goodrich Co.**, Shelton, CT.

1970 - 1972:   Plant Engineer, Brass Rolling Mill, div. **The Miller Co.**, Meriden, CT.

1967 - 1970:   Project Manager, **Farrel Co., div. USM**, Process Engineering Div., Ansonia, CT.

1965 - 1966:   Electric generating station Asst. Supervisor, **United Illuminating Co.**, Bridgeport, CT.

1960 - 1964:   Line Officer, **U.S. Navy**; Active duty included aviation, MAAG, Cruiser & Destroyer billets (Ready Reservist following active duty, until June, 1990)

## Experience

Industrial manufacturing process layout, mechanical, electrical & structural design, project management; Supervision of industrial operations, safety, troubleshooting, maintenance and repair; Construction supervision/management and new facility startup; Air, water and noise pollution control; Hazardous materials and waste management; Construction and general industry OSHA compliance; Fire loss cause and origin analysis; Fuel and explosive engineering & safety; Energy management and conservation; Instructor for safety, computer programming and energy management continuing education programs.

## Professional Activities

**National Society of Professional Engineers** Past President New Haven, CT Chapter • **American Society for Testing & Materials** Former First Vice-Chairman and currently a member of E-34 Main Committee on Occupational Health & Safety, member Committee F-8 on Sports Equipment and Facilities • **Society of Automotive Engineers** former Transportation Section Chairman, So. New England Section • **American Society of Safety Engineers** former National Delegate • **American National Standards Institute** Served on various standards-writing committees • **American Arbitration Association** served in four arbitrations • **National Safety Council** • **National Fire Protection Association** • **National Association of Professional Accident Reconstruction Specialists** • Affiliate of **Building Officials and Code Administrators, International** • Session Chairman for two national engineering Conferences • Authored numerous trade journal articles on safety and engineering subjects • Contributing editor to *Safety Management* newsletter (Aspen Publishers) and two technical handbooks published by the American Society of Safety Engineers, *ASSE Safety Refresher Guide* and *Risk Management Correspondence Course* • OSHA trained and authorized Outreach Safety seminar instructor • Lectured to numerous business, civic and professional clubs and organizations.

## Automotive Background

Former motocross and formula auto competition driver and maintenance crewman. • training includes: accident analysis/reconstruction; defensive driving; gasoline, diesel and gas turbine engine and transmission design & technology and developmental testing of wankel and gas turbine automotive engines, hydraulic, air, mechanical and electronic anti-lock (ABS) brake system design & technology for trucks and automobiles; occupant seat belt and air-bag (SRS) restraint design and occupant kinematics during a collision; diesel truck operation and mechanics. • Previous military and industrial duties included responsibility for fleet auto and truck maintenance and training; Conducted many auto, truck, motorcycle and off-road accident reconstruction/analysis assignments. • Performed large scale motorcycle safety evaluations while on active duty training at U.S. Naval Safety Center • Participated in and managed design and start-up of a number of automotive tire manufacturing facilities.

Rev 2/03



forensic engineering

Testimony by Michael E. Shanok, PE at trials,
hearings and depositions, from 7/28/99 to 7/28/03

