UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIE SANDERS | : | CIVIL ACTION NO. |
| | : | 3:02 cv 498(AWT) |
| Plaintiff, | : | |
| | : | |
| VS. | : | |
| | : | |
| FIRELINE, INC. | : | |
| | : | |
| Defendant. | : | JUNE 15, 2006 |

### DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE PROFFERED EXPERT TESTIMONY OF MICHAEL SHANOK PURSUANT TO FEDERAL RULE OF EVIDENCE 702 AND *DAUBERT*

I.  **PRELIMINARY STATEMENT**

The Defendant, Fireline, Inc. ("Defendant" or "Fireline"), through its undersigned counsel, respectfully requests this Court to preclude the Plaintiff, Willie Sanders ("Plaintiff" or "Sanders"), from introducing at trial the proffered expert testimony of Michael Shanok ("Shanok") pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ("*Daubert*"). Specifically, but not by way of limitation, Defendant avers that: (1) Shanok is not qualified to render expert testimony regarding the design of the fused silica pour cup at issue; (2) he has not reached a final opinion regarding the alleged defect in the pour cup; (3) his opinions regarding causation are based on data and methodology inadequate to support the conclusions reached; and (4) his opinions regarding causation do not exhibit a sufficiently rigorous analytical connection to his methodology; rather, it is only Shanok's *ipse*

*dixit* that connects his conclusions to his methodology. Accordingly, Shanok's proffered expert testimony is not relevant or reliable, and thus, should be excluded. Moreover, Shanok should not be afforded any further opportunity to conduct testing or any further analysis in this matter.[1]

## II. BACKGROUND

This is a product liability case arising from an incident, which allegedly occurred at Ansonia Copper & Brass ("AC&B") on February 23, 1999. AC&B is a foundry, located in Ansonia, Connecticut. AC&B manufactures wire and rods. As part of this process, metal billets, from which the wire and rods are cut, are manufactured by casters at various casting stations.[2]

At the time of the incident, Sanders was a caster, operating Station No. 4. He was in the middle of the casting process, known as a "pour," when he experienced a flash explosion of steam, allegedly caused by the contact of molten metal and water. The pour process involves the pouring of molten metal (melted in a furnace by the caster at the beginning of the pour process) into certain molds, which form the shape of the billets. The molten metal is poured through certain fused silica pour cups, manufactured by Fireline, which then distribute the molten metal through four holes in the bottom of the cups, so that the metal flows up against the walls of the

---

[1] The incident at issue occurred over seven years ago. This case has been pending for over four years. Plaintiff's deadline for disclosing an expert was May 3, 2006 – this deadline passed much earlier under the various scheduling orders that have been in place throughout the 4+ year pendency of this case. Defendant has expended significant time and expense to learn and analyze the opinions of Shanok, including the taking of his deposition over two separate days. To allow Shanok or Plaintiff to conduct further analysis, which will then need to be the subject of additional discovery by Defendant would be extremely prejudicial to Defendant at this late stage of this matter. Shanok's "Report of Opinion" was produced pursuant to Fed.R.Civ.P. 26(a)(2)(B), and Defendant had the right to rely on it as a reflection of Shanok's final opinions about this case.

[2] By way of illustration, a billet is a long, solid, metal cylinder, which when completed, looks like a small, metal telephone pole.

- 2 -

HFD_164736_4/JGEOGHEGAN

molds, to create the billets. Each pour involves two cups, two molds, and results in two billets. As the molds are formed, they are gradually lowered into cooling tanks, which contain water, and which act to cool the molten metal, thereby resulting in the hardening of the metal into the appropriate shape.

Essentially, Plaintiff alleges that during the pour at issue, the bottom portion of one of the cups broke off, thereby causing an improper distribution of the molten metal, which ultimately caused the south billet to swell and break, causing the molten metal to come into direct contact with the water in the cooling tank. As all casters know, when molten metal and water come into contact, a flash explosion occurs. See Deposition of Sanders at 77, attached hereto as Exhibit A.

