**EXHIBIT C**

**forensic engineering**
*Accident, fire and failure investigation*

Michael E. Shanok, PE
Gilbert E. Nicholls, PE

100 Hinman Street ■ Cheshire, Connecticut 06410-2546
203-699-9137 ■ Fax: 203-2727512   www.foreng.com

July 28, 2003

**Report of Opinion #03071**

Subject:   ***Injuries to Willie Sanders at Ansonia Copper & Brass,
75 Liberty Street in Ansonia, CT, on February 23, 1999***

To Whom It May Concern:

The writer was called upon to investigate and conduct a technical analysis of the subject incident. Pursuant to that request, the writer reviewed the following file documents:

a.  Listing of entries for Ansonia Copper & Brass posted in establishment search section of OSHA's internet website (both Ansonia and Waterbury facilities);

b.  Deposition of Willie Sanders taken April 8, 2003;

c.  OSHA case file for Inspection #123280810;

d.  The writer's interview with Mr. Sanders on June 20, 2003;

e.  Exemplar new and used pour cups manufactured by Fireline, Inc., received at the writer's interview with Mr. Sanders on June 20, 2003;

f.  The writer's visit to Ansonia Copper & Brass on July 21, 2003, at which time Mr. Sanders was again interviewed and the operation of furnace number four was observed and photographed during a casting pour;

g.  The writer's conversations with the Mill Superintendent, Joseph Walsh, on July 21, 2003 and subsequently, by telephone.

The following report of findings, opinions and conclusions is based upon those activities and the writer's education, training, background and experience in engineering and safety, including previous employment with and consultant to ferrous and non-ferrous industrial employers with foundry facilities.

1.  The writer is of the following understanding: on February 23, 1999, Willie Sanders was employed as a caster at number four furnace in the Casting Department at

**Report of Opinion #03071**
July 28, 2003,  Page 2

Ansonia Copper & Brass' 75 Liberty Street facility, where he had worked for more than 18 years. In addition to his employment responsibilities, he was also a vice president of Local 445 of the Steelworkers Union at the time, and he had also held various offices within the union chapter's operation, including membership of the safety committee's accident investigation team. (At this writing, he is president of the Local.) He was performing his duties as a caster at number four furnace, while casting two billets of copper alloy #1450. The total length of the billets was to be approximately eleven feet. The casting process was approximately 76% completed shortly after 9:00 AM, when molten metal suddenly flowed directly into the water bath surrounding the molds. The water in the bath rapidly turned to steam, causing a violent reaction. As a result, Mr. Sanders sustained serious burns over his face, arms and a knee, and he was thrown approximately 15 feet against the side of a large waste material bin, thereby sustaining his injuries.

2. The following is a general description of the casting system which Willie Sanders was operating at the time he was injured. The molten metal is contained in the crucible of a furnace, in this case an Inducto coil-less electrical induction furnace with a capacity of approximately 24,000 pounds. The crucible is slowly tilted by a hydraulic system, so that molten metal is poured into a T-shaped container called a *running box*. The leg of the running box T faces the furnace, and each side of the T's crossbar has a hole, approximately 6 inches in diameter, through which the molten metal will pour into *pour cups* and, from there, into the *molds*. On top of the running box, immediately above the pour cups, cone-shaped forms called *pins* are mounted on linkages so that they can be moved, up and down, to act as valves to control the flow of molten metal from the running box into the pour cups. The bottoms of the holes are fitted with slotted retaining sleeves, into which the pour cups are inserted. The pour cups have closed bottoms and four 1"-diameter holes on the sides. The molten metal flows into the pour cups and through the holes, so as to flow against the sides of the molds. The molds are metal sleeves with water-cooled jackets, and are suspended over a platform called a *platen*. The platen is attached to the end of a hydraulic cylinder  rod, and slowly lowers into a water bath at a rate of approximately 4 inches per minute, as the billets are being cast. Surrounding the



———— forensic engineering ————

**Report of Opinion #03071**
July 28, 2003,   Page 3

billets, just beneath the molds, are circular piping rings with holes pointed toward the billets, called *spray rings*. Cooling water is pumped through the spray rings to further aid in solidifying the metal billets as they pass out of the molds. Shown below is a diagram of casting apparatus. Photographs of Furnace #4 and its apparatus are shown on the following pages.



