**EXHIBIT D**

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

COPY

-------------------------------------x

WILLIE SANDERS,                          :

                    Plaintiff            :

          VS                             : 3:02CV 498(JBA)

FIRELINE, INC.,                          :

                    Defendant            :

-------------------------------------x


Deposition of MICHAEL SHANOK, P.E., taken pursuant to

the Rules of Practice held at the Law Offices of Edwards

& Angell, LLP, 90 State House Square, Hartford, CT,

before Debra A. Chasse, LSR, License No. 00055, a Notary

Public in and for the State of Connecticut, on Monday,

August 11, 2003, at 10:23 a.m.


BEECHER & HORVATH REPORTING ASSOCIATES
73 Millbrook Road
North Haven, CT 06473
(203) 230-0010

A P P E A R A N C E S:


THE LAW OFFICES OF EDWARDS & ANGELL, LLP
Attorneys for the Defendant
90 State House Square
Hartford, CT 06103
BY:  MARK B. SEIGER, Esquire


THE LAW OFFICES OF EARLY, LUDWICK, SWEENEY, LLC
Attorneys for the Plaintiff
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT 06508-1866
BY:  ROBERT J. SWEENEY, Esquire


Also Present:  Robert A. Wimer

1    something that I haven't seen.

2        Q    If you're going to render an opinion in a case,

3    don't you think you should have all the information

4    before you start rendering the opinion, yes or no?

5        A    I do not agree with that concept.

6        Q    You don't know the engineering drawings, it has

7    no impact whatsoever?

8        A    I didn't say that.

9        Q    What you're saying is the engineering drawings

10    may have an impact, you just don't know?

11        A    The answer is, without seeing them I can't tell

12    you.

13        Q    If you're rendering -- asked to render an expert

14    opinion, don't you think you should get as much

15    information together before you render that opinion?

16        A    I do.

17        Q    And you recognize before rendering this opinion

18    you didn't get the engineering drawings; correct?

19        A    That's correct.

20        Q    So at least with respect to that component you

21    don't have complete information?

22        A    You're right.

23        Q    Thank you.  With respect to materials, would it

24    be fair to say that it's important to you if you're

1   doing a complete investigation to know the specific

2   materials that had been used in a product that you're

3   rendering an opinion on, yes or no?

4      A    Again, without seeing the formulation I can't

5   tell you.  I don't know.

6      Q    But you recognize that the formulation may have

7   an impact on your opinion in the case?

8      A:   I do.

9      Q    Yet, before getting those materials you again

10  rendered an expert opinion without full and complete

11  information?

12     A    That's correct.

13     Q    And the third category of information was the

14  process.  And I'm assuming that you're referring to the

15  process by which the pour cup was actually manufactured;

16  is that correct?

17     A    Yes.

18     Q    And that's something that could be important in

19  rendering your expert opinion, or it might not be, you

20  just don't know one way or the other?

21     A    That's correct.

22     Q    Because you don't have it?

23     A    That's correct.

24     Q    So it would be fair to say that at the time you

1    rendered your expert opinion in this case you didn't

2    have all the information in front of you with respect to

3    engineering drawings, materials out of which the pour

4    cups were manufactured, and the actual process by which

5    they were manufactured; is that correct?

6        A    With that respect it is correct, I did not have

7    that information.

8        Q    As you've already acknowledged several times,

9    that information in any one of those categories could

10   potentially change your expert opinion in this case.

11       A    There's a possibility, yes.

12       Q    Do you know anything about the rate of thermo

13   expansion with respect to the pour cups?

14       A    Yes.

15       Q    What do you know about the rate of thermo

16   expansion?

17       A    If they were properly designed and formulated

18   that thermo expansion should be negligible, but it could

19   be critical to the process of temperatures that were

20   being used.

21       Q    Do you know what the rate of thermo expansion is

22   with respect to the pour cups that are sitting in front

23   of you that have been marked Defendant's Exhibit 5 and

24   Defendant's Exhibit 6?

1  being used?

2      A    I do know how they react from firsthand

3  knowledge.

4      Q    What do you define firsthand knowledge, from

5  actually seeing tests of it done, actually being there

6  while it's being used?

7      A    I was not there during the incident which

8  resulted in Mr. Sanders injuries, so.

9      Q    Incidentally, are you familiar with Alfred

10  University in upstate New York?  It may be Alfred

11  College.

12      A    Other than having heard the name, no.

13      Q    Do you know what it is?

14      A    No.

15      Q    Do you know what their specialty is?

16      A    No.

17      Q    Have you ever heard of a specialty called ceramic

18  engineering?

19      A    Of course.

20      Q    Are you an expert in ceramic engineering?

21      A    The answer is I would not hold myself out as an

22  expert in ceramic engineering.

23      Q    Have you ever designed a product similar to the

24  pour cups that have been marked as Exhibits 5 and 6 for

1    the refractory industry?

2        A    No.

3        Q    Have you ever done any specific scientific

4    studies with respect to pour cups similar to Exhibits 5

5    and 6 that are used in the refractory industry?

6        A    No.

7        Q    Have you ever worked for a manufacturer that

8    manufactures products similar to Exhibits 5 and 6 that

9    are used in a refractory industry?

10       A    The answer is yes, but, to be fair to you in

11   consultation, that did not involve the design or

12   manufacture of that product or a product like it.

13       Q    So it would be fair to say that you've never been

14   involved in the design or manufacture of a product

15   similar to what's been marked as Exhibits 5 and 6?

16       A    That's correct.  I'm not -- I'll have to say the

17   answer is I don't think so, I'm not sure.  I'd have to

18   see the specifications to know whether or not.

19       Q    Have you ever worked with fused silica before?

20       A    Yes.

21       Q    When and where?

22       A    I was plant engineer of a brass mill at the

23   Miller Company.

24       Q    What was your involvement with fused silica?

BEECHER & HORVATH

1    A    My involvement was in the -- simply in the

2    maintenance of the equipment that utilized fused silica

3    materials.

4    Q    Nothing more than that?

5    A    That's correct.

6    Q    So you've never done any designs of products

7    incorporating fused silica; correct?

8    A    That's correct.

9    Q    Before we go back to this area, I just want to go

10   through your client list that you provided to us.

11   Perhaps after we do that that might be a good point to

12   stop for lunch.

13            MR. SWEENEY:   You mean the deposition

14       testimony?

15            MR. SEIGER:   I'm assuming that that's a

16       client list.

17   Q    Mr. Shanok, you may or may not have it in front

18   of you.   Let me show you what I'm holding up.   Do you

19   have a copy of that in front of you?

20   A    I do now.

21   Q    That is contained, I believe, in Defendant's

22   Exhibit 2 for identification.

23   A    I believe you're right.

24   Q    What counsel handed you, does that appear to be

BEECHER & HORVATH