## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIE SANDERS | : | CIVIL ACTION NO. |
| | : | 3:02 cv 498 (AWT) |
| Plaintiff | : | |
| | : | |
| VS. | : | |
| | : | |
| FIRELINE, INC. | : | |
| | : | |
| Defendant | : | November 15, 2006 |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITON TO
### DEFENDANT'S MOTION TO PRECLUDE EXPERT TESTIMONY

**I.    PRELIMINARY STATEMENT**

Plaintiff, Willie Sanders, hereby objects to the Defendant Fireline's motion to

preclude the Plaintiff's expert, Michael Shanok, from testifying at trial in this matter.  Mr.

Shanok should be permitted to offer his opinions concerning the failure of and the defective

design of the pour cup manufactured and sold by the defendant because (1) Mr. Shanok is

qualified to render such expert testimony based on his over forty years of engineering

experience, nearly thirty years of experience serving as an engineering expert and accident

reconstructionist and his experience serving as a plant engineer in a brass foundry and

working with ceramic and fused silica products; (2) contrary to the defendant's claims, Mr.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
ORAL ARGUMENT REQUESTED
TESTIMONY REQUIRED    **EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

Shanok has set forth his "final" opinions concerning the defect in the pour cup; (3) Mr.

Shanok's opinions regarding causation more than meet the standards set out by Fed. R. Evid.

702 and <u>Daubert v. Merrel Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993); and (4) Mr.

Shanok's methodology in determining that the subject pour cup was defective is sound and

provides relevant and reliable conclusions based on recognized brass mill foundry practices,

the OSHA regulations that govern safety in a brass mill foundry, and information that has

been verified by the operators, first line supervisors and managers of the foundry.

Accordingly, the defendant, who has failed to proffer its own expert on liability or causation

in this case, has failed to set forth any justifiable basis for precluding Mr. Shanok from

testifying in this case.  Therefore, Defendant's motion should be denied.

## II.    **BACKGROUND**

The instant action was brought by the plaintiff, Willie Sanders, for injuries and losses

stemming from an explosion at Ansonia Copper and Brass (hereinafter "ACB").  Mr.

Sanders is a long time employee of ACB.  Mr. Sanders, while working as a caster, was

severely burned when the molten metal he was pouring contacted the water bath used in the

cooling process.  The leak out that lead to the explosion was caused by the breaking of the

pour cup manufactured and supplied by the Defendant Fireline, Inc. (hereinafter "Fireline"

or "Defendant").  Plaintiff contends that these cups were defective in that they would crack

when used for their intended use.

During 1999, Defendant Fireline, Inc. was engaged in the business of manufacturing, supplying, and selling certain ceramic cups to be used in the production of metal billets. Prior to February 23, 1999, the defendant sold said cups to ACB.

Willie Sanders has been employed by ACB as a caster for the last 25 years. On February 23, 1999, he was casting, at furnace number four, two billets of copper alloy #1450. The total length of the billets was to be approximately 130 inches. The casting process was approximately 76% complete when molten metal suddenly leaked out directly into the water baths surrounding the molds, causing a violent explosion. As a result, Mr. Sanders sustained severe burns to his face and body.

The defendant is legally responsible to the plaintiff for his personal injuries and losses as a result of the defective and unreasonably dangerous condition of said cup pursuant to Connecticut General Statutes Section 52-572m et. seq. in one or more of the following ways:

a) in that it negligently failed to design said pour cup in such a manner so that it would not crack or break when being used;
b) in that it negligently manufactured said cup in such a manner so as to cause it to crack or break;
c) in that it negligently failed to test and/or inspect said cup thereby causing it to crack or break;
d) in that it failed to warn the plaintiff of the aforesaid dangerous conditions;
e) in that it breached its warranty of merchantability in that said cup was not

fit for the ordinary purposes for which it was sold;
f) in that it sold said cup in the aforesaid defective, unsafe and dangerous condition, thereby subjecting the plaintiff to an unreasonable risk of injury.

