**EXHIBIT A**



**forensic engineering**

*Accident, fire and failure investigation*

Michael E. Shanok, PE
Gilbert E. Nicholls, PE

100 Hinman Street ■ Cheshire, Connecticut 06410-2546
203-699-9137 ■ Fax: 203-2727512 www.foreng.com

*COPY*

July 28, 2003

## Report of Opinion #03071

Subject: ***Injuries to Willie Sanders at Ansonia Copper & Brass,***
***75 Liberty Street in Ansonia, CT, on February 23, 1999***

To Whom It May Concern:

The writer was called upon to investigate and conduct a technical analysis of the subject incident. Pursuant to that request, the writer reviewed the following file documents:

a.  Listing of entries for Ansonia Copper & Brass posted in establishment search section of OSHA's internet website (both Ansonia and Waterbury facilities);

b.  Deposition of Willie Sanders taken April 8, 2003;

c.  OSHA case file for Inspection #123280810;

d.  The writer's interview with Mr. Sanders on June 20, 2003;

e.  Exemplar new and used pour cups manufactured by Fireline, Inc., received at the writer's interview with Mr. Sanders on June 20, 2003;

f.  The writer's visit to Ansonia Copper & Brass on July 21, 2003, at which time Mr. Sanders was again interviewed and the operation of furnace number four was observed and photographed during a casting pour;

g.  The writer's conversations with the Mill Superintendent, Joseph Walsh, on July 21, 2003 and subsequently, by telephone.

The following report of findings, opinions and conclusions is based upon those activities and the writer's education, training, background and experience in engineering and safety, including previous employment with and consultant to ferrous and non-ferrous industrial employers with foundry facilities.

1.  The writer is of the following understanding: on February 23, 1999, Willie Sanders was employed as a caster at number four furnace in the Casting Department at

**Report of Opinion #03071**
July 28, 2003,  Page 2

Ansonia Copper & Brass' 75 Liberty Street facility, where he had worked for more than 18 years.  In addition to his employment responsibilities, he was also a vice president of Local 445 of the Steelworkers Union at the time, and he had also held various offices within the union chapter's operation, including membership of the safety committee's accident investigation team.  (At this writing, he is president of the Local.)  He was performing his duties as a caster at number four furnace, while casting two billets of copper alloy #1450.  The total length of the billets was to be approximately eleven feet.  The casting process was approximately 76% completed shortly after  9:00 AM, when molten metal suddenly flowed directly into the water bath surrounding the molds.  The water in the bath rapidly turned to steam, causing a violent reaction.  As a result, Mr. Sanders sustained serious burns over his face, arms and a knee, and he was thrown approximately 15 feet against the side of a large waste material bin, thereby sustaining his injuries.

2.  The following is a general description of the casting system which Willie Sanders was operating at the time he was injured.  The molten metal is contained in the crucible of a furnace, in this case an Inducto coil-less electrical induction furnace with a capacity of approximately 24,000 pounds.  The crucible is slowly tilted by a hydraulic system, so that molten metal is poured into a T-shaped container called a *running box*.  The leg of the running box T faces the furnace, and each side of the T's crossbar has a hole, approximately 6 inches in diameter, through which the molten metal will pour into *pour cups* and, from there, into the *molds*.  On top of the running box, immediately above the pour cups, cone-shaped forms called *pins* are mounted on linkages so that they can be moved, up and down, to act as valves to control the flow of molten metal from the running box into the pour cups.  The bottoms of the holes are fitted with slotted retaining sleeves, into which the pour cups are inserted.  The pour cups have closed bottoms and four 1"-diameter holes on the sides.  The molten metal flows into the pour cups and through the holes, so as to flow against the sides of the molds.  The molds are metal sleeves with water-cooled jackets, and are suspended over a platform called a *platen*.  The platen is attached to the end of a hydraulic cylinder   rod, and slowly lowers into a water bath at a rate of approximately 4 inches per minute, as the billets are being cast.  Surrounding the



**Report of Opinion #03071**
July 28, 2003,   Page 3

billets, just beneath the molds, are circular piping rings with holes pointed toward the billets, called *spray rings*.  Cooling water is pumped through the spray rings to further aid in solidifying the metal billets as they pass out of the molds.  Shown below is a diagram of casting apparatus.  Photographs of Furnace #4 and its apparatus are shown on the following pages.



**DIAGRAM OF CASTING APARATUS**
Not to Scale



**Report of Opinion #03071**
July 28, 2003,   Page 4



Photos taken by M.
Shanok on 7/21/03

General view of furnace
#4 in operation.  Dump
box can be seen in upper
right of photo.



Closeup view of furnace
#4 in operation.

 forensic engineering

**Report of Opinion #03071**
July 28, 2003,   Page 5



View of top of running box.



Running box with pins and
their operating linkages
installed.



**Report of Opinion #03071**
July 28, 2003,   Page 6



Underside of running box,
showing receptacles for
pour cups.



View of top of molds
before running box is
placed over them.



**Report of Opinion #03071**
July 28, 2003,   Page 7



View of piping leading
to spray rings, looking
into water bath tank.



View of cast billets.

 forensic engineering.

**Report of Opinion #03071**
July 28, 2003,   Page 8



**Report of Opinion #03071**
July 28, 2003,   Page 8



View of ends of billets. Upper left (lighter colored) billet end shows conical depression which is filled during "shrink" process.



forensic engineering

**Report of Opinion #03071**
July 28, 2003,  Page 9

3.    Mr. Sanders told the writer that the ceramic pour cups, which were manufactured by Fireline, Inc., with offices in Youngstown, Ohio, have been problematic. Many of them had cracked circumferentially around the outflow holes at the bottom of the cups. The company had adopted a practice of not using the cups out of a concern that they would crack and separate during the casting process. Mr. Sanders testified at deposition, and Mr. Walsh also told the writer, that Fireline representatives had visited the factory a number of times to discuss the problems with their pour cups and to develop remedies to prevent the failures. It is significant that, the moment before the subject incident occurred, Mr. Sanders saw one of the casting cups rise up to the surface of molten metal within the running box. (The cups are manufactured of a material which, being lighter than the metal, will float in the metal, much like a piece of wood will float in water.)

