**EXHIBIT B**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WILLIE SANDERS            :      CIVIL ACTION NO.
                                         3:02 CV 498 (WWE)

     Plaintiff                :

V.                                :

FIRELINE, INC.               :

     Defendant             :      DECEMBER 30, 2002

## PLAINTIFF'S DISCLOSURE OF EXPERT WITNESSES

The plaintiff, Willie Sanders, makes the following disclosure of expert witnesses:

The plaintiff will call as expert witnesses all of his treating physicians.   Specifically, the

plaintiff will call:

1.  Ken Yanagisawa, M.D., F.A.C.S., LLC
    Southern New England Ear, Nose, Throat
    98 York Street
    New Haven, CT 06511

Dr. Yanagisawa will testify in accordance with the medical records previously disclosed

to defense counsel.

2.  Walter E. Pleban, M.D.
    1817 Black Rock Turnpike, #6
    Fairfield, CT 06432

Dr. Pleban will testify in accordance with the medical records previously disclosed to

defense counsel.

3.  The plaintiff will call as expert witnesses any and all healthcare providers set forth in the records and reports of Bridgeport Hospital.

4.  Michael Shanok, P.E.
    Forensic Engineering, PC
    100 Hinman Street
    Cheshire, CT 06410

Mr. Shanok will testify concerning his examination of a mold/cup which is the subject of this lawsuit.  He will testify concerning the crack or cracks which the mold/cup developed.  He will testify as to how these crack(s) contributed to the events which resulted in the plaintiff's injuries.  He will testify that the mold/cup was not adequate and safe for its intended use and was defectively designed and/or manufactured.  He will further testify that any warnings and instructions for the use of the mold/cup were defective.

The plaintiff reserves the right to supplement his list of expert witnesses as discovery proceeds.

THE PLAINTIFF

BY _____
Robert J. Sweeney
Fed. Bar No. ct06046
EARLY, LUDWICK & SWEENEY, L.L.C.
265 Church Street, 11th Floor
P.O. Box 1866
New Haven, CT 06508-1866
(203) 777-7799

## **CERTIFICATION**

This is to certify that a copy of the foregoing was mailed first-class, postage prepaid, to the following counsel of record this 3⁰ day of December, 2002:

Mark B. Seiger, Esquire
Charles F. Gfeller
Edwards & Angell, LLP
90 State House Square
Hartford, CT 06103

Timothy D. Ward
McGann, Bartlett & Brown
281 Hartford Turnpike #401
Vernon, CT 06606

Robert J. Sweeney

**EXHIBIT C**

Case 3:02-cv-00498-AWT    Document 70-4    Filed 11/29/06    Page 6 of 45

**forensic engineering**

*Accident, fire and failure investigation*

100 Hinman Street ■ Cheshire, Connecticut 06410-2546
203-699-9137 ■ Fax: 203-272-7512  www.foreng.com

**Michael E. Shanok, PE**
**Gilbert E. Nicholls, PE**

Curriculum Vitae
*Michael E. Shanok, PE*

## Education and background

Electrical, Mechanical and Structural Engineer; Principal of a consulting engineering firm in its 27th year of operation, offering accident investigation / analysis / reconstruction, safety auditing and training and emergency trouble-shooting services. More than thirty years of staff and managerial engineering experience including electric utilities, plastics, rubber, ferrous and non-ferrous metal manufacturing industries. Performed assignments in more than half the states of the Union and four foreign countries.

- **B.S. - U.S. Naval Academy, 1960**; Mechanical/Electrical Engineering & Naval Science

- More than 2,500 hours of continuing education in engineering, advanced mathematics, safety, computer science, fire cause & origin analysis, motor vehicle accident reconstruction.

- **Registered Professional Engineer,** Connecticut and Massachusetts

- Trained and accredited by OSHA as an **Authorized Outreach instructor** for general industry and construction safety

- Accredited by CT Dept. Of Education and the American Institute of Architects as a **provider of Continuing Education Units** (CEU's) for safety training.

- American Society of Safety Engineers 1989 Region XI (New England/Eastern New York state) "**Safety Professional of the Year**"

## Previous Positions

1972 - 1973:   Senior Engineer, Services & Utilities, **General Products div. B.F. Goodrich Co.**, Shelton, CT.

1970 - 1972:   Plant Engineer, Brass Rolling Mill, div. **The Miller Co.**, Meriden, CT.

