UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

------------------------------x
                              :
WILLIE SANDERS,               :
                              :
    Plaintiff,                :
                              :
v.                            : Civil No. 3:02CV00498(AWT)
                              :
FIRELINE, INC.,               :
                              :
    Defendant.                :
                              :
------------------------------x

## RULING ON MOTIONS FOR RECONSIDERATION

Plaintiff Willie Sanders ("Sanders") has moved for reconsideration of the court's rulings granting the Defendant's Motion to Preclude Expert Testimony and the Defendant's Motion for Summary Judgment. (See Ruling on Pending Motions, Doc. No. 75). For the reasons set forth below, the motions for reconsideration are being denied.

### I. FACTUAL BACKGROUND

The defendant is an Ohio company that manufactures and sells pour cups made of fused silica for use in the metal casting process. At the time of the events that gave rise to the complaint, Ansonia Copper & Brass, Inc. ("AC&B"), a foundry that manufactures wires and rods, used the defendant's pour cups in its manufacturing process. As part of this process at AC&B, metal casters pour molten metal into molds to create metal billets from which wires and rods are ultimately cut; a billet is

-1-

a long, solid, metal cylinder which, when completed, looks like a small, metal telephone pole. The casting of the metal billets occurs at various casting stations in AC&B's plant.

On February 23, 1999, plaintiff Willie Sanders ("Sanders") was employed by AC&B as a metal caster, operating casting Station No. 4. The plaintiff contends that at some point during the casting process at Station No. 4, the bottom of the pour cup installed at the south end of the running box failed because it was defective and it broke. He also contends that this failure of the pour cup caused a maldistribution of the molten metal within the billet mold, such that the molten metal collected at the center of the mold rather than the outer portion as intended. The plaintiff further contends that the pooling of the molten metal caused the billet to leak, which resulted in molten metal leaving the billet and entering the cooling tank, and that when the leaked molten metal came into contact with the water in the cooling tank, a flash explosion occurred. As a result of the flash explosion, the plaintiff suffered severe burns.

Shortly after the incident, the local office of the Occupational Safety Hazard Administration ("OSHA") visited the AC&B plant to investigate the explosion and to conduct a plain view assessment of any hazards. OSHA prepared a report (the "OSHA Report"). (See Def.'s Mem. (Doc. No. 58), Ex. B., Attach. 1). The OSHA inspectors conducted an examination of the

facility, interviews with witnesses, and extensive testing of the billets involved in the incident. Their findings included the following:

> Based on the investigation, it appears that the caster began the shrinking process ([Redacted] Statement) for the billets, however he neglected to turn off the down-cast unit ([Redacted] Statement).  The billet continued to be lowered into the tank at a rate of approximately 4 inches per minute.  The billet had been lowered enough so that when molten metal was introduced into the cooling center, the side walls reheated and did not have the normal support of the mold depth which is 15 inches.  The walls of the south billet bulged outward (Photo's Roll 9), finding a weak point in which the molten metal was able to penetrate the billet wall, reaching the outside part of the billet.  The molten metal hit the spray ring which caused the contact with the water and thereby caused the violent reaction between the two.

(Id. at 4).

The plaintiff alleged that the defendant manufactured and sold a defective and unreasonably dangerous pour cup in violation of the Connecticut Products Liability Act (the "CPLA"), Conn. Gen. Stat. § 52-572m, et seq.. The plaintiff argued the defective cup was the direct and proximate cause of his injuries. The plaintiff disclosed Michael E. Shanok as an expert witness whose testimony he intended to offer at trial.  Shanok is an electrical, mechanical, and structural engineer with a Bachelor of Science degree in Mechanical/ Electrical Engineering & Naval Science from the U.S. Naval Academy.  Shanok is the principal of an engineering consulting firm, which offers accident investigation and reconstruction, safety auditing and training,

-3-

and emergency trouble-shooting services. He has more than thirty years of staff and managerial engineering experience relating to electric utilities, plastics, rubber, and ferrous and non-ferrous metal manufacturing industries.