| Date | Job # | Client | Assignment | Docket # | T/D/H |
|---|---|---|---|---|---|
| 7/30/1999 | 99168 | Lasala Walsh & Wicklow | Vece / Stop & Shop | CV-95-0374678 S | D |
| 8/12/1999 | 97164 | Bercury McCarthy & Blake | Bonessi / Ford | 397CV02256(JBA) | D |
| 9/1/1999 | 96025 | Spodnick | Walsh / Elrac | CV-97-0340743 S | D |
| 9/7/1999 | 99167 | Furey & Donovan | Simmonds / Metro Taxi (Muhamed) | CV-95-0371681 S | H |
| 9/9/1999 | 98200 | Suisman Shapiro | Wagner / Clark | CV-91-0115288 S | T |
| 9/29/1999 | 99188 | Adelman Hirsch | Griffin / Stokes | CV-95-0326237-S | D |
| 10/5/1999 | 97057 | Philpot | Caesar / General Motors | CV-95-0555472 S | D |
| 10/27/1999 | 98213 | Sack Spector | Lanzieri / Sylvan | 3:98CV2535(JBA) | D |
| 12/28/1999 | 95199 | Harrington & Forgione | BAC / Blakeslee Prestress | CV98-0407564 S | D |
| 1/14/2000 | 97165 | Harrington & Forgione | Warren / Blakeslee | CV 98-0145401 S | T |
| 1/19/2000 | 96217 | Wiggin & Dana | Weissman / Norwalk Tech. College | CT-17176 | H |
| 1/20/2000 | 97217 | Cohen & Kessler | Pickell / AWD and DiVivo | CV-95-0320063-S | T |
| 3/22/2000 | 97213 | Mulroney | Laracuente / Stennett | CV-98-0356319 S | D |
| 3/23/2000 | 99043 | Updike Kelly | Petrozzi / Ensign - Bickford | CV-97-0574903 S | D |
|  | 99226 | Crosby | Sobieraj / Hirtle-Burns | CV-97-0082842 S | D |
| 3/24/2000 | 98114 | Kerin & Canty | Janssen / Navistar | 399CV00356 (JCH) | D |
| 4/12/2000 | 99226 | Crosby | Sobieraj / Hirtle-Burns | CV-97-0082842-S | T |
| 4/19/2000 | MM084 | Cleary | Hayward / Johnson & Johnson | CV-98-0491281 S | D |
| 5/19/2000 | 99035 | Zagorsky | Buffing / Estlay | CV-00-0069096 | D |
| 6/2/2000 | 98018 | Jacobs & Jacobs | Nassimos / Pierce-Correll | CV-98-0263066 S | D |
|  | 99218 | Cleary | Clady / Clark | CV 99-0078614 S | D |
| 6/6/2000 | 99038 | Tyler Cooper | Errato / Omni Hotel | CV-99-0432705 S | D |
| 7/6/2000 | 96115 | Casper & De Toledo | Signore / Milford Ice | CV 96-0154254 | T |
| 7/7/2000 | 94083 | Moses | Hayward / Pontiac | 19142.97T(NY) | T |
| 10/5/2000 | 97047 | Cohan & Kulawitz | Hennessey / Travelers | CV 98-0332786 S | D |
|  | 98117 | Schlessinger & Barbara | Mazzacco / Hudson; Gould | CV 99-0362760 S | D |
| 10/24/2000 | 99265 | Silver | Pernal / Pero | CV-99-0430432-S | D |
| 11/9/2000 | 97011 | Shasha Law Office | McCarthy / Daniels | CV 97-05416355 | D |
| 12/8/2000 | 99080 | Farrell, M | Leary / Lojack | CV 97-0402978 S | D |
| 1/17/2001 | 97127 | Kinney & Secola | Shandrowski / CT | CV 94-0313509 S | D |
| 1/18/2001 | 95199 | Harrington & Forgione | BAC / Blakeslee Prestress | CV 98-0407564 S | H |
| 2/1/2001 | 99204 | Sack Spector | Talbot / Exl. | 3:00CV0801 (GLG) | D |
| 2/26/2001 | 97077 | Rodie & Connolly | Payne / Perry | CV 98-0351626 S | D |
| 4/13/2001 | 99203 | Carrano | Grillo / Sanzari | CV-00-0270699-S | D |
| 4/16/2001 | 98098 | Tremont | Mercurio / McDonald's | CV-98-0419571-S | T |
| 4/25/2001 | MM127 | Fogarty Cohen | Cypher / Doorly | CV-99-0336527-S | D |
| 4/30/2001 | 99253 | Merly | Pomianowski / Heck | CV-98-0352331-S | D |
| 5/3/2001 | 99253 | Merly | Pomianowski / Heck | CV-98-0352331-S | D |
| 5/9/2001 | 99265 | Silver | Pernal / Pero | CV-99-0430432-S | D |
| 6/5/2001 | 97034 | Watstein | Fregeau / Dresser | CV-98-049065-S | D |
| 6/8/2001 | 99219 | Mihaly | Ramierz / International Beauty Design, Inc. | CV-99-0360767-S | D |
| 6/13/2001 | 97034 | Watstein | Fregeau / Dresser | CV-98-049065-S | D |
| 6/25/2001 | MM164 | Walsh | Murano / Kanakis | CV-99-0267609-S | H |
| 7/10/2001 | 98002 | Turney | Haydu / Wang | CV-96-0054777-S | D |
| 8/23/2001 | 01026 | Ouellette Deganis | Kahn / Makita | 300CV1696(DJS) | D |
| 9/1/2001 | 97077 | Yudkin Young | Wakeman / Snow | CV-96-0389092S | D |

Page 1

Testimony by Michael E. Shanok, PE at trials,
hearings and depositions, from 7/28/99 to 7/28/03

| Date | Job # | Client | Assignment | Docket # | T/D/H |
|---|---|---|---|---|---|
| 7/11/2003 | 02129 | Morrison Mahoney | Shelby Ins. / Penn Warehouse | CV-00-0073836-S | T |

Page 3

## Listing of publications and lectures by Michael E. Shanok, PE subsequent to July, 1993

*Practical Mathematics* section of **Certified Safety Professional Exam Refresher Guide**, American Society of Safety Engineers, 1991 & 1994 editions

**OSHA Safety Regulations for Confined Spaces**, Presentation to ASSE Professional Development Conference, 6/94

*Practical Mathematics* section of **Certified Risk Manager's Exam Preparation Guide**, American Society of Safety Engineers, 1995 edition

**Three-day General Industry Safety & Health Training**, a 16-hour training program which has been presented approximately twice annually, between 1988 and 1996

**OSHA Construction Industry Outreach**, a 10-hour training program which has been presented approximately three times annually, since 1992

**OSHA General Industry Outreach**, a 10-hour training program which has been presented approximately four times annually, since 1993

**How to Supercharge Your Safety Committee,** a six-hour training program which has been presented three times annually, since 1998

**OSHA Laboratory Chemical Safety Standard**, an Internet training program, comparable to a 10-hour seminar, which opened on October 10, 1999 by the University of Toledo, in cooperation with UOL Publishing and ConnSafe

**Preventing Violence in the Workplace**, a three-hour seminar based upon NIOSH research and OSHA doctrine, first presented in May, 1999

**Home Office Workplace Safety**, a five-hour seminar on home office safety issues, presented to employers of telecommuting employees, June, 2000

**Motivating Supervisors**, *Safety Management* (a monthly newsletter published by the Bureau of Business Practice), February, 1999

**OSHA's Proposed Ergonomics Standard** , *CT Business Magazine*, Dec, 2000