Plaintiff commenced this suit in Connecticut Superior Court by way of a Complaint, dated February 19, 2002. On March 21, 2002, the Defendant removed this action to the United States District Court for the District of Connecticut, pursuant to 28 U.S.C. § 1441(a). Plaintiff's *single* cause of action against Fireline sounds in a purported violation of the Connecticut Products Liability Act, Conn. Gen. Stat. § 52-572m et seq. ("CPLA") in that the cup sold by Defendant was allegedly defective and/or unreasonably dangerous to the Plaintiff and that such alleged defect caused Plaintiff's injuries. See Complaint, ¶¶ 4-7. In other words, Plaintiff claims

that as a direct and proximate result of the breaking of the cup, he was injured. See Complaint, ¶¶ 4-7.[3]

On or about April 15, 2002, Defendant filed its Answer and Affirmative Defenses ("Answer & Affirmative Defenses") to Plaintiff's Complaint. In its Answer and Affirmative Defenses, Fireline denied any and all alleged liability.[4]

Plaintiffs have disclosed Michael Shanok as their sole liability expert in this case. See Exhibit B, Disclosure of Expert Witnesses, dated December 30, 2002, attached hereto. According to the Disclosure of Expert Witnesses, Shanok will testify as follows:

> Mr. Shanok will testify concerning his examination of a mold/cup which is the subject of this lawsuit. He will testify concerning the crack or cracks which the mold/cup developed. He will testify as to how these crack(s) contributed to the events which resulted in the plaintiff's injuries. He will testify that the mold/cup was not adequate and safe for its intended use and was defectively designed and/or manufactured. He will further testify that any warnings and instructions for the use of the mold/cup were defective.

See Exhibit B.

---

[3] Plaintiff further alleges negligent failure to test/inspect, failure to warn, breach of the warranty of merchantability, and unreasonable risk of injury. There has been no expert testimony offered as to these allegations, except that Plaintiff's Disclosure of Expert Witnesses claims that Shanok will offer expert testimony regarding failure to warn.

[4] Defendant also asserted the following five affirmative defenses: (1) Plaintiffs' Complaint fails to state a claim upon which relief may be granted; (2) any damages purportedly suffered by Plaintiffs were caused by the negligence or other culpable conduct of third parties over which Fireline had no control, and with whom it had no relationship; (3) any damages Plaintiffs claim to have suffered were caused by the improper use and operation of the product or by the misuse of the product; (4) any damages Plaintiffs claim to have suffered were caused by the alteration, modification, and change of the product by Plaintiffs or a third party, and finally that (5) any damages Plaintiffs claim to have suffered were caused, in whole or in part, by their own negligence.

Moreover, per the requirements of Fed.R.Civ.P. 26(a)(2)(B), Plaintiffs have offered Shanok's "Report of Opinion" ("Shanok's Report"), dated July 28, 2003, attached hereto as Exhibit C, as further evidence of Shanok's opinions. Shanok's Report claims that Shanok's opinion is based upon the following:

    a. Review of entries regarding AC&B on OSHA's website;

    b. Review of a deposition of, and interviews with, Sanders;

    c. Review of OSHA's case file on its inspection of the incident alleged in Sanders' Complaint (the "OSHA Report");

    d. Examination of new and used pour cups (not including the one destroyed in the incident alleged in Sanders' Complaint);

    e. Shanok's visit to AC&B, where he observed and photographed a furnace in operation;

    f. Shanok's conversations with AC&B Superintendent Joseph Walsh; and

    g. Shanok's "education, training, background and experience in engineering and safety, including previous employment with and [work as a] consultant to ferrous and non-ferrous industrial employers with foundry facilities."

See Shanok's Report, preliminary statement.

Shanok's Report lists five separate hypotheses regarding the alleged defect in the pour cup that led to its alleged failure. See Shanok's Report at ¶ 9 a-e. Shanok also admits, at ¶ 9, that he cannot say with any certainty whether the actual defect is any one, or more than one, of

his hypotheses. During deposition, Shanok admitted the following, all relevant to his offered expert opinion regarding the alleged defect in the pour cup: 1) he is not an expert in ceramics[5]; 2) he cannot identify which, *if any*, of his five hypotheses is the correct one[6]; 3) he has done absolutely nothing to test his hypotheses[7]; and 4) he cannot say he has reached a final conclusion regarding the alleged defect.[8]

Shanok's Report contains pages from the OSHA Report, See Shanok's Report at "Enclosure #1," which detail OSHA's investigation of the incident, including examination of the facility, interviews with witnesses, testing of the billets involved in the incident alleged in Sanders' Complaint, and OSHA's conclusions. OSHA's testing of the billets was extensive, as

---

[5]    Q: Are you an expert in ceramic engineering?
       **A: The answer is I would not hold myself out as an expert in ceramic engineering.**
See Deposition Transcript Part I of Michael Shanok ("Dep. Tr. of Shanok I"), dated August 11, 2003, at 71, attached hereto as Exhibit D.