DIAGRAM OF CASTING APARATUS
Not to Scale

forensic engineering

**Report of Opinion #03071**
July 28, 2003,   Page 4



Photos taken by M. Shanok on 7/21/03

General view of furnace #4 in operation. Dump box can be seen in upper right of photo.



Closeup view of furnace #4 in operation.



forensic engineering,

**Report of Opinion #03071**
July 28, 2003,   Page 5



View of top of running box.



Running box with pins and their operating linkages installed.



forensic engineering



Underside of running box, showing receptacles for pour cups.



View of top of molds before running box is placed over them.



— forensic engineering,

**Report of Opinion #03071**
July 28, 2003,   Page 7



View of piping leading to spray rings, looking into water bath tank.



View of cast billets.

forensic engineering

Report of Opinion #03071
July 28, 2003,   Page 8



View of ends of billets. Upper left (lighter colored) billet end shows conical depression which is filled during "shrink" process.



forensic engineering

**Report of Opinion #03071**
July 28, 2003,   Page 9

3.  Mr. Sanders told the writer that the ceramic pour cups, which were manufactured by Fireline, Inc., with offices in Youngstown, Ohio, have been problematic. Many of them had cracked circumferentially around the outflow holes at the bottom of the cups. The company had adopted a practice of not using the cups out of a concern that they would crack and separate during the casting process. Mr. Sanders testified at deposition, and Mr. Walsh also told the writer, that Fireline representatives had visited the factory a number of times to discuss the problems with their pour cups and to develop remedies to prevent the failures. It is significant that, the moment before the subject incident occurred, Mr. Sanders saw one of the casting cups rise up to the surface of molten metal within the running box. (The cups are manufactured of a material which, being lighter than the metal, will float in the metal, much like a piece of wood will float in water.)

4.  OSHA's internet website (www.osha.gov) contains a section entitled, "Establishments Search," which allows an individual to search for summary records of OSHA inspections by entering the name of an employer as a search parameter. Utilizing this feature, the writer found records of six OSHA inspections at Ansonia Copper & Brass, including both its Waterbury and Ansonia plants. One record, Inspection Number 123280810, was commenced at the Ansonia facility on February 24, 1999, the day following the Sanders accident. This inspection was in response to a formal complaint to the Bridgeport Area OSHA Office. The writer ordered a copy of that report, along with photographs taken during the inspection, under the Freedom of Information Act. A review of the report showed that, although its primary focus was related to Subpart Z, the OSHA Health Regulations for General Industry, an inspection of the Sanders accident was conducted as part of the inspection.

5.  Because the OSHA inspection report is voluminous, pages are unnumbered and in seemingly random order, and most of it is not germane to the subject of this report, the writer has photocopied those four pages which contain the essence of OSHA's accident inspection and analysis. In keeping with privacy constraints of the Freedom of Information Act, names, dates and times of day have been redacted from these pages. The following is a summary of OSHA's findings and opinions:

forensic engineering

**Report of Opinion #03071**
July 28, 2003, Page 10

    a.    Mr. Sanders stopped the casting pour early. There was an inference that this might have been done because he believed that the furnace charge was "short," i.e., insufficient to cast two complete billets;

    b.    Upon deciding to stop the pour, Mr. Sanders commenced the "shrink" process without stopping the platen's descent. (When a billet casting pour is completed, the metal at the top of the billet cylinder contracts as it cools, thereby forming an inverted conical depression. "Shrinking" is the term applied to the process of manually adding molten metal into that depression, to level off the top face of the billet.)

    c.    The incident was precipitated when "the billet had been lowered enough so that, when molten metal was introduced into the cooling center, the sidewalls reheated and did not have the normal support of the mold depth, which is 15 inches. The walls of the south billet bulged outward . . . , finding a weak point in which the molten metal was able to penetrate the billet wall, reaching the outside of the billet. The molten metal hit the spray ring, which caused the contact with the water, and thereby caused the violent reaction between the two."