Michael Shanok has been disclosed by the plaintiff in this case for the purpose of offering expert testimony at trial on the issues of the hazardous and unsafe nature of the ceramic cups manufactured by Fireline and the cause of the explosion that resulted in the Plaintiff's injuries. In particular, Mr. Shanok is expected to testify within a reasonable degree of scientific certainty that the subject cup was the cause of the leak out and resultant explosion. See Shanok Report, attached hereto as Exhibit A. Mr. Shanok will further testify within a reasonable degree of scientific certainty that the ceramic cup was not adequate and safe for its intended use and was defectively designed and/or manufactured. See Shanok Disclosure, attached hereto as Exhibit B. Further, Mr. Shanok will testify that Fireline failed to provide adequate warnings concerning the use of the cup. Id.

Based upon his review of the available data, examination of the cups and accident scene and interviewing witnesses at ACB, Mr. Shanok "determined that the top of the breach in the south billet was immediately below the bottom edge of the mold and the deposit of the metal on the north billet was immediately at the tank waterline...and there was a sudden redirection of molten metal flow from the mold's sides, toward its bottom, as would occur if the pour cup fractured and separated around its periphery, at the outflow

holes." See Exibit A, p.12.   As a result, Mr. Shanok has concluded that:

(1) the pour cup, which was installed over the south mold in the assembly, was defective; (2) the defective nature of the pour cup over the south mold was concealed and was thereby incapable of detection by Mr. Sanders; (3) immediately prior to the leak out, the pour cup cracked and failed; (4) failure of the pour cup allowed molten metal flow into the mold's central core, rather than directing it toward the sides of the mold; (5) because the freshly deposited molten metal charge did not immediately flow to the sides of the mold, it did not form an adequately strong exterior 'skin' on the portion of the billet's surface which was exiting the mold; (6) the weight of the molten metal within the billet overcame the strength of the billet's thin, solidified wall surface; and (7) the surface of the billet split open, allowing molten metal to flow freely onto the spray ring and into the water bath. Id.

Mr. Shanok opined that the failure of the pour cup was the result of the following defects in manufacture or design:

(1) the pour holes at the bottom of the cup are too large, thereby causing the material between them to be inadequate in volume and strength to withstand the temperatures and forces to which they are subjected during use:
(2) the surfaces of the pour holes are sharply perpendicular to the inner and outer walls of the pour cup, thereby presenting too severe a change in mass and direction of the material, and resulting in its inability to resist the temperatures and forces to which it is subjected;
(3) fusion of the silica is incomplete within the makeup of the pour cup, resulting in inadequate strength of the cup wall, with the area in which it is reduced in size by the presence of the pour holes;
(4) the walls of the pour cup are too thin at the location where the pour holes are formed, causing them to have inadequate strength to resist the temperatures and forces  to which they are subjected; and
(5) the characteristics of fused silica give it inadequate strength to withstand the temperatures and forces to which it is subjected without a form of reinforcement. Id. at p. 14.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
EARLY, LUDWICK & SWEENEY, L.L.C.
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

Given that the subject pour cup was not available for inspection, it is not possible to conclusively establish which one or more of the aforementioned five causes is responsible for the failure. See Shanok Aff., ¶8. However, Mr. Shanok is able to conclude, within a reasonable degree of scientific probability that one or more of such causes resulted in the subject pour cup failing, resulting in the explosion that caused the plaintiff's injuries. Id. Further, in Mr. Shanok's professional opinion, within a reasonable degree of scientific probability, any of the five such causes would render the pour cup defective for its intended use and all five were created by the Defendant during the manufacturing and/or design process. Id.

Mr. Shanok is a professional engineer with over forty years of experience in electrical, mechanical and structural engineering. See Exhibit C. He has been a principal of a consulting engineering firm for the last thirty years, offering accident investigation, analysis and reconstruction. Id. His engineering experience includes electrical, plastics, rubber, ferrous and non-ferrous metal manufacturing industries. Moreover, Mr. Shanok has experience as a plant engineer in a brass mill, during which time he routinely worked with furnaces that were lined with ceramics and various ceramic parts and pieces that were utilized in the production process. See Shanok Aff., ¶6.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
EARLY, LUDWICK & SWEENEY, L.L.C.
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

Mr. Shanok has served as an expert and testified in both State and Federal Courts in Connecticut, as well as being qualified as an expert in many foreign courts. He has served as an expert on behalf of both plaintiffs and defendants in hundreds of matters related to engineering and accident reconstruction. He has authored numerous papers on subjects involving engineering, manufacturing and workplace safety. See Exhibit C.