4.    OSHA's internet website (www.osha.gov) contains a section entitled, "Establishments Search," which allows an individual to search for summary records of OSHA inspections by entering the name of an employer as a search parameter. Utilizing this feature, the writer found records of six OSHA inspections at Ansonia Copper & Brass, including both its Waterbury and Ansonia plants. One record, Inspection Number 123280810, was commenced at the Ansonia facility on February 24, 1999, the day following the Sanders accident. This inspection was in response to a formal complaint to the Bridgeport Area OSHA Office. The writer ordered a copy of that report, along with photographs taken during the inspection, under the Freedom of Information Act. A review of the report showed that, although its primary focus was related to Subpart Z, the OSHA Health Regulations for General Industry, an inspection of the Sanders accident was conducted as part of the inspection.

5.    Because the OSHA inspection report is voluminous, pages are unnumbered and in seemingly random order, and most of it is not germane to the subject of this report, the writer has photocopied those four pages which contain the essence of OSHA's accident inspection and analysis. In keeping with privacy constraints of the Freedom of Information Act, names, dates and times of day have been redacted from these pages. The following is a summary of OSHA's findings and opinions:



**forensic engineering**

**Report of Opinion #03071**
July 28, 2003,  Page 10

a.   Mr. Sanders stopped the casting pour early. There was an inference that this might have been done because he believed that the furnace charge was "short," i.e., insufficient to cast two complete billets;

b.   Upon deciding to stop the pour, Mr. Sanders commenced the "shrink" process without stopping the platen's descent.   (When a billet casting pour is completed, the metal at the top of the billet cylinder contracts as it cools, thereby forming an inverted conical depression.  "Shrinking" is the term applied to the process of manually adding molten metal into that depression, to level off the top face of the billet.)

c.   The incident was precipitated when "the billet had been lowered enough so that, when molten metal was introduced into the cooling center, the sidewalls reheated and did not have the normal support of the mold depth, which is 15 inches.  The walls of the south billet bulged outward . . . , finding a weak point in which the molten metal was able to penetrate the billet wall, reaching the outside of the billet.  The molten metal hit the spray ring, which caused the contact with the water, and thereby caused the violent reaction between the two."

OSHA faulted housekeeping at the facility because, during the incident, "a dust cloud was created, and it was determined to have hampered the attempt to find the injured worker and created a source of significant concern for the ambulance crew's safety and health." The CSHO was apparently unaware that the extensive use carbon black, to protect  molten metal from oxidization due to exposure to the atmosphere, was a mandatory function of the casting process. Additionally, OSHA did not believe Mr. Sanders' claim that he was thrown into the side of a dump box located in the general vicinity of the furnace.  It was OSHA's finding that the box was probably not there, because it was not utilized for the disposal of running box contents when alloy #1450 is cast, and because the ambulance call report stated that Mr. Sanders was not thrown. The writer believes that this was an incorrect assumption. However, it is irrelevant, as Mr. Sanders' primary injuries were severe burns.



forensic engineering

**Report of Opinion #03071**
July 28, 2003,  Page 11

6.   During the writer's July 21, 2003, visit to the facility, Mr. Sanders was shown the pages of the OSHA report which were discussed in the previous paragraph. He adamantly disagrees with OSHA's determination that he stopped the casting pour before the billets were cast to their proper, full length. He further disagrees with OSHA's contention that he was not thrown against the side of the dump box. He further insisted that he had not commenced the shrink process at the time, since the billet casting process was incomplete. He was incredulous at OSHA's suggestion that he would perform the shrink operation without stopping the platen's descent. The writer brought Mr. Sander's attention to OSHA's comment, that the pour cup for the south billet (the one that was involved in the accident) "was unsalvageable and was not available for this investigation." Apparently, the investigating CSHO either did not know of Mr. Sanders' observation that the upper section of the cup had floated to the top if the running box, or was told of this fact, but did not comprehend its significance. In one of the photographs appended to this report, the dump box is located in approximately the same position that Mr. Sanders believes it was on the date of the subject incident.

7.   The writer is of the opinion that, due to the investigating OSHA CSHO's unfamiliarity with the worksite and incomplete assessment of the factors involved in the Sanders incident, the conclusions which OSHA drew as to how the incident occurred are faulted. The omitted information which was most important was that which dealt with the missing south pour cup. This writer does not fault the OSHA CSHO. He is neither required nor expected to be an expert in every kind of workplace. Further, it appears that he was denied the opportunity to completely learn and understand the mechanics of the casting operation, leaving him inadequately prepared to draw correct conclusions. The writer believes that, had he known about the previous problems the facility had experienced with pour cups provided by Fireline, and had he more been more completely informed about Mr. Sanders' observation regarding the south pour cup, he would have drawn much different conclusions.