1967 - 1970:   Project Manager, **Farrel Co., div. USM**, Process Engineering Div., Ansonia, CT.

1965 - 1966:   Electric generating station Asst. Supervisor, **United Illuminating Co.**, Bridgeport, CT.

1960 - 1964:   Line Officer, **U.S. Navy;** Active duty included aviation, MAAG, Cruiser & Destroyer billets (Ready Reservist following active duty, until June, 1990)

## Experience

Industrial manufacturing process layout, mechanical, electrical & structural design, project management; supervision of industrial operations, safety, troubleshooting, maintenance and repair; construction supervision/management and new facility startup; air, water and noise pollution control; hazardous materials and waste management; construction and general industry OSHA compliance; fire loss cause and origin analysis; fuel and explosive engineering & safety; energy management and conservation; instructor for safety, computer programming and energy management continuing education programs.

## Professional Activities

**National Society of Professional Engineers.** Life Member, Past President New Haven, CT, Chapter

**American Society for Testing & Materials.** Former First Vice-Chairman and currently a member of E-34 Main Committee on Occupational Health & Safety, Committee F-8 on Sports Equipment and Facilities, Committee E30 on Forensic Sciences, and Committee F24 on Amusement Rides and Devices

**Society of Automotive Engineers.** Former Transportation Section Chairman, So. New England Section

**American Society of Safety Engineers.** Professional member. Former National Delegate

**American National Standards Institute.** Served on various standards-writing committees

**American Arbitration Association.** Served in four arbitrations

**National Safety Council.** Member

**National Fire Protection Association.** Member

**National Association of Professional Accident Reconstruction Specialists.** Member

**International Code Council (formerly BOCA).** Professional member

**National Spa and Pool Association.** Professional member

Session Chairman for two national engineering Conferences.

Authored numerous trade journal articles on safety and engineering subjects.

Contributing editor to *Safety Management* newsletter (Aspen Publishers) and two technical handbooks published by the American Society of Safety Engineers, *ASSE Safety Refresher Guide,* and *Risk Management Correspondence Course.*

Lectured to numerous business, civic and professional clubs and organizations.

## Automotive Background

Former motocross and formula auto competition driver and maintenance crewman. • Training includes: accident analysis/reconstruction; defensive driving; gasoline, diesel and gas turbine engine and transmission design & technology and developmental testing of wankel and gas turbine automotive engines, hydraulic, air, mechanical and electronic anti-lock (ABS) brake system design & technology for trucks and automobiles; occupant seat belt and air-bag (SRS) restraint design and occupant kinematics during a collision; diesel truck operation and mechanics. • Previous military and industrial duties included responsibility for fleet auto and truck maintenance and training; conducted many auto, truck, motorcycle and off-road accident reconstruction/analysis assignments. • Performed large scale motorcycle safety evaluations while on active duty training at U.S. Naval Safety Center • Participated in and managed design and start-up of a number of automotive tire manufacturing facilities.



Rev. 01/06

**forensic engineering**

**EXHIBIT D**

SHAN

1

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT



------------------------------------x

WILLIE SANDERS,                          :

              Plaintiff          :

        VS                       : 3:02CV 498(JBA)

FIRELINE, INC.,                          :

              Defendant          :

------------------------------------x


   Deposition of MICHAEL SHANOK, P.E., taken pursuant to
the Rules of Practice held at the Law Offices of Edwards
& Angell, LLP, 90 State House Square, Hartford, CT,
before Debra A. Chasse, LSR, License No. 00055, a Notary
Public in and for the State of Connecticut, on Monday,
August 11, 2003, at 10:23 a.m.


BEECHER & HORVATH REPORTING ASSOCIATES
73 Millbrook Road
North Haven, CT 06473
(203) 230-0010

BEECHER & HORVATH

12:29:39  1   the refractory industry?

12:29:42  2       A   No.

12:29:49  3       Q   Have you ever done any specific scientific

12:29:53  4   studies with respect to pour cups similar to Exhibits 5

12:29:57  5   and 6 that are used in the refractory industry?

12:30:01  6       A   No.

12:30:02  7       Q   Have you ever worked for a manufacturer that

12:30:08  8   manufactures products similar to Exhibits 5 and 6 that

12:30:11  9   are used in a refractory industry?

12:30:19 10       A   **The answer is yes, but, to be fair to you in**

12:30:24 11   **consultation, that did not involve the design or**

12:30:27 12   **manufacture of that product or a product like it.**

12:30:30 13       Q   So it would be fair to say that you've never been

12:30:34 14   involved in the design or manufacture of a product

12:30:37 15   similar to what's been marked as Exhibits 5 and 6?