Shanok prepared an expert's report containing his analysis of the alleged failure of the pour cup. In the report, Shanok criticized the OSHA findings and offered an alternative explanation for the incident. Based on measurements of the casting apparatus involved in the incident, taken by OSHA and by the mill superintendent, Joseph Walsh, Shanok concluded that the flash explosion occurred as a result of the failure of the pour cup installed over the south mold in the assembly Sanders was using at the time of his injury. Upon "putting all this dimensional data together," Shanok determined that "the top of the breach in the south billet was immediately below the bottom edge of the mold and the deposit of metal on the north billet was immediately at the tank waterline." (Id., Ex. B at 13). Shanok concluded that "this is consistent with a scenario in which the Sanders incident was precipitated by a sudden redirection of molten metal flow from the mold's sides, toward its bottom, as would occur if the pour cup fractured and separated around its periphery." (Id.). He further opined that the failure occurred as a result of one or more of the following defects in the manufacture or design of the pour cup:

> (a) The pour holes at the bottom of the cup are too large, thereby causing the material between them to be inadequate in volume and strength to withstand the temperatures and forces to which they are subjected during use;
>
> (b) The surfaces of the pour holes are sharply perpendicular to the inner and outer walls of the pour cup, thereby presenting too severe a change in mass and direction of the material, and resulting in its inability to resist the temperatures and forces to which it is subjected;
>
> (c) Fusion of the silica is incomplete within the makeup of the pour cup, resulting in inadequate strength of the cup wall, within the area in which it is reduced in size by the presence of the pour holes;
>
> (d) The walls of the pour cup are too thin at the location where the pour holes are formed, causing them to have inadequate strength to resist the temperatures and forces to which they are subjected;
>
> (e) The characteristics of fused silica give it inadequate strength to withstand the temperatures and forces to which it is subjected without a form of reinforcement.

(Id. at 15). However, Shanok noted that he was "unable to offer a specific cause of the exemplar's failure" because "analysis of the particular cause of the failure would require extensive examination and testing of a large number of other pour cups which have cracked in the same manner." (Id.). Shanok based his opinion on information provided to him from several sources and his own examination of two exemplar pour cups, one of which was cracked at the same location at which other pour cups had failed

in the past.[1]

On April 12, 2004, Shanok provided testimony at a deposition, where he was specifically asked about his conclusions. Shanok testified in pertinent part:

> Q. You haven't gone about developing any tests or actually following through on any tests to validate your hypothesis one way or the other, isn't that correct?
>
> A. Yes
>
> * * *
>
> Q. So you recognize that you could develop the appropriate test to go back and try to validate through scientific methodology your hypotheses which appear in 9-A through E?
>
> A. Yes.
>
> Q. Yet you've never done that?
>
> A. That's right.
>
> Q. So, as you sit here today, you can't offer a specific cause of the failure of the pour cup that Mr. Sanders was using on February 23 of 1999; is that correct?

---

[1] Shanok reviewed the following documents: (1) Listing of entries for Ansonia Copper & Brass posted in establishment search section of OSHA's internet website (both Ansonia and Waterbury facilities); (2) Deposition of Willie Sanders taken April 8, 2003; (3) OSHA case file for Inspection #123280810; (4) An interview with Mr. Sanders on June 20, 2003; (5) Exemplar new and used pour cups manufactured by Fireline, Inc., received at the interview with Mr. Sanders on June 20, 2003; (6) A visit to Ansonia Copper & Brass on July 21, 2003, at which time Mr. Sanders was again interviewed and the operation of furnace number four was observed and photographed during a casting pour; (7) Conversations with the Mill Superintendent, Joseph Walsh, on July 21, 2003 and subsequently by telephone.

>A. I can't -- I cannot offer a specific cause of its failure.
>
>\*\*\*
>
>Q. Are your opinions in paragraph 9 finalized?
>
>A. At this point I cannot call them final opinions.
>
>\*\*\*
>
>Q. So, you would be unable at this point to go into court, raise your right hand in front of the judge, Judge Thompson, and render these opinions to him as the cause?
>
>A. Oh, I'd have no problem rendering him that opinion that one or more of these items is one of the causes.
>
>Q. Is one of the causes. One or more of them, but you don't know which one?
>
>A. As I sit here, I can't tell you.
>
>Q. So, you don't know whether the opinion in paragraph 9-A was the cause of the failure of the pour cup that Mr. Sanders was using on February 23 of 1999; is that correct?
>
>A. That's correct.

(Id., Ex. A at 110-113, 125).

The defendant moved to preclude Shanok's proffered expert testimony and for summary judgment. After oral argument, the court granted both motions.