[6]    Q:    So, what you're telling us now is those opinions are not finalized?
       A:    **Well, there are a number of – I say here that I'm of the opinion the failure occurred as a result of one or more of the following defects, the manufacture or design, and without further information which will be produced at the time that Fireline's expert produces his or her report, I don't have a final opinion as to which one or more of those possible defect causes is going to be my final opinion.**
       Q:    If any?
       A:    **If any.**
See Deposition Transcript Part II of Michael Shanok ("Dep. Tr. of Shanok II"), dated April 12, 2004, at 100, attached hereto as Exhibit E.

[7]    Q:    ... So, you recognize that you could develop the appropriate test to go back and try to validate through scientific methodology your hypotheses which appear in 9-A through E [of the Shanok Report]?
       A:    **Yes.**
       Q:    Yet you've never done that?
       A:    **That's right.**
See Dep. Tr. Of Shanok II at 110.

[8]    Q:    And you're sitting here now under oath telling me these opinions aren't finalized; is that correct?
       A:    **With respect to the perspective causes of the failure, at this time it would be wrong for me to say they're final opinions.**
See Dep. Tr. Of Shanok II at 112.

reflected in their report. The two billets were cut open in several predetermined locations, compared with one another, measured, acid-etched and polished. OSHA examined the billets' grain, the centering and tightness of the pour, and the composition of the alloy, as well as the stress fractures in the damaged billet.

OSHA concluded, upon the completion of its investigation, that the incident alleged in Sanders' Complaint was caused by operator error:

> Based on the investigation, it appears that the caster began the shrinking process ([redacted] Statement) for the billets, however, he neglected to turn off the down-cast unit ([redacted] Statement). The billet continues to be lowered into the tank at a rate of approximately 4 inches per minute. The billet had been lowered enough so that when molten metal was introduced into the cooling center, the side walls reheated and did not have the normal support of the mold depth which is 15 inches. The walls of the south billet bulged outward ... finding a weak point in which the molten metal was able to penetrate the billet wall, reaching the outside part of the billet. The molten metal hit the spray ring which caused the contact with the water and thereby caused the violent reaction between the two.

See Shanok's Report at "Enclosure #1," "Conclusion."

Shanok's Report contains several statements that are highly critical of the OSHA Report's conclusions. See Shanok's Report at ¶¶ 5 ("The writer believes that this was an incorrect assumption.") and 7 ("The writer is of the opinion that ... the conclusions which OSHA drew as to how the incident occurred are faulted.").

Shanok's Report instead develops an alternative explanation for the incident, one that involves a) the failure of the pour cup, b) an absence of operator error, and c) a direct causal link

between the failure of the pour cup and the flash explosion. See Shanok's Report at ¶¶ 8 and 8 a-g. In developing this alternative explanation, Shanok relies on measurements taken directly from the OSHA report of which he is so highly critical, and on approximate measurements taken for him secondhand by Joseph Walsh, the Mill Superintendent:

> The OSHA accident investigation contained measurements which demonstrated that the breach in the sidewall of the south billet, which allowed molten metal to flow directly into the water bath tank, was eight inches from the top of the billet and that contact of molten metal flow occurred 28 to 29 inches below the top of the north billet. At the writer's request, Mr. Walsh determined that, during the casting process, the bottom of the pour cup is approximately eleven inches above the bottom of the mold, the bottom of the mold is approximately eighteen inches above the surface of the water in the water bath tank and the molds are seven inches apart from one another.

See Shanok's Report at ¶ 8.