OSHA faulted housekeeping at the facility because, during the incident, "a dust cloud was created, and it was determined to have hampered the attempt to find the injured worker and created a source of significant concern for the ambulance crew's safety and health." The CSHO was apparently unaware that the extensive use carbon black, to protect molten metal from oxidization due to exposure to the atmosphere, was a mandatory function of the casting process. Additionally, OSHA did not believe Mr. Sanders' claim that he was thrown into the side of a dump box located in the general vicinity of the furnace. It was OSHA's finding that the box was probably not there, because it was not utilized for the disposal of running box contents when alloy #1450 is cast, and because the ambulance call report stated that Mr. Sanders was not thrown. The writer believes that this was an incorrect assumption. However, it is irrelevant, as Mr. Sanders' primary injuries were severe burns.



forensic engineering

**Report of Opinion #03071**
July 28, 2003, Page 11

6. During the writer's July 21, 2003, visit to the facility, Mr. Sanders was shown the pages of the OSHA report which were discussed in the previous paragraph. He adamantly disagrees with OSHA's determination that he stopped the casting pour before the billets were cast to their proper, full length. He further disagrees with OSHA's contention that he was not thrown against the side of the dump box. He further insisted that he had not commenced the shrink process at the time, since the billet casting process was incomplete. He was incredulous at OSHA's suggestion that he would perform the shrink operation without stopping the platen's descent. The writer brought Mr. Sander's attention to OSHA's comment, that the pour cup for the south billet (the one that was involved in the accident) "was unsalvageable and was not available for this investigation." Apparently, the investigating CSHO either did not know of Mr. Sanders' observation that the upper section of the cup had floated to the top if the running box, or was told of this fact, but did not comprehend its significance. In one of the photographs appended to this report, the dump box is located in approximately the same position that Mr. Sanders believes it was on the date of the subject incident.

7. The writer is of the opinion that, due to the investigating OSHA CSHO's unfamiliarity with the worksite and incomplete assessment of the factors involved in the Sanders incident, the conclusions which OSHA drew as to how the incident occurred are faulted. The omitted information which was most important was that which dealt with the missing south pour cup. This writer does not fault the OSHA CSHO. He is neither required nor expected to be an expert in every kind of workplace. Further, it appears that he was denied the opportunity to completely learn and understand the mechanics of the casting operation, leaving him inadequately prepared to draw correct conclusions. The writer believes that, had he known about the previous problems the facility had experienced with pour cups provided by Fireline, and had he more been more completely informed about Mr. Sanders' observation regarding the south pour cup, he would have drawn much different conclusions.

8. The OSHA accident investigation contained measurements which demonstrated that the breach in the sidewall of the south billet, which allowed molten metal to flow

**Report of Opinion #03071**
July 28, 2003,   Page 12

directly into the water bath tank, was eight inches from the top of the billet and that contact of molten metal flow occurred 28 to 29 inches below the top of the north billet. At the writer's request, Mr. Walsh determined that, during the casting process, the bottom of the pour cup is approximately eleven inches above the bottom of the mold, the bottom of the mold is approximately eighteen inches above the surface of the water in the water bath tank and the molds are seven inches apart from one another. Putting all of this dimensional data together (see diagram on following page), the writer determined that the top of the breach in the south billet was immediately below the bottom edge of the mold and the deposit of metal on the north billet was immediately at the tank waterline. This is consistent with a scenario in which the Sanders incident was precipitated by a sudden redirection of molten metal flow from the mold's sides, toward its bottom, as would occur if the pour cup fractured and separated around its periphery, at the outflow holes. It is therefore the writer's opinion that:

a. The pour cup, which was installed over the south mold in the assembly which Mr. Sanders was using at the time of his injury, was defective for one or more of the reasons which are enumerated in paragraph #9 of this report;