Mr. Shanok's opinions in this case are based on his education, training, background and experience in engineering and safety, including previous employment with and consultant to ferrous and non-ferrous industrial employers with foundry facilities. Additionally, Mr. Shanok's opinions are based on eyewitness testimony concerning the pour cup's failure and explosion and previous incidents where the pour cups cracked during normal use.

## III. LAW AND ARGUMENT

### A. Standard for Admissibility

The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert

by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The admissibility of expert testimony is not subject to a definite checklist or test but depends on the application of many different considerations depending on the circumstances of each individual case. Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993). It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of Frye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923). See, e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 588 (1993); USA v. Dukagjini, 326 F.2d 45, 52 (2003); United States v. Boissoneault, 926 F.2d 230, 232 (2d Cir. 1991). Rule 702 governs the district court's responsibility to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589. In Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999), the Court clarified that, whether a witness's area of expertise was technical, scientific, or more generally "experience-based," Rule 702 required the district court to fulfill the "gatekeeping" function of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."

In <u>Daubert</u>, the Supreme Court made clear that the district court has a "gatekeeping" function under Rule 702, and is charged with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." <u>Wills v. Amerada Hess Corp.</u>, 379 F.3d 32, 48 (2004); citing 509 U.S. at 597, cert. denied, 126 S.Ct. 355 (2005). In fulfilling this role, the district court must consider both the reliability and relevance of the proffered testimony. <u>Id</u>. In gauging reliability, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on "sufficient facts or data;" (2) that the testimony "is the product of reliable principles and methods;" and (3) that "the witness has applied the principles and methods reliably to the facts of the case." <u>Id</u>. citing Fed. R. Evid. 702. In so doing, the district court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." <u>Kumho Tire Co.</u>, 526 U.S. at 152.

To determine whether a witness qualifies as an expert, district courts should compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony. <u>USA v. Chin</u>, 371 F.3d 31(2004); <u>see also</u> <u>United States v. Diallo</u>, 40 F.3d 32 (2d Cir. 1994). "A district court should

consider the Daubert factors where they are reasonable measures of the reliability of expert testimony; the list of factors neither necessarily nor exclusively applies to all experts or in every case,". <u>Zaremba v. General Motors</u>, 360 F.3d 355, 358 (2004)(internal citations omitted). "The trial judge has the same kind of latitude in deciding how to test an expert's reliability . . . as it enjoys when it decides whether that expert's relevant testimony is reliable." <u>Id</u>. (internal quotations omitted).

Here, as discussed more fully below, Mr. Shanok's proposed testimony concerning the cracking of the pour cups and the explosion that resulted in plaintiff's injuries rests on a reliable foundation and is relevant to the task at hand. Further, Mr. Shanok's opinions are based on his experience and training in the engineering field and his analysis of data and facts developed while investigating the causes of the explosion.

## B. <u>Shanok is Qualified to Offer Expert Testimony in this Case</u>

Contrary to the Defendant's contentions, Mr. Shankok is qualified to offer an expert opinion concerning the failure of the Fireline pour cups and the resulting explosion. Based on his engineering experience and knowledge of thermodynamics, Mr. Shanok is not only qualified to offer his opinions concerning causation, but his well grounded conclusions would be helpful to the trier of fact in this case.

Mr. Shanok's opinions in this case are based on his experience as a plant engineer in a brass mill, similar to the site of the explosion in this case. See Shanok Aff., ¶6. While serving as a plaint engineer, Mr. Shanok routinely worked with furnaces that were lined with ceramics and various ceramic parts and pieces that were utilized in the production process. Id. The subject pour cup that forms the basis for this action is ceramic in nature. Further, Mr. Shanok is qualified to offer expert opinions in this case based on his training and on-point employment experience in the brass foundry industry and with ceramic products and previous investigations of other accidents in brass mills. See Shanok Aff., ¶12.