8.   The OSHA accident investigation contained measurements which demonstrated that the breach in the sidewall of the south billet, which allowed molten metal to flow

**Report of Opinion #03071**
July 28, 2003,  Page 12

directly into the water bath tank, was eight inches from the top of the billet and that contact of molten metal flow occurred 28 to 29 inches below the top of the north billet. At the writer's request, Mr. Walsh determined that, during the casting process, the bottom of the pour cup is approximately eleven inches above the bottom of the mold, the bottom of the mold is approximately eighteen inches above the surface of the water in the water bath tank and the molds are seven inches apart from one another. Putting all of this dimensional data together (see diagram on following page), the writer determined that the top of the breach in the south billet was immediately below the bottom edge of the mold and the deposit of metal on the north billet was immediately at the tank waterline. This is consistent with a scenario in which the Sanders incident was precipitated by a sudden redirection of molten metal flow from the mold's sides, toward its bottom, as would occur if the pour cup fractured and separated around its periphery, at the outflow holes. It is therefore the writer's opinion that:

a.  The pour cup, which was installed over the south mold in the assembly which Mr. Sanders was using at the time of his injury, was defective for one or more of the reasons which are enumerated in paragraph #9 of this report;

b.  The defective nature of the pour cup over the south mold was concealed and was thereby incapable of detection by Mr. Sanders;

c.  In the moments immediately prior to the initiation of events which resulted in Mr. Sanders' injury, the pour cup cracked and failed;

d.  Failure of the pour cup allowed molten metal flow into the mold's central core, rather than directing it toward the sides of the mold;

e.  Because the freshly deposited molten metal charge did not immediately flow to the sides of the mold, it did not form an adequately strong exterior "skin" on the portion of the billet's surface which was exiting the mold;

f.  The weight of the molten metal within the billet overcame the strength of the billet's thin, solidified wall surface;

g.  Unable to contain the molten metal, the surface split open, allowing molten metal to flow freely onto the spray ring and into the water bath.



**forensic engineering**

**Report of Opinion #03071**
July 28, 2003,   Page 13



DIAGRAM OF INCIDENT DIMENSIONS

Not to Scale



**Report of Opinion #03071**
July 28, 2003,   Page 14

9.    The writer examined two  exemplar pour cups, one of which has been reportedly been used for one pour, and the other of which was unused. The used cup is cracked circumferentially, through approximately the centers of the outflow holes. The writer was told that this was the same location at which other pour cups had failed in the past. Analysis of the particular cause of failure would require extensive examination and testing of a large number of other pour cups which have cracked in the same manner.  The writer is therefore unable to offer a specific cause of the exemplar's failure. However, the writer is of the opinion that the failure occurred as a result of one or more of the following defects in manufacture or design of the south pour cup which was installed in furnace #4 at the time of the Sanders incident :

a.    The pour holes at the bottom of the cup are too large, thereby causing the material between them to be inadequate in volume and strength to withstand the temperatures and forces to which they are subjected during use;

b.    The surfaces of the pour holes are sharply perpendicular to the inner and outer walls of the pour cup, thereby presenting too severe a change in mass and direction of the material, and resulting in its inability to resist the temperatures and forces to which it is subjected;

c.    Fusion of the silica is incomplete within the makeup of the pour cup, resulting in inadequate strength of the cup wall, within the area in which it is reduced in size by the presence of the pour holes;

d.    The walls of the pour cup are too thin at the location where the pour holes are formed, causing them to have inadequate strength to resist the temperatures and forces to which they are subjected;

e.    The characteristics of fused silica give it inadequate strength to withstand the temperatures and forces to which it is subjected without a form of reinforcement.

10.    In the writer's opinion Fireline knew or should have known, as a result of its investigations at Ansonia Copper & Brass and its experience in the industry, that:

a.    The pour cups it introduced into the stream of commerce, which were eventually sold to Ansonia Copper & Brass, had a propensity to fail without

**forensic engineering**

Report of Opinion #03071
July 28, 2003,  Page 15

> warning;

b.  Such failures would result in disruption of the casting process at Ansonia Copper & Brass;

c.  The opportunity for molten metal to flow into the water bath, and the probable consequences of such an incident, made it reasonably probable that the safety of Ansonia Copper & Brass employees would be compromised by such failures.

11.  Based upon conversations with Joseph Walsh and Willie Sanders and Mr. Sanders' deposition testimony, the writer is of the understanding that Fireline took no actions to warn Ansonia Copper & Brass that its employees' health and/or safety could be jeopardized by use of its products, nor did it conduct a job safety analysis or other formal procedure, for the purpose of determining methods of protecting employees of Ansonia Copper & Brass from injury that might result from such failures, nor did it undertake  adequate changes in its design or manufacturing processes to enable the production of products which would not fail.  The writer therefore concludes that those failures of action resulted in unsafe exposure of employees of Ansonia Copper & Brass to risk of injury, and the resulting exposure to its defective product was the proximate cause of the subject incident and Willie Sanders' resulting injuries.

This concludes my report.  Should there be further questions or comments, please contact the writer.

Respectfully submitted,

Michael E. Shanok, P.E.

MES/k
Enclosures - See following page



**forensic engineering.**

**Report of Opinion #03071**
July 28, 2003,  Page 16

## Enclosures

a.  Excerpt from OSHA Inspection Report

b.  Photographs taken by OSHA during its investigation

c.  Deposition transcript of Willie Sanders

d.  Photos of exemplar pour cups

e.  C.V. of Michael E. Shanok, PE

f.  List of testimony by Michael E. Shanok, PE at trials, depositions and hearings from July 28, 1999, to July 28, 2003

g.  List of materials published by Michael E. Shanok, PE between July of 1993 and the present

g.  Fee schedule for Michael E. Shanok, PE



**forensic engineering**

limited to: Skimming, Charging ●d Pouring, workers must also wear half fac●pirators, aluminized full length coats and face shields. Aluminized coats are optional during the warmer weather, although management is presently exploring options such as cooling vests in order to make these coats mandatory.

The operation involved in t'      '' .  '''' ... direct chill (also called semi-continuous) process which is the melting of the Copper alloy                      mixture is created and the amount necessary to make ⎯⎯⎯                 ⎯⎯ed at the rear of the furnace. The alloy is then                   is melted at a temperature

of 1200 degrees Celsius. Once the entire contents is melted, impurities are skimmed" off the top, and a sample is taken and sent to the lab (onsite) for analysis (called Sampling). When the lab determines the mixtures is correct, they release it and the caster begins pouring the molten metal at a prescribed downcast rate of 4 inches per minute. Completed billets measure 130 inches long by 13.5 inches in diameter.