12:30:48 16       A   **That's correct.  I'm not -- I'll have to say the**

12:31:01 17   **answer is I don't think so, I'm not sure.  I'd have to**

12:31:04 18   **see the specifications to know whether or not.**

12:31:08 19       Q   Have you ever worked with fused silica before?

12:31:11 20       A   **Yes.**

12:31:13 21       Q   When and where?

12:31:14 22       A   **I was plant engineer of a brass mill at the**

12:31:20 23   **Miller Company.**

12:31:20 24       Q   What was your involvement with fused silica?

**EXHIBIT E**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

WILLIE SANDERS,

               PLAINTIFF,

                      Civil Action
                      No. 3:02 CV 498 (JBA)

        VS

FIRELINE, INC.

              DEFENDANT.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    VOLUME II

CONTINUED DEPOSITION OF MICHAEL SHANOK, P.E., taken
pursuant to the Federal Rules of Civil Procedure,
at the Law Offices of EDWARDS & ANGELL, 90 State
House Square, Hartford, Connecticut, before
Carol J. Beecher, a Registered Professional
Reporter and Notary Public in and for the State
of Connecticut on MONDAY, APRIL 12, 2004 AT
10:00 A.M.

BEECHER & HORVATH
73 MILLBROOK ROAD
NORTH HAVEN, CT.  06473
(203) 23 -0010
FAX (203) 81-3429

1      A  As I sit here, no.

2      Q  Have you ever designed any products

3   involving fused silica?

4      A  No.

5      Q  Have you ever manufactured or been

6   involved in the manufacturing of any products

7   dealing with fused silica?

8      A  I would say the answer to that is no.

9      Q  Have you ever been involved with the

10  designing of any specifications for a product

11  dealing with fused silica?

12     A  To a small extent, yes.

13     Q  Tell us about that.

14     A  When I worked for the Miller Company,

15  some of the tools and furnaces used fused silica.

16     Q  And what was your involvement?

17     A  Simply to make sure that the

18  specifications were properly given, that the

19  products that came back worked properly.

20     Q  Did you have hands-on involvement or were

21  you kind of a project manager?

22     A  Neither.  I was the plant engineer of the

23  brass mill, and I was responsible for the

24  reliability and maintainability of the equipment,

**BEECHER  &  HORVATH**

**MICHAEL SHANOK, P.E., 4/12/04**

1    and it was with that respect that I had

2    involvement.

3        Q  Did you design the specifications?

4        A  I can't say that I designed the

5    specifications.  I had a part in making up the

6    specifications.

7        Q  What part did you have?

8        A  In just determining what the formula was

9    for the liners of the -- in the furnaces and some

10   of the tools that got used with the furnaces.

11       Q  Were the liners made up of or composed of

12   fused silica?

13       A  They weren't 100 percent fused silica.

14   It was a recipe.

15       Q  Do you remember what went into that

16   recipe?

17       A  As I sit here, I can't remember the

18   formula for the product.

19       Q  Do you remember the processes that were

20   used to create the product?

21       A  I have a vague memory, yes.

22       Q  Did you participate in developing the

23   processes to develop the liners?

24       A  No.  Those existed before I got there.

1      Q  As you sit here right now --

2      A  I never developed a formula for any of

3   that material.  Once again, I referred to handbooks

4   that gave that information.

5      Q  What handbooks?

6      A  Oh, I don't recall.

7      Q  Have you ever developed a process that

8   incorporated silica to create a fused silica

9   product?

10      A  No.

11      Q  Have you ever been at a plant where

12   silica was taken and turned into a fused silica

13   product?

14      A  In the process of creating a lining for a

15   furnace, you start off with the unfused material

16   and you build the liner, and then you fuse it.  So,

17   I've been involved to that extent, and it was

18   not -- once again, it was not 100 percent silica

19   that was used.

20      Q  And what was your involvement in those

21   liners, the actual processing of them?

22      A  Simply to monitor what was being done so

23   that it would happen correctly and that it would be

24   durable.

**BEECHER & HORVATH**

i-Page™        **MICHAEL SHANOK, P.E., 4/12/04**

Page 52

1    Q  Did you ever have hands-on experience of

2  taking the silica and fusing it?