## II. LEGAL STANDARD

The standard applied when reviewing a motion for reconsideration is set forth in Local Rule 7(c), which reads in relevant part as follows:

>Motions for Reconsideration shall be filed and served

> within ten (10) days of the filing of the decision or order from which relief is sought, and shall be accompanied by a memorandum setting forth concisely the matters or controlling decisions which counsel believes the Court overlooked in the initial decision or order.

D. Conn. Loc. R. Civ. P. 7(c). A motion for reconsideration should be granted only in cases where the "moving party can point to controlling decisions or data that the court overlooked." Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995). The plaintiff may not use a motion for reconsideration to relitigate the merits of a question which has already been decided. See Fleming v. New York Univ., 865 F.2d 478, 484 (2d Cir. 1989).

### III. DISCUSSION

#### A. The Defendant's Motion to Preclude Expert Testimony

In its Ruling on Pending Motions (the "Ruling"), the court concluded that the plaintiff failed to meet his burden of establishing the admissibility of expert testimony by Shanok regarding the cause of the flash explosion that injured Sanders. Federal Rule of Evidence 702 sets forth the standard to be used by the court in evaluating the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.

In Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 597 (1993), the Supreme Court held that Rule 702 "assigns to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." With respect to reliability, the Supreme Court identified four factors that, while not definitive, are ones a district court might consider: "whether a theory or technique has been and could be tested, whether it had been subject to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." Ruggiero v. Warner-Lambert, 424 F.3d 249, 253 (2d Cir. 2005) (citing Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir. 2005)). "When an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." Id. (citing Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002)).

Although the plaintiff's expert has substantial experience as a mechanical and structural engineer, Shanok's responses to questioning during his deposition reflect that he has no experience in the design or manufacture of pour cups. Shanok did not perform a failure analysis in this case, and he has no experience in conducting failure analysis for the product. In

-9-

addition, Shanok's report reflects impermissible reliance on his assessment of the plaintiff's credibility. See Nimely, 414 F.3d at 399. Moreover, his report and his testimony reflect a failure to make any effort to validate through scientific methodology the hypotheses set forth in his report regarding the cause of the accident. (See Def.'s Mot. for Summ. J., Ex. B. at 110, 125). Thus, the court concluded that Shanok's testimony would not be the product of reliable principles and methods.

In his motion for reconsideration, the plaintiff urges the court to convene a Daubert hearing so the plaintiff could present evidence concerning the methodology and credentials of Shanok. However, the plaintiff fails to cite any controlling decisions or data to support its argument that the court erred in rendering its ruling before conducting a Daubert hearing. Instead, the plaintiff relies on decisions from other circuits, which are not binding on this court. Contrary to the suggestion in the plaintiff's memorandum submitted in support of his motion, "[n]othing in Daubert, or any other Supreme Court or Second Circuit case, mandates that the district court hold a Daubert hearing before ruling on the admissibility of expert testimony, even where such ruling is dispositive of a summary judgment motion." Colon ex rel. Molina v. BIC USA, Inc., 199 F.Supp.2d 53, 70-71 (S.D.N.Y. 2001). Although such pre-trial evidentiary hearings may be "highly desirable" in some cases, they are not

required. See Borawick v. Shay, 68 F.3d 597, 608 (2d Cir.1995) (affirming exclusion of expert testimony despite district court's failure to hold pretrial hearing). In this case, the court based its decision to exclude Shanok's testimony on a well-developed factual record, which included his expert report, curriculum vitae, and deposition testimony. The plaintiff fails to point to any new evidence or any compelling reason to convene a Daubert hearing that was not already considered by the court.

## B. The Defendant's Motion for Summary Judgment

The court granted the defendant's motion for summary judgment because this was a case "where the plaintiff must establish causation through expert testimony in order to establish liability under the Connecticut Product Liability Act, Conn. Gen. Stat. § 520572m, et seq." (See Ruling at 1). Under the CPLA, a plaintiff must plead and prove that the defendant's product was defective and that the defect proximately caused his injuries. See Sharp v. Wyatt, Inc., et al., 31 Conn. App. 824, 833 (Conn. App. 1993). "A requisite element of proximate cause is 'cause in fact'." Gold v. Dalkin Shield Claimants Trust, 1998 WL 351456, at *2 (D. Conn. June 15, 1998) (citing Fitzgerald v. Manning, 679 F.2d 341, 348 (4th Cir. 1982)). "Expert testimony with reference to proximate causation is not always required . . . .," for example, when a jury could find "proximate causation from its consideration of . . . the [product] and the plaintiff's

description of how the accident happened." Fane v. Zimmer, Inc., 927 F.2d 124, 131 (2d Cir. 1991). However, an expert opinion as to proximate causation "is required[] when the subject-matter to be inquired about is presumed not to be within common knowledge and experience and when legal inference predominates over statement of fact . . ." Id.