If Shanok's sourcing of his data is dubious, his methodology is a mystery. Shanok's Report does not describe any tests he devised to validate his opinion regarding causation. It does not cite any authorities, and contains no calculations other than the addition of two approximate measurements of length. Instead, Shanok's Report contains the bare statement that the measurements he relied on are "consistent with a scenario" that matches his conclusions. See Shanok's Report at ¶ 8. He offers absolutely no scientific or technical reasons for privileging his own account, based partially on secondhand, inexact measurements, over that of OSHA's investigators, which is based on extensive testing. The only reasoning in Shanok's Report that

would justify privileging his explanation over that of the OSHA investigators is that he finds the Plaintiff to be credible. Shanok's Report at ¶ 6.

**The incident at issue occurred over seven years ago. This case was filed over four years ago.** ***Despite all of this, Shanok has no final opinion as to the alleged defect in the ceramic pour cup***, a field in which he is admittedly not an expert, and his opinions regarding causation exhibit only the most tenuous link with methodology of any kind. Accordingly, Defendant now moves the court for an order precluding Shanok from testifying as an expert in this case. Moreover, because the deadline for disclosing an expert, *with a complete opinion*, has long since passed, Defendant moves this court for an order precluding Shanok, or anyone else on Plaintiff's behalf, from performing any further analysis in regard to this matter.

### III.   LAW & ARGUMENT

#### A.   Standard for Admissibility of Expert Testimony in Federal Court

Fed. R. Evid. 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

See *Fed. R. Evid.* 702. The "touchstone" of Fed. R. Evid. 702 is the helpfulness of the expert testimony – in other words, "whether it will assist the trier of fact to understand the evidence or to determine a fact in issue." *U.S. v. Stevens*, 935 F.2d 1380, at 1398 (3rd Cir. 1991).

With its focus upon "scientific" knowledge or testimony, *Daubert* established a two-pronged standard requiring the district court, pursuant to Fed. R. Evid. 104(a),[9] to act in a "gate-keeping" role in determining whether the proffered expert testimony is both *reliable and relevant*. See also *Saia v. Sears Roebuck & Co., Inc.*, 47 F.Supp.2d 141, 144 (D. Mass. 1999) (citing *Daubert*, 509 U.S. at 591-95). "Faced with a proffer of expert scientific testimony . . . the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 593; *Saia*, 47 F.Supp.2d at 144 (providing that "whether the evidence is relevant, . . . i.e., whether it 'fits' the case, requires a determination as to whether the evidence will assist the jury in determining the existence of any fact of consequence.").

Furthermore, the Court in *Daubert* set forth a four-part inquiry in which the trial judge should engage when deciphering whether the proffered expert testimony is reliable: (1) can the theory or technique at issue be tested; (2) has the theory or technique been subject to peer review; (3) does the theory or technique have a known error rate; and (4) has the theory or technique been generally accepted in the relevant scientific community. *Saia*, 47 F.Supp.2d at 144 (citing *Daubert*, 509 U.S. at 591-95). In short, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in

---

[9] Pursuant to Fed. R. Evid. 104(a), "preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court. . . . " *Fed. R. Evid.* 104(a).

the courtroom, the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (citations and quotations omitted).

Under Fed. R. Evid. 104(a), the proponent of the expert testimony must establish, by a preponderance of the evidence, the admissibility of the proffered expert's testimony. *Johnson Elec. North Am., Inc. v. Mabuchi Motor Am. Corp.*, 103 F.Supp.2d 268, 279 (S.D.N.Y. 2000). Although there is a general presumption of admissibility in federal court, "**where a purported expert fails to meet the requirements of the Federal Rules of Evidence and Daubert, courts within the Second Circuit have not hesitated to exclude the expert's testimony at trial**." *Id.* (emphasis added); see also *Amorgianos*, 303 F.3d at 267 (noting that although the *Daubert* standard is flexible, it is "critical that an expert's analysis be reliable at every step.") Pursuant to the Federal Rules of Evidence, "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Id.* at 278 (citing *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962); *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 224 (2d Cir. 1999)).

Additionally, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court extended *Daubert* to encompass *all* expert testimony, as opposed to merely "scientific" expert testimony. See *Johnson Elec. North Am.*, 103 F.Supp.2d at 279. The *Kumho* Court specifically held that "*Daubert's* general holding – setting forth the trial judge's general 'gatekeeping' obligation – applies not only to testimony based on 'scientific' knowledge, but also to testimony

based on 'technical' and 'other specialized' knowledge." Saia, 47 F.Supp.2d at 144 (citing Kumho, 119 S. Ct. at 1171).