b. The defective nature of the pour cup over the south mold was concealed and was thereby incapable of detection by Mr. Sanders;

c. In the moments immediately prior to the initiation of events which resulted in Mr. Sanders' injury, the pour cup cracked and failed;

d. Failure of the pour cup allowed molten metal flow into the mold's central core, rather than directing it toward the sides of the mold;

e. Because the freshly deposited molten metal charge did not immediately flow to the sides of the mold, it did not form an adequately strong exterior "skin" on the portion of the billet's surface which was exiting the mold;

f. The weight of the molten metal within the billet overcame the strength of the billet's thin, solidified wall surface;

g. Unable to contain the molten metal, the surface split open, allowing molten metal to flow freely onto the spray ring and into the water bath.



forensic engineering

**Report of Opinion #03071**
July 28, 2003,  Page 13



DIAGRAM OF INCIDENT DIMENSIONS
Not to Scale



forensic engineering

**Report of Opinion #03071**
July 28, 2003,   Page 14

9. The writer examined two exemplar pour cups, one of which has been reportedly been used for one pour, and the other of which was unused. The used cup is cracked circumferentially, through approximately the centers of the outflow holes. The writer was told that this was the same location at which other pour cups had failed in the past. Analysis of the particular cause of failure would require extensive examination and testing of a large number of other pour cups which have cracked in the same manner. The writer is therefore unable to offer a specific cause of the exemplar's failure. However, the writer is of the opinion that the failure occurred as a result of one or more of the following defects in manufacture or design of the south pour cup which was installed in furnace #4 at the time of the Sanders incident:

   a. The pour holes at the bottom of the cup are too large, thereby causing the material between them to be inadequate in volume and strength to withstand the temperatures and forces to which they are subjected during use;

   b. The surfaces of the pour holes are sharply perpendicular to the inner and outer walls of the pour cup, thereby presenting too severe a change in mass and direction of the material, and resulting in its inability to resist the temperatures and forces to which it is subjected;

   c. Fusion of the silica is incomplete within the makeup of the pour cup, resulting in inadequate strength of the cup wall, within the area in which it is reduced in size by the presence of the pour holes;

   d. The walls of the pour cup are too thin at the location where the pour holes are formed, causing them to have inadequate strength to resist the temperatures and forces to which they are subjected;

   e. The characteristics of fused silica give it inadequate strength to withstand the temperatures and forces to which it is subjected without a form of reinforcement.

10. In the writer's opinion Fireline knew or should have known, as a result of its investigations at Ansonia Copper & Brass and its experience in the industry, that:

   a. The pour cups it introduced into the stream of commerce, which were eventually sold to Ansonia Copper & Brass, had a propensity to fail without

—— forensic engineering ——

**Report of Opinion #03071**
July 28, 2003,   Page 15

        warning;

    b.    Such failures would result in disruption of the casting process at Ansonia Copper & Brass;

    c.    The opportunity for molten metal to flow into the water bath, and the probable consequences of such an incident, made it reasonably probable that the safety of Ansonia Copper & Brass employees would be compromised by such failures.

11.    Based upon conversations with Joseph Walsh and Willie Sanders and Mr. Sanders' deposition testimony, the writer is of the understanding that Fireline took no actions to warn Ansonia Copper & Brass that its employees' health and/or safety could be jeopardized by use of its products, nor did it conduct a job safety analysis or other formal procedure, for the purpose of determining methods of protecting employees of Ansonia Copper & Brass from injury that might result from such failures, nor did it undertake adequate changes in its design or manufacturing processes to enable the production of products which would not fail. The writer therefore concludes that those failures of action resulted in unsafe exposure of employees of Ansonia Copper & Brass to risk of injury, and the resulting exposure to its defective product was the proximate cause of the subject incident and Willie Sanders' resulting injuries.

This concludes my report. Should there be further questions or comments, please contact the writer.

                                                               Respectfully submitted,

                                                               Michael E. Shanok, P.E.

MES/k
Enclosures - See following page



— forensic engineering,