The defendant relies on Stolting v. Jolly Roger Amusement, Inc.[1], 37 Fed. Appx. 80 (4th Cir. 2002) as evidence that Mr. Shanok does not possess the requisite qualifications to testify in the present case. A cursory examination of such case yields the opposite conclusion. In Stolting, the plaintiff proposed expert testimony regarding the defendant Jolly Roger's duty to warn patrons of the specific dangerousness of the Cannonball, a water slide, and the need to instruct patrons to tuck their knees when descending the slide and entering the catch pool. The Plaintiff's expert analysis was limited to the following:

> Plaintiff's expert's investigation entailed just three visits to the water park. On September 1, 2000, he observed and videotaped water park patrons riding down the Cannonball. He also slid down the Cannonball approximately six times. The next day, he met with

---

[1] This is an unreported decision from the 4th Circuit and, therefore, of questionable value to this Court.

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

Stolting and asked her to observe him slide down the Cannonball and to inform him as to how she proceeded down the slide and into the catch pool. He went down the slide between six and twelve times in different body positions. Each time, his feet contacted the bottom of the entry pool without sustaining an injury, and none of the patrons whom he observed riding the slide were injured from the impact of hitting the bottom of the entry pool. On December 1, 2000, Hanst visited the park with an engineer to view the slide and entry pool again.

Thereafter, Hanst concluded that Jolly Roger should have posted a sign that read, "Please draw your knees up and cup your hands under them in a full tuck and hit the water in a cannonball position." Hanst also concluded that Jolly Roger breached its duty to warn Stolting "that injury would result if the slider did not assume the so called cannonball position upon entry." He stated that his conclusions and suggestion for a sign were based upon his experience. Stolting v. Jolly Roger Amusement, Inc., 37 Fed. Appx. 80, 83 (4th Cir. 2002).

Based on such evidence, the Court concluded that Plaintiff's expert "did not set forth facts and scientific principles or methods to support his conclusion that a specific warning was necessary or that the suggested body position was warranted." Id. Here, Mr. Shanok does have the training and experience to render an opinion concerning the cause of the explosion. Mr. Shanok has over forty years engineering experience and has spent the last thirty years analyzing accident scenes and similar defective products. Further, his opinions are based on his previous employment with and consultation to ferrous and non-ferrous industrial employers with foundry facilities. See Exh. B. Moreover, Mr. Shanok interviewed eyewitnesses to the explosion, as well as researched the history of the pour cups' past

failures. <u>See</u> Shanok Aff., ¶12.

The Defendant next cites to <u>Free v. Bondo-Mar-Hyde Corp.</u>, 25 Fed. Appx. 170 (4th Cir. 2002)[2], a defective products case stemming from an exploding aerosol can.  Again, the underlying facts are instructive as to why the court precluded the expert in such case.   The Court concluded that the proffered expert lacked knowledge of the aerosol can manufacturing process, the process of filling aerosol cans, the testing performed on cans during the manufacturing process prior to their distribution, the pressurization of the can, or the normal pressure expected of the type of can utilized. And therefore, such expert lacked "the expertise necessary to determine (1) whether certain scratches on the interior of the can were defects or simply normal consequences of the manufacturing process and (2) whether those scratches actually caused the explosion." <u>Free v. Bondo-Mar-Hyde Corp.</u>, 25 Fed. Appx. 170, 172 (4th Cir. 2002).

Here, Mr. Shanok has extensive knowledge of the conditions present in a foundry such as ACB, is familiar with the thermodynamic stresses placed on the pour cups and has considerable experience in reconstructing similar industrial accidents and the underlying causes.  Moreover, unlike in <u>Free</u>, it is undisputed that the pour cups here have cracked in the past, rather than incidental scratches that may or may not have contributed to the

---

[2] Again, the Defendant cites to an unreported decision from the 4th Circuit.

explosion in <u>Free</u>. Further, if in fact plaintiff's expert is correct that the subject pour cup did

crack, the leak out and subsequent explosion were inevitable. Additionally, notwithstanding

the defendant's claims, Mr. Shanok testified that he has previously worked with fused silica

products (the pour cups at issue here are constructed of fused silica). <u>See</u> Shanok I Dep.