The caster achieves this pour by tilting the furnace forward so the molten metal pours into a "Running Box". This box is "T" shaped with holes on either end of the horizontal portion. These holes are directly above their respective billet molding unit. The metal is poured into the running box where it flows through the holes and onto "Cups" (ceramic unit with holes at the bottom of the unit which directs the metal towards the sides of the mold). The cups are controlled by "Screw Downs" located on either side of the mold. The screw downs control the amount of metal allowed into the cups. The base of the mold is located on the "Plenum" on which the base of the billet sits during the pour. The plenum is controlled with a hydraulic lift, which moves the mold up to the top of the mold tank, then as metal is poured, the plenum moves downward to the desired length of 130 inches.

The mold unit is cooled with a "Water Ring" located on the outside of the mold (it does not come in contact with the molten metal). As a result of the cooling, the metal is cooled from the outside in. This causes the billet to create it's own walls. The base unit is dropped (downcast) as the continues to be poured in. The cups causes the metal to be directed to the sides so the wall continues to solidify before the center of the billet. This entire process normally takes between 25-35 minutes, depending on the alloy being poured and it's prescribed downcast rate.

At the end of the pour, the billet has about a 12 inch section at the top of the billet where the outer wall has reached the desired length, but the center has not. The process to fill this void is known as the "Shrinking" process. The caster first waits for about ten (10) minutes, and then pour small amounts of metal into the billet until the center is filled. This process is used to minimize waste; even though waste can easily be remelted.

According to management, furnace #4 (involved in the accident) had been checked out and placed back in service sometime on the second shift the day following the accident. The molds had also been taken out of service, and were placed on a pallet, to be held in the wood shop pending the outcome of the investigation. The billets were marked and placed in the Metal Storage Department pending testing to be performed in the next few days.

ACCIDENT INVESTIGATION

The investigation of the accident was begun, when the facility was re-entered. At that time, the #4 furnace was observed in operation. According to management, the furnace (involved in the accident) had been checked out and placed back in service sometime on the second shift the following day. The molds and personal protective equipment had been removed from service as well and were placed on a pallet, to be held in the wood shop pending the outcome of the investigation. (NOTE: Although the Wood shop is remotely located with respect to the Casting Department, no chain of custody or other security measures was maintained for either the molds or the ppe). Also, the two billets were marked and placed in Metal Storage pending testing to be done in the next few days.

The first priority in this inspection was the investigation of the accident. Several days were required to conduct initial interviews and take statements (March 3rd-16th). Interviews were conducted in the following order;

G̶y̶              7c    , Casting Department Superintendent

G̶y̶         ·-    7c        Caster Furnace #21/Injured Worker (At his Home)

G̶y̶           7c  . Electronic Technician

S̶            7c      ), Union President/Electrician

G̶r̶̶              Caster Furnace #4
          7/C   Casting Department Foreman
                Casting Department, General Foreman

Tuesday, March 9th- 

- General Mechanic
- R.N., Company Nurse
- Caster Furnace #6
- Metal Storage Department Foreman
- Caster Furnace #23
- Caster Furnace #22
- General Mechanic

Thursday, March 11th- 

- Electrician Leadman
- General Mechanic
- Rod Mill Operator/Safety Committee Member

## FINDINGS

### Preceding Events

- On the day of the accident, . 7ᴄ furnace (#21) was out of service since the previous shift. When he arrived to work, he was informed of this and immediately assigned to the utility job and was told that ! 7ᴄ had to go to the company doctor that morning and he would be taking over #4 while 7ᴄ was gone. 7ᴄ was the regular operator of Furnace #4.

- 7ᴄ states he began the pour at 5 and 7ᴄ took over at 5 am so he could go to the company doctor. Both men indicate there were no problems at this time.

### Time

- Security reports show the initial call from the Casting Department (500 Line) came in at 5 , as was the initial 911 call for the ambulance. The report also notes there was a one to two minute time lapse between the explosion and the call to security.

- Allegations were made regarding excessive time, from initiating the "911" call to the time it took for the company nurse to arrive (forty-five minutes because she was lost in another part of the mill). Security records indicate the initial call for help was made within one or two minutes of the explosion, the "911" call was made immediately following that call and that security transported the company nurse within four minutes of the first call, from the Medical department where she and the company doctor were holding clinic and had seen just moments before. The first of two ambulances arrived within ten minutes and the second ambulance (Paramedic Intercept) seven minutes later.

- The length of the billets (100.5 and 99 inches) at a rate of 4 inches per minute per interviews with both casters. Immediately following the explosion, 7ᴄ who was first on scene, indicates he found the down-cast speed indicator at 4.16 inches per minute.

- The noted speed of down-cast and billet's length indicates the pour had been going on for at least 24 minutes. This along with the first call made at 5 (and subsequent note regarding lapse time) indicates the start of the pour was initiated within two or three minutes of the reported 8:50 am start time. 7ᴄ indicates that the furnace (contents) look small to him, leading him to believe that he did not have enough to make full billets. Subsequent to the accident, the contents were poured into a pot. Per 7ᴄ the pot contents were observed and that judgement was probably okay in that it would have been very close.

- An allegation was made that the "Shrink process" had begun, when the incident occurred, however, the statement of 7ᴄ who was first on scene immediately following the explosion, indicates that he stopped the down cast and tilted the furnace back to it's upright position. The investigation of all the systems, found no problems consistent with this allegation.

### Pour

- 7ᴄ started the pour prior to being relieved by 7ᴄ Interviews indicate there were no problems during the pour and 7- did not have to take any corrective measures while he was pouring. The level of the metal was about an inch from the top of the mold. This is how he normally pours the metal.

### Billets-

- The two billets were observed, photographed and measured. The South billet (involved in the incident) measured 100 inches long, with the interior portion measured to be between 13 1/2 inches deep. An 6 1/2 inch long by 3/4 inch wide opening was observed and measured to be 8 inches from the top of the billet.