3    A  No.  That got done by other people.

4    Q  And have you ever actually ever designed

5  a product that was a fused silica product?

6    A  No.

7    Q  Did you ever do any testing of a fused

8  silica product, performance type testing?

9    A  No.

10    Q  Did you ever do any failure analysis of a

11  fused silica product?

12    A  Yes.

13    Q  How many times?

14    A  I have no idea.  I don't remember how

15  many times, but any time the material cracked or

16  wore too fast, I looked into why it happened

17  because that had to do with the reliability and

18  maintainability of the equipment.

19    Q  So, this would have been the furnace at

20  the Miller Company --

21    A  Yes.

22    Q  -- that you're referring to?

23    A  Yes.

24    Q  And those were furnaces that included

i-Page™          **MICHAEL SHANOK, P.E., 4/12/04**

Page 56

1    of a silica based or fused silica based product?

2        A  I can't remember any other case.

3        Q  And with respect to the Miller Company,

4    what years were you employed there?

5        A  I believe it was 1970 -- I have to look

6    at my CV to be sure I have the right dates.

7        Q  Your CV says --

8        A  1970 to '72.

9        Q  During the time period of 1970 to 1972

10   while you were plant engineer at the Miller

11   Company, on how many occasions would you have

12   conducted the type of failure analysis that you

13   just described for the furnaces?

14       A  Very few.

15       Q  What's your definition of very few?

16       A  Maybe two, perhaps three at the most.

17       Q  Other than your experience at the Miller

18   Company with fused silica, do you have any other

19   hands on experience with that product?

20       A  Not hands on, no.

21       Q  Other than hands on experience with fused

22   silica, what other experiences do you have with it?

23       A  When you say experience with fused

24   silica, I mean I've worked in problem solving in

1   brass mills from time to time and fused silica or

2   let's say modifications. You know, furnace

3   castings have been one of the elements that I had

4   to work with, what I had to understand in order to

5   do my job.

6       Q  First of all, how much work have you done

7   in problem solving in brass mills that would

8   involve fused silica?

9       A  Perhaps maybe about four or five

10  assignments.

11      Q  What would those assignments have

12  entailed?

13      A  In most cases, evaluation of problems in

14  the handling of molten metal, M-O-L-T-E-N.

15          In one case the design of a process that

16  used furnace linings not of 100 percent fused

17  silica, but of a combination of materials that were

18  fused similar to the way silica is fused.

19          That about does it.

20      Q  Those four or five assignments, were

21  those litigations that you were involved in?

22      A  There's only one other furnace failure

23  I've ever been involved in that went to litigation.

24  The rest were industrial troubleshooting.

Page 54 - Page 57

1      A  All of the opinions expressed in this

2  report with the exception of those relating to the

3  nature of the defect which caused the failure of

4  the pour cup are final.

5      Q  But if I understand your report

6  correctly, the blame that you or the fault that you

7  find with Fireline is contained in paragraph 9-A

8  through E, am I correct?

9      A  No.

10     Q  Okay.  Let me do this a little bit

11  differently.  Let's take a look at the first thing

12  you say in paragraph 9.  "The writer examined two

13  exemplar pour cups, one of which had been

14  reportedly used for one pour and the other of which

15  was unused."

16        That's something you state, correct?

17     A  Yes.

18     Q  Okay.  And with respect to the used pour

19  cup, that information came from Willie Sanders?

20     A  Yes.

21     Q  And it would be fair to say you don't

22  know how the pour cup was maintained before the

23  pour; is that correct?

24     A  Yes.

Page 131

1     A  I'll leave it up to Mr. Sweeney to decide

2     which way he prefers.

3          MR. SWEENEY:  I mean I think if it's

4     okay with everybody, maybe if you send it

5     directly to Edwards & Angell.

6          MR. SEIGER:  That's fine.

7          THE WITNESS:  And I'll send a copy

8     to Mr. Sweeney.

9          MR. SWEENEY:  Thanks.

10         THE WITNESS:  I will hold you to

11    your honor not to disseminate it.

12         MR. SEIGER:  It will stay for this

13    case only.

14         THE WITNESS:  Thank you.

15         MR. SEIGER:  At this point Fireline

16    has no further questions of Mr. Shanok.

17         MR. SWEENEY:  I just have a few.

18

19    CROSS-EXAMINATION

20    BY MR. SWEENEY:

21       Q  Mr. Shanok, is it your opinion that the

22    pour cup being used by Willie Sanders at the time

23    of his injuries was defective?