"Questions regarding the existence of a causal link classically are reserved for determination by the trier of fact. Proximate cause 'becomes a question of law only when the mind of a fair and reasonable person could reach only one conclusion . . . .'" Battistoni v. Weatherking Products, Inc., et al., 41 Conn. App. 555, 563 (Conn. App. 1996) (quoting Hall v. Winfrey, 27 Conn. App. 145, 158, cert. denied, 222 Conn. 903 (1992)) (internal citations omitted). Where expert testimony is necessary to establish a causal link and none is proffered, "a reasonable jury [cannot] find that the plaintiff has proved that the defect caused [his] injuries." Gold, 1998 WL 351456, at *3.

To meet his burden of proof as to cause in fact, the plaintiff had to establish a causal link between the defect in the pour cup and his claimed injuries. Specifically, at the summary judgment stage, the plaintiff had the burden of producing evidence that could establish that it is more probable than not that a defective pour cup failed, causing a mal-distribution of molten metal within the billet mold that, in turn, caused the

billet to leak, which resulted in molten metal leaving the billet and entering the cooling tank. Based on the plaintiff's highly technical explanation of how the accident occurred, the court concluded that expert testimony would be required in order to establish causation.

In his motion for reconsideration, the plaintiff argues that the court denied him the opportunity to (1) present evidence and testimony at a Daubert hearing and (2) offer factual evidence that the defendant's product was defective in the absence of expert testimony. The plaintiff contends that genuine issues of material fact remain, including whether the defendant's product was defective and whether the alleged defect resulted in the explosion that caused the plaintiff's injuries.

The court has already addressed the plaintiff's first argument. With respect to the plaintiff's second argument, the plaintiff fails to provide the court with any controlling decisions or data that would alter its initial ruling and merely seeks to re-litigate an issue already decided. Contrary to the plaintiff's assertion, the court did not "automatically" grant summary judgment upon concluding that Shanok's testimony was inadmissible. The court recognized the exceptions to the expert testimony requirement in a products liability action based on a manufacturing or design defect. See, e.g., Debartolo v. Daimler Chrysler Corp., No. X10NNHCV030482725S(CLD), 2005 WL 3665602, at

*4 (Conn. Super. Ct. Dec. 22, 2005); see also Potter v. Chicago Pneumatic Tool Co., 241 Conn. 199, 218 (1997) (under proper circumstances, finder of fact can infer liability from circumstantial evidence). However, the court concluded that this was not a case where the fact of a defect is within the common knowledge of an average juror. Specialized knowledge was needed to determine how the accident occurred. Nor was it a case where there was an absence of other identifiable causes. Indeed, OSHA found that the accident was caused by operator error rather than a product defect. As a result, the court concluded that this was the kind of case in which expert testimony was required to establish causation. See Zuchowicz v. United States, 140 F.3d 381, 389 (2d Cir. 1998); Fane, 927 F.2d at 131-32 (expert testimony required where there were two possible causes of complex injury); Gold, 1998 WL 351456, at *3 (citing Connecticut v. McClary, 207 Conn. 233 (Conn. 1998)).

In support of his motion for reconsideration, the plaintiff cites cases that, almost without exception, appeared in its earlier submissions to the court and that the court fully considered when issuing the Ruling. The two exceptions involve decisions that are not controlling. Thus, the plaintiff has failed to satisfy the standard for a motion for reconsideration on the issue of summary judgment.

**IV. CONCLUSION**

For the reasons set forth above, Plaintiff's Motion for Reconsideration of Order Granting Summary Judgment (Doc. No. 77) and Plaintiff's Motion for Reconsideration (Doc. No. 78) are hereby DENIED.

The Clerk shall close this case.

It is so ordered.

Dated this 17th day of December 2007 at Hartford, Connecticut.

                                        Alvin W. Thompson
                                 United States District Judge