### B. Shanok is Not Qualified to Proffer Expert Testimony Regarding Fused Silica Pour Cups, and Therefore, His Testimony is Inherently Unreliable and Unhelpful and Should be Precluded.

Shanok's opinion with regard to the Fireline pour cup is that it was defective in either manufacture or design. See Shanok Report at ¶ 9. However, Shanok does not qualify as an "expert" in the design, manufacture, or application of the fused silica pour cup at issue. Accordingly, he should not be allowed to offer expert testimony on the design of the cup or its appropriateness for use at AC&B.

In *Stolting v. Jolly Roger Amusement, Inc.*, 37 Fed. Appx. 80 (4th Cir. 2002), the defendant moved *in limine* to preclude the plaintiff from introducing the proffered expert testimony of a recreation maintenance supervisor in a negligence action based on injuries the plaintiff allegedly suffered due to a water slide amusement park ride.[10] In affirming the granting of the defendant's motion to preclude the "expert" testimony, the Fourth Circuit found that the so-called expert was not qualified to provide expert testimony regarding the issue at hand, and that his conclusions rested on bare assumptions absent reliable support. *Id.* at 83. It noted:

> [Plaintiff] asserts that [the proposed expert's] experience as a recreation maintenance supervisor and his investigation of the [incident] are sufficient for the court to admit his

---

[10] The proffered expert was experienced in constructing and maintaining all recreational facilities in the area as well as being a member of the professional organization of water park operators. **However, he had no experience as a designer or builder of water slides.** See *Stolting*, 37 Fed. Appx. at 83.

>proffer as an expert. [The proffered expert's] qualification to render an expert opinion in this case was, at best, dubious.

*Id.*

Similarly, in *Free v. Bondo-Mar-Hyde Corp.*, 25 Fed. Appx. 170 (4th Cir. 2002), the plaintiffs brought a products liability claim stemming from the explosion of an aerosol can of paint remover. The district court granted the defendants' motion *in limine* excluding the plaintiffs' proffered expert based on the fact that the expert's opinion stemmed from his assumptions of what caused the can to explode rather than scientific, technical or other specialized knowledge. *Id.* at 172. Instead:

> The expert's opinion was based on his assumptions of what caused the can to explode rather than on scientific, technical, or other specialized knowledge. The expert appears to be an accomplished metallurgist, but he lacks knowledge of the aerosol can manufacturing process, the process of filling aerosol cans, the testing performed on cans during the manufacturing process prior to their distribution, the pressurization of the can, or the normal pressure expected of this type of can. **Accordingly, he lacked the expertise necessary to determine (1) whether certain scratches on the interior of the can were defects or simply normal consequences of the manufacturing process and (2) whether those scratches actually caused the explosion. Because the expert's testimony is based merely on his belief and speculation and is therefore not reliable, the district court did not abuse its discretion in excluding his testimony**.

*Id.* (emphasis added).

Similarly, in the matter at bar, the proffered "expert" is not qualified as to the design, manufacturing, or application of the pour cups at issue. Specifically, Shanok is not qualified to offer expert testimony regarding whether the pour cup in this case was defective.

Shanok's own sworn testimony demonstrates his lack of qualifications to testify in this case. For example, Shanok has specifically testified as follows:

> Q: Are you an expert in ceramic engineering?
>
> **A: The answer is I would not hold myself out as an expert in ceramic engineering.**
>
> ...
>
> Q: So it would be fair to say that you've never been involved in the design or manufacture of a product similar to what's been marked as Exhibits 5 and 6 [the pour cups]?
>
> **A: That's correct.**

See Dep. Tr. of Shanok I at 71-72.

Strikingly, Shanok admits that his opinion is based on incomplete information. See Dep. Tr. Of Shanok I at 67. He has not seen the engineering drawings of the pour cups, and he does not know the actual chemical composition of the pour cups, or the process by which the pour cups are manufactured – information he admits could change his opinion in this case. See Dep. Tr. Of Shanok I at 68-69.

Shanok is admittedly not an expert with respect to the material at issue – fused silica.[11] He has admitted that his opinion is not finalized, not based on full information, and subject to change. Shanok is simply not qualified to render "expert" testimony regarding the alleged defect in the Fireline pour cup.