Trans. at p.72, attached hereto as Exh. D.

> Q: Have you ever worked with fused silica before?
> A: Yes.
>
> Q: When and where?
> A: I was plant manager of a brass mill at the Miller Company.

Mr. Shanok also testified at his second deposition in this case that he has experience

with fused silica in a foundry setting, similar to ACB here. <u>See</u> Shanok II Dep. Trans. at

p.47, attached hereto as Exh. E. He has been involved in designing specifications for fused

silica products. <u>Id</u>. Mr. Shanok, while serving as the plant engineer of a brass mill, was

responsible for the reliability and maintainability of furnaces lined with silica. <u>Id</u>. at 47-48.

Mr. Shanok has worked at a plant where silica was turned into fused silica. <u>Id</u>. at 51.

Significantly, Mr. Shanok has previously conducted failure analysis on fused silica products

and worked on problem solving at brass mills involving fused silica. <u>Id</u>. at 52 and 56-57.

Mr. Shanok has previously served as an expert and an industrial trouble shooter in cases

involving fused silica. Id. at 57.

Defendant next seeks to take advantage of the fact that they have failed to produce information concerning the cups it manufactured, such as the engineering drawings of the pour cups, the chemical composition of the pour cups, and the process by which the cups are manufactured. While such information may be helpful in determining the exact source of the defect, Mr. Shanok testified that it would not change his opinion that the pour cup was defective. See id. at p.67. Regardless of whether such information could potentially modify Mr. Shanok's opinion as to the origin of the defect, it does not affect Mr. Shanok's opinion that the pour cup failed due to the inherent defective nature of the product.

Defendant claims that Mr. Shanok's opinion is somehow not "finalized" and therefore should be discounted. Mr. Shanok has offered a final opinion, has produced a final report and has been deposed in this case. See Shanok Aff., ¶7; see also Exh E at 100-101, 131-133. Simply because the defendant does not agree with the opinions of Mr. Shanok, they are not rendered incomplete. At his deposition, Mr. Shanok indicated that should new or different information become available that bears on the issues in this case, he would be willing to consider such information and its impact on his current hypothesis and opinions, as any scientist would.

Accordingly, Mr. Shanok has the credentials and more than sufficient experience to

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
EARLY, LUDWICK & SWEENEY, L.L.C.
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

render an expert opinion in this case.

**C.    Shanok's Opinions regarding Causation are Supported by his Methodology**

While Mr. Shanok methodology is based on a review of Mr. Sander's testimony, he also considered other eyewitness accounts, data compiled during the OSHA investigation and his own examination of the pour cups and the job site where the explosion took place. Given that Mr. Shanok's opinion is based on significantly more than the recollection of the plaintiff, the defendant's argument is spurious at best.

Mr. Shanok's methodology in this case is based on recognized brass mill foundry practices, the OSHA regulations that govern safety in a brass mill foundry, and information that has been verified by the operators, first line supervisors and managers of the foundry. See Shanok Aff., ¶12. Further, Mr. Shanok's opinions regarding causation are connected to his methodology and supported by his education, training and on-point employment experience in the brass foundry industry and with ceramic products and previous investigations of other accidents in brass mills. Id.

The Defendant relies on Nimely v. City of New York, 414 F.3d 381 (2nd Cir. 2005) for the proposition that an expert should not solely rely on the credibility of the party who

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

retained him.  The facts of <u>Nimely</u> could not be further removed from this case and, therefore, make it easily distinguishable.  In <u>Nimely</u>, the Defendant's expert offered testimony that he found the police officers who shot the plaintiff to be more credible than other eyewitness testimony, clearly an issue for the jury to decide.  Defendant's expert, Dawson, testified that he believed the two police officers involved in the shooting to have been truthful in their account of the seconds preceding the shooting of the plaintiff, as well as offering his own explanation for the discrepancy between the uncontroverted facts and the officers' description of what they saw.