The North billet was measured ●● 99 inches long, with it's interior portion measured to also be 13 1/2 inches deep. An area on the outside of this billet measured to be 28-29 inches from the top of the billet was observed to have come in contact with molten metal after the outer wall had been formed and cooled.

The difference in lengths is attributed to the loss of metal through the breached area of the south billet. According to management, both the opening in the south billet and the area of metal on the outside portion of the north billet were determined to face each other at the time of the accident.

## Billet Testing

The billets were taken to the lab for testing to determine whether or not there was a problem in the pour. Both billets were cut so comparisons could be made between billets. Each billet was cut in several predetermined locations (see field notes for diagram). It was determined through this testing that the pour piece was acid etched and polished to bring out the grain. It was determined through this testing that the pour was in fact without problems in that the center of the billet was observed to be generally centered (slight drifting in the good or north billet) and non-drifting, the pattern was uniformed and tight, and no impurities were observed. Additional testing will be performed on the damaged portion of the billets to further ensure the nothing was missed.

This testing was reported by management to be unremarkable and provided little additional information. The cuts made in the upper portion of the billet revealed an oblong ring, with several stress fractures on the outside portion of the billet indicating that the molten metal had pushed towards the breached area. Management believes this occurred from one of two conditions. First, there was a "Hot Spot" caused by any number of reasons. Second, there was a malfunction of the cup. In either condition, there is a set protocol for the caster to use. Management also feels that if either condition existed to the point of breaching the wall, then it would be due to the caster not properly watching the pour.

A post pour alloy analysis was conducted by the company lab. The analysis determined that although the billet started out as a "1450" alloy, it ended up as a "1452" alloy because of excessive Phosphorous. According to management, this is not unusual for an alloy to be reclassified. In this particular instance, both alloys are cast using identical procedures (heat, downcast speed, etc).

## Molds

The molds were inspected after the accident and found to have cooled splattered molten metal on the top section of the mold, consistent with molten metal that is shot straight up in the air and falling directly onto the mold. The only damage noted was to the water ring on the mold unit. No problems with the mold rings were observed, reported or discussed by either caster before or during the pour.

## Running Box

The running box was observed by     7◡     and     7◡     immediately following the incident. The running box was in an up-side-down position nearly on top of the molds. Mr.  7◡   indicates that an inspection of the box found no damage and despite allegations of an overflow, there were no visible indications of an overflow on the box's exterior.

## Cup

The cup (South Billet) involved in the accident was unsalvageable according to management and was not available for this investigation. Interviews with both casters indicate the cup was new for that pour, and are not generally a problem with that particular alloy (Other alloys such as 1850 can cause the cup to become brittle).

## Mold Tank

The plenum was removed from the tank and the walls were visually observed both interior and exterior for damage. None was found.

## Control Panel

Following the initial accident investigation of the incident (by management) the "Electronics" were inspected. A small piece of metal was found across two contacts, causing a light to remain lit. This was the only problem found with the electronics. Despite allegations that one arm fell off, and the other was unresponsive, interviews indicate both control arms on the panel were in tact and correctly secured in place and were functioning properly.

Personal Protective Equipment 

- The injured's personal protective equipment (hardhat, face shield, safety glasses, respirator, green fire retardant jacket, aluminized coat, spats, and work boots), except for the green fire retardant pants was collected, placed in a plastic bag and was kept with the molds in the wood shop for later evaluation. The pants are thought to have accompanied the injured to the hospital and have not been seen since. All the remaining equipment was observed and found to be completely covered in lamp black but undamaged as a result of the explosion.

Rescue operation/Ambulance personnel

- Interviews indicate that immediately following the explosion the area surrounding Furnace #4 was completely covered in a cloud of lamp black such that workers could not see directly in front of them even with a flashlight. This cloud did not dissipate for at least several minutes after the explosion. Subsequently when the ambulance crew arrived, they raised significant concerns about the dust and the potential contents and their personal safety. At one point the crew apparently asked to have the injured worker brought out of the area to them.

- An allegation was made by the injured that he was thrown into a dump box located in the general vicinity of the furnace. This box is used to dump the contents out of the running box, and is only used for certain alloys. 1450 is not one that requires the box, although the alloy (182) being pour on Number 6 Furnace did require the box be in the area. The ambulance call report indicates the injured was not thrown.

## DETERMINATIONS

- On the morning of the day of the explosion, the injured took over a pour at furnace #4 of a 1450 copper alloy. At that time communication between both men indicated there were no problems with the pour.

- The injured indicated the remainder of the pour was also without problem, except for his feeling that the furnace contents were light, meaning he did not believe he had enough metal to complete a full billet.

- The injured ceased the pour short (at about 100 inches) in favor of beginning the shrinking process. After waiting approximately ten (10) minutes for the center of the billet to cool, he began pouring metal into the running box.

- Shortly after this pour, the explosion occurred.

- ⁀ᐯ, General Supervisor of Metal Storage and Casting, was first on scene following the explosion. He found the plenum in the down-cast mode at a rate of 4.16 inches per minute, and the furnace tilted forward. He turned to down-cast off and tilted the furnace back to it's up-right position.

## CONCLUSION

- Based on the investigation, it appears that the caster began the shrinking process ⁀⁀ Statement) for the billets, however, he neglected to turn off the down-cast unit ⁀⁀ Statement). The billet continued to be lowered into the tank at a rate of approximately 4 inches per minute. The billet had been lowered enough so that when molten metal was introduced into the cooling center, the side walls reheated and did not have the normal support of the mold depth which is 15 inches. The walls of the south billet bulged outward (Photo's Roll 9), finding a weak point in which the molten metal was able to penetrate the billet wall, reaching the outside part of the billet. The molten metal hit the spray ring which caused the contact with the water and thereby caused the violent reaction between the two.

- The company has no written procedures for any of the casting processes, relying on caster experience instead.