24       A  Yes.

**BEECHER  &  HORVATH**

ti-Page™          **MICHAEL SHANOK, P.E., 4/12/04**

Page 132

1      Q  And that pour cup that was being used by

2    Mr. Sanders at the time of his incident, was it

3    defective in one or more of the following ways that

4    you've set forth in the sub-paragraphs of paragraph

5    9 on page 14 of your report?

6      A  In my opinion it was.

7      Q  And those sub-paragraphs are lettered A

8    through E; is that correct?

9      A  Yes.

10     Q  And are your opinions that you've set

11   forth in your report and that you've testified to

12   both today and a few months ago, are those opinions

13   final based upon the information and the

14   investigation undertaken to date?

15     A  Yes.

16     Q  And is it your opinion that the cause of

17   the failure of the pour cup that Mr. Sanders was

18   using at the time of his injuries are one or more

19   of the sub-paragraphs set forth in paragraph 9 at

20   page 14 of your report?

21         MR. SEIGER:  Objection as to form.

22         MR. SWEENEY:  You can answer.

23     A  Yes.

24     Q  Is it also your opinion that the

1    defendant Fireline knew or should have known based

2    upon reasonable investigation that these pour cups

3    were failing?

4            MR. SEIGER: Objection as to form.

5        A  Yes.

6        Q  And based upon your conversations with

7    Mr. Joseph Walsh and Mr. Willie Sanders, is it your

8    opinion that Fireline failed to adequately warn

9    workers in the position of Mr. Sanders of the

10   potential failure of these pour cups?

11           MR. SEIGER: Objection as to form.

12       A  Yes.

13       Q  And is it your opinion that that failure

14   to warn was a substantial causal factor in the

15   injuries sustained by Mr. Sanders?

16           MR. SEIGER: Objection as to form.

17       A  Yes.

18       Q  Mr. Shanok, is it standard foundry

19   industry practice to drop a pour cup on the floor

20   prior to using it in a pour?

21           MR. SEIGER: Objection as to form.

22       A  No.

23       Q  And by the way, you've already testified

24   as to your experience in the foundry industry; is

## WILLIE SANDERS VS FIRELINE, INC.    Multi

Page 134

1    that correct?

2        A  Yes, sir.

3        Q  Is it standard foundry industry practice

4    to hit a pour cup with a hammer prior to using it

5    in a pour?

6            MR. SEIGER:  Objection as to form.

7        A  No.

8        Q  Based upon your training and experience

9    in the industry, is it standard foundry industry

10   procedure to handle pour cups such as those used by

11   Mr. Sanders with appropriate care?

12           MR. SEIGER:  Objection as to form.

13       A  Yes.

14       Q  Also based upon your training and

15   experience in the foundry industry, is it standard

16   foundry practice to calibrate as to temperature the

17   furnaces used in pours on a regular basis?

18           MR. SEIGER:  Objection as to form.

19       A  Yes.

20       Q  And is that something that's important in

21   terms of pouring the appropriate -- producing the

22   appropriate metals?

23       A  Very important.

24           MR. SWEENEY:  I think that's all I

EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

COPY

WILLIE SANDERS,                          \*

              PLAINTIFF,   \*       Civil Action

                      \*   No. 3:02 CV 498 (AWT)

        VS                       \*

FIRELINE, INC.                           \*

             DEFENDANT.   \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF JAMES E. LINDSEY, JR., taken
pursuant to the Federal Rules of Civil Procedure, at
the Law Offices of EDWARDS, ANGELL, PALMER & DODGE,
90 State House Square, Hartford, Connecticut, before
Carol J. Beecher, a Registered Professional Reporter
and Notary Public in and for the State of Connecticut
on FRIDAY, MARCH 10, 2006 AT 10:10 A.M.