---

[11] Shanok's only experience with fused silica was as a plant engineer, and his contact with the material was limited to the "maintenance of the equipment that utilized fused silica materials." See Dep. Tr. of Shanok I at 73.

HFD_164736_4/JGEOGHEGAN

C. **Shanok's Opinion Regarding Causation Is Not Properly Linked to Methodology.**

"[T]he Supreme Court has ... stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between [the] methodology and the expert's conclusions." Nimely v. City of New York, 414 F.3d 381, 396 (2d Cir. 2005). " '[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert.' " Id, quoting, General Electric Co. v. Joiner, 522 U.S. 136, 146 (1997). In Nimely, the Second Circuit vacated the Eastern District of New York's admission of the testimony of a medical expert. While the Court allowed that the expert's opinion may have been predicated to a degree on genuine expertise and experience, the expert's opinion also depended on the expert's conclusions about the credibility of the parties retaining him. "That such a 'methodology' could not even begin to satisfy any of Daubert's criteria for assessing the scientific reliability of an opinion, see Daubert, 509 U.S. at 593-94, 113 S.Ct. 2876, only scratches the surface of its shortcomings." Id. at 399.

As stated above, Shanok's methodology is difficult to discern in his Report, but it does appear to rely on his perception that Sanders is credible. Shanok's description of the facts contains a string of statements reflecting his reliance on the testimony of Sanders over the conclusions of the OSHA investigators: "OSHA did not believe Mr. Sanders' claim ... [Sanders] adamantly disagrees with OSHA's determination ... He further disagrees with OSHA's contention ... He further insisted ... He was incredulous ... Mr. Sanders believes ... Mr. Sanders'

observation ... ." See Shanok's Report at ¶¶ 5-7. At one point, when faced with a contradiction between Sanders' recollection and OSHA's conclusion, Shanok says of the latter, "The writer believes that this was an incorrect assumption." See Shanok's Report at ¶ 5. In short, the chief factor in Shanok's difficult-to-discern methodology for privileging a conclusion that is "consistent with" his secondhand, inexact measurements – over that of OSHA investigators who have conducted rigorous testing – appears to be his acceptance of the credibility of the party retaining him, a methodology roundly rejected by the Second Circuit in Nimely. If this Court rejects the conclusion that Shanok relies on Sanders' credibility, there remains no discernible reasoning in Shanok's Report for preferring his own opinion over OSHA's, and one can only conclude that Shanok has connected the data to his conclusion on his own *ipse dixit*.

In short, Shanok's testimony will provide absolutely no assistance to this court, which, in this instance, is the trier of fact, since the case was never claimed to a jury trial. Accordingly, his testimony should be precluded.

## IV. **CONCLUSION**

WHEREFORE, and for the foregoing reasons, Defendant, Fireline, Inc., respectfully requests that the Court preclude Plaintiff from introducing the testimony of his proffered liability expert, Michael Shanok, in this case. Moreover, Plaintiff initiated this lawsuit over four years ago and has the burden of proof. As Plaintiff's deadline for putting forth a reliable, complete expert opinion has long since passed, Michael Shanok should be precluded from conducting any

further testing, and Plaintiff should be precluded from relying upon Shanok, or any other experts, not previously disclosed.

        THE DEFENDANT
        FIRELINE, INC.

By_____
Mark B. Seiger, Esq.
Fed. Bar No. ct 05580
Charles F. Gfeller, Esq.
Fed. Bar No. ct 18119
EDWARDS ANGELL PALMER
& DODGE LLP
90 State House Square
Hartford, Connecticut 06103
(860) 525-5065
Telecopy (860) 527-4198

## CERTIFICATION

This is to certify that on the 15th day of June, 2006, a copy of the foregoing has been mailed via First Class U.S. Mail, postage pre-paid, to:

Robert J. Sweeney, Esq.
Early, Ludwick & Sweeney
One Century Tower
265 Church Street, 11th Floor
PO Box 1866
New Haven, CT 06508

Timothy D. Ward, Esq.
McGann, Bartlett & Brown
281 Hartford Turnpike # 401
Vernon, CT 06066

_____
Charles F. Gfeller