Incredibly, in <u>Nimely</u>, Defendant's expert rejected the possibility that the officers had lied, and explained various reasons why police officers have no incentive to give false statements in excessive force cases.  "On cross-examination Dawson reiterated his conclusion that the police officers were 'telling the truth as they perceived it.'" <u>Id</u>. at 398. The Court concluded that the expert's statements "essentially instructed the jury as to an ultimate determination that was exclusively within its province, namely, the credibility of [the officers]." <u>Id</u>.  The Court also found that the other medical evidence and eyewitness testimony presented at trial called substantially into question the truthfulness of the officers' version of events, thus placing the officers' credibility very much at issue. <u>Id</u>.  The Court was also critical of the Defendant's expert's "misperception hypothesis...through which the

defense sought to convince the jury of what otherwise seemed a factual impossibility: that [the officers] truthfully testified that Nimely was shot in the chest, notwithstanding the uncontested medical evidence that Nimely was shot in the back." Id. at 400.

Here, Mr. Shanok is analyzing whether a product manufactured by the defendant is defective and whether such defect caused the plaintiff's injuries. He is not proposing to offer testimony concerning the credibility of witnesses. Simply because Mr. Shanok takes into account Mr. Sanders', and other eyewitnesses, recollection of the events that led up to the explosion in formulating his opinions, it does not mean that plaintiff's expert is testifying as to a party's credibility, as in Nimely.

Defendant also attempts to discredit Mr. Shanok's opinion by comparing it to the OSHA investigation and report. Even assuming that the OSHA report is admissible in this case, which is doubtful, the mere fact that Mr. Shanok has drawn a different conclusion based on some of the same data that OSHA reviewed is not a valid reason for disqualifying Mr. Shanok. See, e.g., Jarvis v. Ford Motor Co., 283 F.3d 33 (2nd Cir. 2002), cert. denied, 537 U.S. 1019 (2002)(Court concluded that differing conclusions contained in governmental agency report did not affect the admissibility of plaintiff's expert theories to prove causation). Any such arguments clearly go to weight and should be limited to cross

examination, rather than a discussion on preclusion under Daubert.[3]

While Mr. Shanok considered the OSHA report and data compiled by its investigators, he found such report to be incorrect for reasons wholly independent of Mr. Sander's testimony. According to Mr. Shanok, OSHA's conclusion was based upon only one hypothesis that was not tested and arrived at by individuals who were neither ceramics experts, nor experts in brass foundry operations. See Shanok Aff., ¶10. Based upon his personal experience as the plant engineer in a brass mill, including working on furnaces that were lined with ceramics and various ceramic products that were utilized in the production process, Mr. Shanok determined that OSHA's conclusion was not the likely explanation for the cause of the explosion in this case. Id. Moreover, OSHA failed to account for the absence of other damage that would have occurred and that the pour cup would not have been destroyed had its hypothesis been correct. Id.

Additionally, Mr. Shanok's opinion that the pour cup cracked and failed, leading to the explosion is supported by ACB employees' prior experiences with such cups cracking during normal use. See Lindsey Dep. Trans. p. 24, attached hereto as Exh. F.

Q: Do you recall anybody ever telling you that the cups should only be used one

---

[3] "On cross-examination, an attorney is free to challenge an expert's methodology, h[is] conclusions, and the bases for h[is] conclusions. To the extent that the reliability of certain facts accepted by an expert is questionable, the exercise and process of cross-examination allow a defendant to bring any such factual disputes to the attention of the jury." Howard v. Walker, 406 F.3d 114, 127 (2nd Cir. 2005).

time?
      A: No.

      Q: Did you ever have problems with the cups?
      A: There were complaints that they were cracking.

<u>See also</u> Vinca Dep. Trans. p.36, attached hereto as Exh. G.

      Q: Now, when you take a brand new cup to examine it or look at it, are you looking to see if there are any cracks?
      A: Yeah, you gotta look. You gotta look because if you got cracks, they break up right away.

When asked what can cause a leak out, like the one that led to the explosion in this case, Mr. Nunley responded: "Broken Cups. The cups, they disperse the metal on an angle, like toward the sides. It sprays out like that. When the cup breaks, all of the metal is going straight down, which doesn't cool properly and cause a leak-out." <u>See</u> Nunley Depo. Trans. p.16, attached hereto as Exh. H.