- The company did not adequately conduct a Job Hazard analysis of this work and subsequently has no safe guards in place for the possibility of problems due to malfunction of the machinery and/or operator error and/or misjudgment. The company is not adequately prepared for emergencies such as molten metal contacting water.

- The company has inadequate housekeeping requirements for the casting shop. During the event of an explosion, a dust cloud was created and it was determined to have hampered the attempt to find the injured worker and created a source of significant concern for the ambulance crews safety and health.

Enclosure #2
OSHA Photographs





















**forensic engineering**

*Accident, fire and failure investigation*

Michael E. Shanok, PE
Gilbert E. Nicholls, PE

100 Hinman Street ■ Cheshire, Connecticut 06410-2546
203-699-9137 ■ Fax: 203-2727512  www.foreng.com

Curriculum Vitae
*Michael E. Shanok, PE*

## *Education and background*

**Electrical, Mechanical and Structural Engineer**; Principal of a consulting engineering firm in its 27th year of operation, offering accident investigation / analysis / reconstruction, safety auditing and training and emergency trouble-shooting services.  More than thirty years of staff and managerial engineering experience including electric utilities, plastics, rubber, ferrous and non-ferrous metal manufacturing industries. Performed assignments in more than half the states of the Union and four foreign countries.

- **B.S. - U.S. Naval Academy, 1960**; Mechanical/Electrical Engineering & Naval Science

- More than 2,500 hours of continuing education in engineering, advanced mathematics, safety, computer science, fire cause & origin analysis, motor vehicle accident reconstruction.

- **Registered Professional Engineer**, Connecticut and Massachusetts

- Trained and accredited by OSHA as an **Authorized Outreach instructor** for general industry and construction safety

- Accredited by CT Dept. Of Education and the American Institute of Architects as a **provider of Continuing Education Units** (CEU's) for safety training.

- American Society of Safety Engineers 1989 Region XI (New England/Eastern New York state) **"Safety Professional of the Year"**

## *Previous Positions*

1972 - 1973:  Senior Engineer, Services & Utilities, **General Products div. B.F. Goodrich Co.**, Shelton, CT.

1970 - 1972:  Plant Engineer, Brass Rolling Mill, div. **The Miller Co.**, Meriden, CT.

1967 - 1970:  Project Manager, **Farrel Co., div. USM**, Process Engineering Div., Ansonia, CT.

1965 - 1966:   Electric generating station Asst. Supervisor, **United Illuminating Co.**,  Bridgeport, CT.

1960 - 1964:  Line Officer, **U.S. Navy**; Active duty included aviation, MAAG, Cruiser & Destroyer billets (Ready Reservist following active duty, until June, 1990)

## *Experience*

Industrial manufacturing process layout, mechanical, electrical & structural design, project management; Supervision of industrial operations, safety, troubleshooting, maintenance and repair; Construction supervision/management and new facility startup; Air, water and noise pollution control; Hazardous materials and waste management; Construction and general industry OSHA compliance; Fire loss cause and origin analysis; Fuel and explosive engineering & safety; Energy management and conservation; Instructor for safety, computer programming and energy management continuing education programs.

## *Professional Activities*

**National Society of Professional Engineers** Past President New Haven, CT Chapter • **American Society for Testing & Materials** Former First Vice-Chairman and currently a member of E-34 Main Committee on Occupational Health & Safety, member Committee F-8 on Sports Equipment and Facilities • **Society of Automotive Engineers** former Transportation Section Chairman, So. New England Section • **American Society of Safety Engineers** former National Delegate • **American National Standards Institute** Served on various standards-writing committees • **American Arbitration Association** served in four arbitrations • **National Safety Council** • **National Fire Protection Association** • **National Association of Professional Accident Reconstruction Specialists** • Affiliate of **Building Officials and Code Administrators, International** • Session Chairman for two national engineering Conferences • Authored numerous trade journal articles on safety and engineering subjects • Contributing editor to *Safety Management* newsletter (Aspen Publishers) and two technical handbooks published by the American Society of Safety Engineers , *ASSE Safety Refresher Guide* and *Risk Management Correspondence Course* • OSHA trained and authorized Outreach Safety seminar instructor • Lectured to numerous business, civic and professional clubs and organizations.

## *Automotive Background*

Former motocross and formula auto competition driver and maintenance crewman. • training includes: accident analysis/reconstruction; defensive driving; gasoline, diesel and gas turbine engine and transmission design & technology and developmental testing of wankel and gas turbine automotive engines, hydraulic, air, mechanical and electronic anti-lock (ABS) brake system design & technology for trucks and automobiles; occupant seat belt and air-bag (SRS) restraint design and occupant kinematics during a collision; diesel truck operation and mechanics. • Previous military and industrial duties included responsibility for fleet auto and truck maintenance and training; Conducted many auto, truck, motorcycle and off-road accident reconstruction/analysis assignments. • Performed large scale motorcycle safety evaluations while on active duty training at U.S. Naval Safety Center • Participated in and managed design and start-up of a number of automotive tire manufacturing facilities.

Rev 2/03



**forensic engineering.**

Testimony by Michael E. Shanok, PE at trials,
hearings and depositions, from 7/28/99 to 7/28/03