BEECHER & HORVATH
73 MILLBROOK ROAD
NORTH HAVEN, CT.  06473
(203) 230-0010
FAX (203) 281-3429

24

```
1          A     Or with the torch.

2          Q     Do you recall anybody ever telling you

3    that the cups should only be used one time?

4          A     No.

5          Q     Do you know whether Ansonia

6    Copper & Brass was ever told that by anybody?

7          A     I have no idea.

8          Q     Prior to receiving the papers in the mail

9    from our office to have you come in here today, had

10   you ever heard of Fireline, Incorporated?

11         A     Yes.

12         Q     How had you heard of Fireline?

13         A     Through the vendor, Peter -- I forgot

14   what his last name is.  He used to come in regular.

15   If I had a problem with cups or anything, all I

16   would have to do is call him, and he would come in.

17         Q     He was a distributor of the cups?

18         A     Yes.

19         Q     Did you ever have problems with the cups?

20         A     There were complaints that they were

21   cracking.  Okay.  Whenever there was a complaint

22   like that, I would go or someone else would go and

23   check the cups to make sure.  We'd call Pete in and

24   show Pete whatever the problem was, what they were
```

**EXHIBIT G**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

COPY

```
* * * * * * * * * * * * * * *
                                    *
WILLIE SANDERS,
                                    *
              PLAINTIFF,            *
                                        Civil Action
         VS                         *   No. 3:02 CV 498(AWT)

FIRELINE, INC.                      *

              DEFENDANT.            *

* * * * * * * * * * * * * * *
```

        DEPOSITION OF BECIR VINCA, taken pursuant
to the Federal Rules of Civil Procedure at the Law
Offices of EDWARDS ANGELL PALMER & DODGE,
90 State House Square, Hartford, Connecticut,
before Carol J. Beecher, a Registered Professional
Reporter and Notary Public in and for the State
of Connecticut on TUESDAY, MARCH 7, 2006 AT
2:45 P.M.

BEECHER & HORVATH
73 MILLBROOK ROAD
NORTH HAVEN, CT.  06473
(203) 230-0010
FAX (203) 281-3429

1

2    CROSS-EXAMINATION

3    BY MR. SWEENEY:

4         Q    I just have a couple.

5         A    Okay.

6         Q    The brand new cups, where are they kept?

7         A    Oh, they keep them in a separate room, in

8    the back.

9         Q    Is it the same room now as it was back

10   when Willie got hurt?

11        A    Yeah, I think it's the same room.

12        Q    The brand new cups, what are they kept

13   in?  Are they kept in a box?

14        A    No.  They take it off from the box and

15   they put them like on a table like this

16   (indicating).

17        Q    Now, when you take a brand new cup to

18   examine it or look at it, are you looking to see if

19   there are any cracks?

20        A    Yeah, you gotta look.  You gotta look

21   because if you got cracks, they break up right

22   away.

23             MR. SWEENEY:  That's all I have.

24

EXHIBIT H

1



UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

- - - - - - - - - - - -x
WILLIE SANDERS,                :
      Plaintiff,        :    Civil Action Number
                  :    3:02CV498(AWT)
      vs.               :
                  :
FIRELINE, INC.,                :
      Defendant.        :    June 5, 2006
- - - - - - - - - - - -x

DEPOSITION OF RAY NUNLEY

Taken before Ellen Szamier, LSR #162, Court
Reporter and Notary Public within and for the
State of Connecticut, pursuant to Notice and
the Connecticut Practice Book, at the offices
of Edwards, Angell, Palmer & Dodge, LLP,
90 State House Square, Hartford, Connecticut,
on Monday, June 5, 2006, commencing at 9:57 a.m.

BEECHER & HORVATH
REPORTING ASSOCIATES
73 Millbrook Road
North Haven, Connecticut 06473
(203) 230-0010
Fax (203) 281-3429

BEECHER & HORVATH

1  A  What happens is is it's not cooling

2 properly, and you can have an explosion.  The metal

3 will actually -- the billet can get so hot that it

4 will leak out because it's not cooling properly, which

5 would then cause the explosion.

6  Q  Now, we've heard a term used by a lot of

7 different casters and supervisors and foremen.  The

8 term is "leak-out."

9    Is that a leak-out, what you just described?

10  A  Exactly.

11  Q  Can anything else besides too fast of a pour

12 rate cause a leak-out?

13  A  Yeah.

14  Q  What else?

15  A  Broken cups.  The cups, they disperse the

16 metal on an angle, like towards the sides.  It sprays

17 out like that.  When the cup breaks, all of the metal

18 is going straight down, which doesn't cool properly

19 and can cause a leak-out.

20  Q  Now, the cups at Ansonia Copper & Brass are

21 used -- well, do you keep them heated between uses?