<u>See also</u> Parente Dep. Trans. pp.27-28, 31, attached hereto as Exh. I.

      Q: What were the concerns that casters had about the cups?
      A: That the cups would crack.
      ……………..

      Q: Did Pete Quigley [Fireline's representative] ever tell you that the cups should only be used one time?
      A: No.

<u>See also</u> Graham Dep. Trans. pp. 54-56, attached hereto as Exh. J.

Q:  So, your opinion as the supervisor in around February of 1999 was that the ceramic cups in use were not adequate for a 1450 pour?
A:  I don't think so.

................

Q:  And you noticed and people under your supervision noticed that hairline cracks would appear in the cups after they were used in the 1450 pour; is that correct?
A:  Yes.

Q:  And that is after a single use?
A:  Yes.
..................
Q:  What is your opinion as to what would occur if you used a cup with a hairline crack in a 1450 pour?
A:  I think the bottom would fall out of it.

..................

Q:  Who was having problems with the cups?
A:  All the casters, they was complaining about them.

Q:  Why were they complaining about them?
A:  Because they was cracking.

When asked how the accident happened, Mr. Sanders responded: "My belief, if the bottom of that cup, what I seen came apart, nothing else could have happened over there. My casting all these years, if that cup come apart, you definitely going to have an explosion, no doubt about it." See Sanders Dep. Trans. p.171, attached hereto as Exh. K.  Mr. Sanders testified that just before the explosion that he saw that the cup had failed.

Q: You testified that you think you saw a piece of the cup floating in the molten, correct?
A: Yes. Id.

Mr. Shanok's methodology is based on his examination of the cups, his inspection of the job site where the explosion took place, and his review of the aforementioned testimony concerning the cups cracking. Unlike the only case cited by the defendant, plaintiff's expert is not offering testimony that the plaintiff is more credible than other witnesses. In fact, the plaintiff's testimony that the cup cracked during the pour when the explosion took place is consistent with other employees' experiences when using the Fireline pour cups. Moreover, just because OSHA arrived at a different conclusion, Plaintiff's expert should not be precluded from testifying.

**D.    Shanok's Expert Opinion Concerning Multiple Possible Causes Is Properly    Admissible**

While stating the background facts in its motion to preclude at p.5, the Defendant criticizes Mr. Shanok for putting forward multiple hypotheses regarding the defect in the pour cup that led to its failure. However, it subsequently offers no legal support for its supposed claim that by offering more than one cause of the product's failure, Mr. Shanok's

opinions are somehow rendered inadmissible. Perhaps, this is because the Defendant could not find any case law to support such a claim. In fact, Connecticut courts have held that a plaintiff in a products liability case is not required to show only one possible theory of causation, while negating all others. <u>See</u>, <u>e.g.</u>, <u>Slepski v. Ford</u>, 170 Conn. 18 (1975).

IV.    **CONCLUSION**

Mr. Shanok is clearly qualified to offer expert testimony as to the issues for which he has been disclosed in this case. His testimony is firmly supported by the facts and circumstances at issue and based on widely accepted engineering principles and sound scientific methodology. The issues raised by the defendant are matters for cross examination and do not implicate the admissibility of his testimony. Accordingly, the motion to preclude should be denied.

THE PLAINTIFF

BY: _____
Robert J. Sweeney
Early, Ludwick & Sweeney, L.L.C.
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT 06508-1866
(203) 777-7799
Fax (203) 785-1671
Fed Bar No. CT06046

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
**EARLY, LUDWICK & SWEENEY, L.L.C.**
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed, postage prepaid on November 15, 2006 to:

Mark Seiger
Charles Gfellar
Edwards Angell Palmer
& Dodge LLP
90 State House Square
Hartford, CT 06103

Timothy Ward
McGann, Bartlett & Brown
281 Hartford Turnpike #401
Vernon, CT 06066