| Date | Job # | Client | Assignment | Docket # | T/D/H |
|------|-------|--------|-----------|----------|-------|
| /30/1999 | 99168 | Lasala Walsh & Wicklow | Vece / Stop & Shop | CV-95-0374678 S | D |
| /12/1999 | 97164 | Bercury McCarthy & Blake | Bonessi / Ford | 397CV02256(JBA) | D |
| /1/1999 | 96025 | Spodnick | Walsh / Elrac | CV-97-0340743 S | D |
| /7/1999 | 99167 | Furey & Donovan | Simmonds / Metro Taxi (Muhamed) | CV-95-0371681 S | H |
| /9/1999 | 98200 | Suisman Shapiro | Wagner / Clark | CV-91-0115288 S | T |
| /29/1999 | 99188 | Adelman Hirsch | Griffin / Stokes | CV-95-0326237-S | D |
| 0/5/1999 | 97057 | Philpot | Caesar / General Motors | CV-95-0555472 S | D |
| 0/27/1999 | 98213 | Sack Spector | Lanzieri / Sylvan | 3:98CV2535(JBA) | D |
| 2/28/1999 | 95199 | Harrington & Forgione | BAC / Blakeslee Prestress | CV98-0407564 S | D |
| /14/2000 | 97165 | Harrington & Forgione | Warren / Blakeslee | CV 98-0145401 S | T |
| /19/2000 | 96217 | Wiggin & Dana | Weissman / Norwalk Tech. College | CT-17176 | H |
| /20/2000 | 97217 | Cohen & Kessler | Pickell / AWD and DiVivo | CV-95-0320063-S | T |
| /22/2000 | 97213 | Mulroney | Laracuente / Stennett | CV-98-0356319 S | D |
| /23/2000 | 99043 | Updike Kelly | Petrozzi / Ensign – Bickford | CV-97-0574903 S | D |
| | 99226 | Crosby | Sobieraj / Hirtle-Burns | CV-97-0082842 S | D |
| /24/2000 | 98114 | Kerin & Canty | Janssen / Navistar | 399CV00356 (JCH) | D |
| /12/2000 | 99226 | Crosby | Sobieraj / Hirtle-Burns | CV-97-0082842-S | T |
| /19/2000 | MM084 | Cleary | Hayward / Johnson & Johnson | CV-98-0491281 S | D |
| /19/2000 | 99035 | Zagorsky | Buffing / Estlay | CV-00-0069096 | D |
| /2/2000 | 98018 | Jacobs & Jacobs | Nassimos / Pierce-Correll | CV-98-0263066 S | D |
| | 99218 | Cleary | Clady / Clark | CV 99-0078614 S | D |
| /6/2000 | 99038 | Tyler Cooper | Errato / Omni Hotel | CV-99-0432705 S | D |
| /6/2000 | 96115 | Casper & De Toledo | Signore / Milford Ice | CV 96-0154254 | T |
| /7/2000 | 94083 | Moses | Hayward / Pontiac | 19142.97T(NY) | T |
| 0/5/2000 | 97047 | Cohan & Kulawitz | Hennessey / Travelers | CV 98-0332786 S | D |
| | 98117 | Schlessinger & Barbara | Mazzacco / Hudson; Gould | CV 99-0362760 S | D |
| 0/24/2000 | 99265 | Silver | Pernal / Pero | CV-99-0430432-S | D |
| 1/9/2000 | 99011 | Shasha Law Office | McCarthy / Daniels | CV 97-05416355 | D |
| 2/8/2000 | 99080 | Farrell, M | Leary / Lojack | CV 97-0402978 S | D |
| /17/2001 | 97127 | Kinney & Secola | Shandrowski / CT | CV 94-0313509 S | D |
| /18/2001 | 95199 | Harrington & Forgione | BAC / Blakeslee Prestress | CV 98-0407564 S | H |
| /1/2001 | 99204 | Sack Spector | Talbot / Exl. | 3:00CV0801 (GLG) | D |
| /26/2001 | 99077 | Rodie & Connolly | Payne / Perry | CV 98-0351626 S | D |
| /13/2001 | 99203 | Carrano | Grillo / Sanzari | CV-00-0270699-S | D |
| /16/2001 | 98098 | Tremont | Mercurio / McDonald's | CV-98-0419571-S | T |
| /25/2001 | MM127 | Fogarty Cohen | Cypher / Doorly | CV-99-0336527-S | D |
| /30/2001 | 99253 | Merly | Pomianowski / Heck | CV-98-0352331-S | D |
| /3/2001 | 99253 | Merly | Pomianowski / Heck | CV-98-0352331-S | D |
| /9/2001 | 99265 | Silver | Pernal / Pero | CV-99-0430432-S | D |
| /5/2001 | 97034 | Watstein | Fregeau / Dresser | CV-98-049065-S | D |
| /8/2001 | 99219 | Mihaly | Ramierz / International Beauty Design, Inc. | CV-99-0360767-S | D |
| /13/2001 | 97034 | Watstein | Fregeau / Dresser | CV-98-049065-S | D |
| /25/2001 | MM164 | Walsh | Murano / Kanakis | CV-99-0267609-S | H |
| /10/2001 | 98002 | Turney | Haydu / Wang | CV-96-0054777-S | D |
| /23/2001 | 01026 | Ouellette Deganis | Kahn / Makita | 300CV1696(DJS) | D |
| /17/2001 | 97077 | Yudkin Young | Wakeman / Snow | CV-96-0389092S | D |

Testimony by Michael E. Shanok, PE at trials,
hearings and depositions, from 7/28/99 to 7/28/03