22  A  Yes.  I do.  I do.

23  Q  And you currently do that?

24  A  I do.  It's not a normal practice, but I do.

BEECHER & HORVATH

**EXHIBIT I**

**1**

UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - x
WILLIE SANDERS,          :
        Plaintiff,       :    Civil Action Number
                         :    3:02CV498(AWT)
        vs.              :
                         :
FIRELINE, INC.,          :
        Defendant.       :    June 5, 2006
- - - - - - - - - - - - -x
```

DEPOSITION OF ANTHONY PARENTE

Taken before Ellen Szamier, LSR #162, Court
Reporter and Notary Public within and for the
State of Connecticut, pursuant to Notice and
the Connecticut Practice Book, at the offices
of Edwards, Angell, Palmer & Dodge, LLP,
90 State House Square, Hartford, Connecticut,
on Monday, June 5, 2006, commencing at 1:54 p.m.

BEECHER & HORVATH
REPORTING ASSOCIATES
73 Millbrook Road
North Haven, Connecticut 06473
(203) 230-0010
Fax (203) 281-3429

BEECHER & HORVATH

**3**

S T I P U L A T I O N S

**1**



1    Q    When the casters would keep the cups warm
2    between uses or heat them up prior to use, did they
3    have any way of measuring the temperature at which
4    they were heating the cups?
5    A    No.
6    Q    Have you ever met anybody from Fireline?
7    A    I don't think so.  Now, I know Pete Quigley
8    is a representative of theirs.  I know he came in with
9    people, but I'm not sure if they were -- you know, I
10   can't remember if they were a Fireline guy or if they
11   were just somebody who worked with Pete.
12   Q    How many times have you met Pete Quigley?
13   A    I want to say three, four times.
14   Q    Do you recall when the first time was?
15   A    Not too long after I took over for Jim.
16   Q    Was it in response to Willie's incident?
17   A    Not in response to his incident, but in
18   response to concerns that the casters had about the
19   cups.
20   Q    When was the last time you saw Pete?
21   A    A long, long time ago.
22   Q    More than two years?
23   A    Oh, yeah.
24   Q    What were the concerns that the casters had

28

about the cups?

A    That the cups would crack.

Q    And the casters were coming to you with this complaint?

A    Correct.

Q    What exactly were they saying?

A    That the cups were cracked after they used them the first time and they cooled down.

Q    Based on the comments that the casters made to you, was the cracking always after the first time?

A    That's what it appeared to me.

Q    In other words, as you sit here today, you don't recall any complaints being made to you by casters about cups cracking -- reporting cracked cups prior to use?

A    Correct.  When they took them out of the box, they weren't cracked.

Q    Did anybody ever complain to you that the cracking of the cups was affecting the pour?

A    No.

Q    So the casters were telling you that the cups were cracking, but they were not telling you that the cracking was causing any problems with the pours; is that correct?

1          MR. SWEENEY:    No, it's not.  It's a

2    comment I couldn't help making, you

3    know, coming from a long line of union

4    family members.

5    BY MR. GFELLER:

6        Q    Let me ask you this:  Recognizing that the

7    president of the union, in any union, is likely to

8    have certain characteristics --

9        A    Correct.

10        Q    -- separating that out, how does Willie get

11    along with people in the workplace?

12        A    See, in our environment, like, everybody

13    kind of like plays with everybody.  So it's -- there's

14    always that banter going back and forth, and everybody

15    does it there and -- what's acceptable to me --

16    because I could fit right into that, it doesn't phase

17    me in the least, where I know that there's other

18    people that would walk into that that would say aren't

19    you controlling anything around here.

20        Q    Did Pete Quigley ever tell you that the cups

21    should only be used one time?

22        A    No.

23        Q    Do you know whether he ever told anybody at

24    Ansonia Copper & Brass that?

**EXHIBIT J**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

COPY

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

WILLIE SANDERS,                                  \*

                        PLAINTIFF,     \*

                                               Civil Action
                VS                     \*       No. 3:02 CV 498(AWT)

FIRELINE, INC.                                   \*

                DEFENDANT.     \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \*


        DEPOSITION OF ALEXANDER GRAHAM, taken pursuant
to the Federal Rules of Civil Procedure at the Law
Offices of EDWARDS ANGELL PALMER & DODGE,
90 State House Square, Hartford, Connecticut,
before Carol J. Beecher, a Registered Professional
Reporter and Notary Public in and for the State
of Connecticut on TUESDAY, MARCH 7, 2006 AT
1:00 P.M.


                BEECHER & HORVATH
                73 MILLBROOK ROAD