Robert J. Sweeney

EARLY, LUDWICK, SWEENEY & STRAUSS
An Association of Professional L.L.C.s
EARLY, LUDWICK & SWEENEY, L.L.C.
ONE CENTURY TOWER • 11th FLOOR • 265 CHURCH STREET • P.O. BOX 1866
NEW HAVEN, CONNECTICUT 06508-1866 • (203) 777-7799 • JURIS. NO. 409080

**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| WILLIE SANDERS | : | CIVIL ACTION NO. |
| | : | 3:02 cv 498 (AWT) |
| Plaintiff | : | |
| | : | |
| VS. | : | |
| | : | |
| FIRELINE, INC. | : | |
| | : | |
| Defendant | : | November 14, 2006 |

## AFFIDAVIT OF MICHAEL SHANOK

I, Michael Shanok, after having been duly sworn, hereby depose and say:

1.     I am over 18 and believe in the obligation of an oath.

2.     I have been retained by the Plaintiff to serve as an expert in the above referenced case and I am familiar with the facts surrounding the accident in this case.

3.     I submit this affidavit in response to Defendant's Motion to Preclude.

4.     In response to Defendant's claim that I am not an expert in ceramics, I submit that not only is it not necessary to be an expert in ceramics to analyze the circumstances of this case, but a ceramics expert would not have the background in occupational safety necessary to perform such an analysis.

5.      Given that the subject pour cup was never recovered, and likely destroyed in the explosion, there would not be any evidence for a ceramics expert to examine.

6.      The expertise that I do bring to bear in this matter comes from my experience as a plant engineer in a brass mill, during which time I routinely worked with furnaces that were lined with ceramics and various ceramic parts and pieces that were utilized in the production process.

7.      In response to Defendant's claim that my opinions are not final, I submit that I was merely reserving the right to consider further evidence brought to bear during discovery and/or submitted by Defendant's expert.  Given that no further evidence has come to light, I consider my opinions to be final in this case.

8.      In response to Defendant's criticism that I have not established which of the five hypotheses that I have put forward caused the subject pour cup to fail, I submit that without being able to examine the subject pour cup, it is not possible to conclusively establish which one or more of the five is responsible for the failure. However, it is my opinion within a reasonable degree of scientific probability that one or more of such hypothesis caused the subject pour cup to fail, causing the plaintiff's injuries.  Further, in my professional opinion, within a reasonable degree of scientific

2

probability, any of the five such causes would render the pour cup defective for its intended use and all five were created by the Defendant during the manufacturing and/or design process.

9.    It would be dangerous and imprudent to attempt to test my hypotheses, by duplicating the events that led to the explosion in this case, because such testing would in all likelihood result in another accident.

10.    In response to the Defendant's claim that I improperly discounted OSHA's testing and analysis, I submit that OSHA's conclusion was based upon only one hypothesis that was not tested and was postulated by OSHA compliance officers who were neither ceramics experts, nor experts in brass foundry operations. Based upon my personal experience as the plant engineer in a brass mill, including working on furnaces that were lined with ceramics and various ceramic products that were utilized in the production process, I determined that OSHA's conclusion was not the likely explanation for the cause of the explosion in this case and failed to account for the absence of other damage that would have occurred had its hypothesis been correct.

11.    In response to the Defendant's criticism of the reliance on measurements taken by Joseph Walsh, I submit that there is no reason to doubt Mr.

3

Walsh's measurements. Moreover, even if Mr. Walsh's measurements were in fact approximations, it would not change my opinion that, within a reasonable degree of scientific probability, the subject pour cup was defective.

12.    In response to the Defendant's criticism of my methodology, I submit that my conclusions and opinions in this case are based on recognized brass mill foundry practices, the OSHA regulations that govern safety in a brass mill foundry, and information that has been verified by the operators, first line supervisors and managers of the foundry, and is supported by my education, training and on-point employment experience in the brass foundry industry and with ceramic products and previous investigations of other accidents in brass mills.

Michael Shanok, P.E.


State of Connecticut    )
County of New Haven    )    ss: Cheshire

This 15 day of November 2006, Michael Shanok personally appeared before me, signer of the foregoing document, who acknowledged the same to be his free act and deed.

Notary Public
My commission expires on: 3-31-08

4