| Date | Job # | Client | Assignment | Docket # | T/D/H |
|------|-------|--------|------------|----------|-------|
| /1/2001 | 99191 | Zone & Bernstein | Baer / Stamford | CV-99-171706 S | D |
| /19/2001 | 01094 | Sabatini | Kuzoian / Old Saybrook Country Barn | CV-00-0501052 | D |
| /14/2001 | 99253 | Merly | Pomianowski / Heck | CV-989-0352331-S | T |
| /21/2001 | 01102 | Meuser, Eckenrode & Hayes | Guggenheim / Millar Elevator | CV-00-069748-S | D |
| 16/2002 | 96212 | Ganim | Sanzo / Wood/Chuck | CV-97-0341957-S | D |
| 6/2002 | 96161 | Morehouse | DeJesus / Howell | CV-98-0355805 | T |
| 15/2002 | 01041 | Jacobs & Jacobs | Fahey / CL&P | CV-99-0496633-S | D |
| 18/2002 | 01041 | Jacobs & Jacobs | Fahey / CL&P | CV-99-0496633-S | D |
| | | Jacobs & Jacobs | Fahey / CL&P | CV-99-0496633-S | D |
| 26/2002 | 01025 | Boyle, Morrisey & Campo | MASSPORT / USA Demolition | (MA) C.A. 0004cv0032 | T |
| 26/2002 | 99175 | Watstein | Farrell / Cheshire Shopping Center | CV-00-271659 S | D |
| 8/2002 | 98068 | Kleban & Samor | Sumyk / Success Hills | CV-00-0373413-S | D |
| 29/2002 | 97052 | Casper & de Toledo | Sackman / CT | CV-97-0159227-S | T |
| 4/2002 | 01153 | Barr & LaCava | Paulino / Chiello | CV-97-0329879-S | D |
| 3/2002 | 02053 | Patti | Loomis / Barbee | CV-98-0352068 S | T |
| 5/2002 | 01085 | Jontos & Lotty | DeMarkey / Fratturo | CV-98-0169490-S | D |
| 24/2002 | 02015 | LoRicco | Cuticello / CTB Whitney | CV-01-0276736-S | D |
| 25/2002 | 98190 | Adelman Hirsch | Digiacomo / Lampost Convenience | CV-99-0429860-S | D |
| 14/2002 | 99033 | Varrone | Riebe / Prybylski | CV-98-0352333-S | T |
| 30/2002 | 98135 | Clark | Belcourt / Freihofer | CV-97-0406763-S | D |
| 19/2002 | 01112 | Dilts & Koester | Southwest Rec. / Cust | L-91-01 (NJ) | D |
| 4/2002 | 02024 | Jacobs & Jacobs (mer) | Perkins / Kell | CV-99-0066934S | D |
| 11/2002 | MM170 | Butler Norris Gold | Cheatem / Konover | CV-01-0810495-S | D |
| 28/2002 | 01100 | Guendelsberger | Chuk / Honda | CV-01-0342266-S | D |
| 30/2002 | 99265 | Kennedy Johnson | Pernal / Pero | CV-99-04300432-S | T |
| 17/2002 | 01011 | Sack Spector | Columbo / Bristol | CV-98-0411649-S | T |
| 8/2003 | 02078 | Eisenberg Anderson | Russell / State of CT | Claim No. 18432 | D |
| 13/2003 | 01121 | Cashman | Guerrera / Ryder; Gelo | CV-00-445937-S | D |
| 21/2003 | 03003 | Toro & Pinciaro | Jordyn / Gometz | CV-00-0092931-S | D |
| 24/2003 | 01103 | McGrail Carroll | Rosadini / Hadvab | | T |
| 3/2003 | 02135 | Sabatini | Kenworthy / Glen Oaks Condo. | CV-02-0515018 | D |
| 14/2003 | 98183 | Tooher & Wocl | Ceci / Mobil Mart | CV-96-0140004-S | D |
| 19/2003 | 02129 | Morrison Mahoney | Shelby Ins. / Penn Warehouse | CV-01-0075918-S | D |
| 21/2003 | 02121 | Koskoff | Martucci / Carlisle | CV-99-0367431-S | D |
| 28/2003 | 02135 | Sabatini | Kenworthy / Glen Oaks Condo. | CV-02-0515018-S | T |
| 21/2003 | 02021 | Sette & Bonadies | Patel / Hacker; Allied School of Health | CV-99-0424954-S | D |
| 9/2003 | 01015 | Jacobs & Jacobs | Handy / Bailey Roofing | CV00-0165021-S | D |
| 2/2003 | MM146 | Blank & Blank | Landrau / McDillon Holdings | CV01-0383323-S | H |
| 16/2003 | 03041 | Moore O'Brien Jacques & Yelenak | Bertin / Bertin | CV-99-0154375-S | D |
| 24/2003 | 03041 | Moore O'Brien Jacques & Yelenak | Bertin / Bertin | CV-99-0154375-S | D |

Testimony by Michael E. Shanok, PE at trials,
hearings and depositions, from 7/28/99 to 7/28/03

| Date | Job # | Client | Assignment | Docket # | T/D/H |
|------|-------|--------|------------|----------|-------|
| /11/2003 | 02129 | Morrison Mahoney | Shelby Ins. / Penn Warehouse | CV-00-0073836-S | T |

**Listing of publications and lectures by Michael E. Shanok, PE
subsequent to July, 1993**

***Practical Mathematics*** section of **Certified Safety Professional Exam
Refresher Guide**, American Society of Safety Engineers, 1991 & 1994 editions

**OSHA Safety Regulations for Confined Spaces**, Presentation to ASSE
Professional Development Conference, 6/94

***Practical Mathematics*** section of **Certified Risk Manager's Exam Preparation
Guide**, American Society of Safety Engineers, 1995 edition

**Three-day General Industry Safety & Health Training**, a 16-hour training
program which has been presented approximately twice annually, between 1988 and
1996

**OSHA Construction Industry Outreach**, a 10-hour training program which has
been presented approximately three times annually, since 1992

**OSHA General Industry Outreach**, a 10-hour training program which has been
presented approximately four times annually, since 1993

**How to Supercharge Your Safety Committee**, a six-hour training program which
has been presented three times annually, since 1998

**OSHA Laboratory Chemical Safety Standard**, an Internet training program,
comparable to a 10-hour seminar, which opened on October 10, 1999 by the University
of Toledo, in cooperation with UOL Publishing and ConnSafe

**Preventing Violence in the Workplace**, a three-hour seminar based upon NIOSH
research and OSHA doctrine, first presented in May, 1999

**Home Office Workplace Safety**, a five-hour seminar on home office safety issues,
presented to employers of telecommuting employees, June, 2000

**Motivating Supervisors**, *Safety Management* (a monthly newsletter published by
the Bureau of Business Practice), February, 1999

**OSHA's Proposed Ergonomics Standard** , *CT Business Magazine*, Dec, 2000