        NORTH HAVEN, CT.    06473
                (203) 230-0010
                FAX (203) 281-3429

54

1        the cups when they were used for the 1450 pour?

2            A    I notice sometime they come out with a

3        little hairline crack on them, and they was

4        complaining about the cups getting the hairline

5        cracks.  I told them, I said "Myself, I'll make my

6        own cups if I'm pouring them things."

7            Q    So, your opinion as the supervisor in

8        around February of 1999 was that the ceramic cups

9        in use were not adequate for a 1450 pour?

10                MR. GFELLER:  Objection.

11           A    I don't think so.

12           Q    And why didn't you think so?

13           A    I think -- ceramic is very brittle, very

14       brittle, and if -- I don't know.  If it's not cured

15       right, seems like it will crack.

16           Q    And would you describe the 1450 pour as

17       the "most dangerous pour" that was being done in

18       1999?

19           A    Yes, and it still is.

20           Q    And you noticed and people under your

21       supervision noticed that hairline cracks would

22       appear in the cups after they were used in the 1450

23       pour; is that correct?

24           A    Yes.


                    BEECHER  &  HORVATH

55

Q    And that is after a single use?

A    Yes.

Q    In February of 1999, did you direct the
people that you supervised to use a new cup if a
1450 pour was going to be made?

A    Well, I always told them to check the
cups.  You know, like I say, check, double-check.

When I came there, they was using those
ceramic cups, and they was saying they was using
them over and over again.  I shook my head.
Because we had -- like I said, we had the graphite
cups.  You can take a graphite cup and hit it on
the table, won't nothing happen.  You take a
ceramic cup, hit it on the table, it will break up.

Maybe I was old-fashioned or whatever,
but sometimes old are better than the new.

Q    What is your opinion as to what would
occur if you used a cup with a hairline crack in a
1450 pour?

A    I think the bottom would fall out of it.

Q    When you heard or observed Mr. Sanders,
you think, tell Tony that the cup should only be
used once --

A    Well, you see --


                BEECHER   &   HORVATH

Q      -- was that before he was hurt?

A      Yes, because they was having problems
with those cups.

Q      Who was having problems with the cups?

A      All the casters, they was complaining
about them.

Q      Why were they complaining about them?

A      Because they was cracking.

Q      And that included your casters as well on
your shift?

A      Yes.

Q      And casters on other shifts?

A      I've seen casters pick up a brand new
cup, look at it, spin it around, check it out, make
sure it's all right.

Q      Have you ever seen a situation where a
caster picked up a new cup and saw a crack in the
cup?

A      Yes, I have.

Q      And that's a cup that had not been used
before?

A      Right.

Q      And did you see that occur prior to
Willie's injury?

**EXHIBIT K**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    *Condensed Transcript & Index*

WILLIE SANDERS,                          \*

              PLAINTIFF,    \*

                                    CIVIL NO.

          VS                     \*    3:02 CV 498 (WWE)

FIRELINE, INC.                           \*

              DEFENDANT.   \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


DEPOSITION OF WILLIE SANDERS, taken
pursuant to the Federal Rules of Civil Procedure,
at the law offices of EDWARDS & ANGELL, 90 State
House Square, Hartford, Connecticut, before
Carol J. Beecher, a Registered Professional
Reporter and Notary Public in and for the State
of Connecticut on TUESDAY, APRIL 8, 2003 AT
10:10 A.M.


BEECHER & HORVATH
73 MILLBROOK ROAD
NORTH HAVEN, CT.  06473
(203) 230-0010
FAX (203) 281-3429

1    MR. GFELLER:  Are you telling him

2    not to answer my question?

3        MR. SWEENEY:  No, I am not.

4        THE WITNESS:  You want to -- because

5    I forgot.

6

7    BY MR. GFELLER:

8    Q  I'm just saying you told me how you

9    believe this accident happened.  Is there any other

10   scenario that could explain how this happened?

11   A  My belief, if the bottom of that cup,

12   what I seen came apart, nothing else could have

13   happened over there.  My casting all these years,

14   if that cup come apart, you definitely going to

15   have an explosion, no doubt about it.

16   Q  But there could be other ways that you

17   could end up with an explosion in this situation as

18   well, correct?

19   A  It could be -- yeah, a lot of different

20   things.  You know, furnace blowing up.  It could be

21   a lot, but in casting, a normal casting day, and

22   what I seen, that's the only thing that could have

23   happened in this case, you know.  You could have

24   explosion for wet scrap going into the furnace, a

**BEECHER & HORVATH**